

pri court reporting, llc

prompt. precise. professional.

390 S. Washington Avenue
Columbus, Ohio 43215

**614.460.5000 · 800.229.0675**

fax 614.460.5566

www.priohio.com · pri@priohio.com

1                                                        Volume I
                                                      Pages 1-293
2                      UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF OHIO
3                           EASTERN DIVISION

4                                          No. 2:17-CV-00719

5
   GREAT SOUTHLAND LIMITED,          JUDGE MORRISON
6        Plaintiff,                  MAGISTRATE JUDGE JOLSON

7   vs.

   LANDASH CORPORATION, et al.,
8        Defendant.

9

10

11

12              ZOOM DEPOSITION OF DAVID JACOBY

13                   July 9, 2021 at 9:05

14                    46 West 65th Street

15                 New York, New York 10003

16

17

18

19
        ----------Jennifer A. Doherty, CSR--------------
20           (Morning Session, Pages 1 - 118)

21
        --------- Jacqueline P. Travis, RPR, CSR -------
22           (Afternoon Session, Pages 119 - 291)

23

24

Page 2

```
 1  APPEARANCES:
 2      CARLILE PATCHEN & MURPHY, LLP
        BY: Anthony Betta, Esq.
 3      950 Goodale Boulevard, Suite 200
        Columbus, Ohio 43212
 4      614-628-0768
        abetta@cpmlaw.com
 5      For the Plaintiff.
 6
        VORYS SATER SEYMOUR AND PEASE, LLP
 7      BY: Martha Brewer Motley, Esq.
        52 East Gay Street, P.O. Box 1008
 8      Columbus, Ohio 43216
        614-464-8283
 9      mbmotley@vorys.com
        For the Defendants XPO Logistics, Inc. &
10      XPO Global Forwarding, Inc.
11
12
        Also present:  Thomas Whaling and Katelyn
13      Pontious.
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1               E X H I B I T S
 2  No.        Description              For I.D.
 3  15 Spruce Point Capital Management
       Report.pdf                          148
 4
    16 Article entitled Why XPO Logistics
 5     Appears to be Using a Nearly Identical
       Playbook to United Rentals which was
 6     Charged with Accounting Fraud         156
 7  17 Warehouse Receipt.pdf                 232
 8  18 Complaint Exhibit 14 Inspection.pdf   223
 9  19 Guide to Loss and Damage Claims.pdf   251
10  20 The 4 Most Common Freight Claims Submitted
       by Shippers-Redwood Logistics_Redwood
11     Logistics.pdf                         252
12  21 Expert Report of Gerald Sabino dated
       June 14, 2021                         280
13
14
15
16
17
18
19
20
21
22       **EXHIBITS SENT TO ATTORNEY MOTLEY**
23
24
```

Page 3

```
 1               I N D E X
    Testimony of:                  Direct
 2
    DAVID JACOBY
 3      by Ms. Motley                  5
 4
 5
 6          E X H I B I T S
    No.       Description           For I.D.
 7
    1  Jacoby Opinions on XPO's Activities and
 8     Responsibilities               10
 9  2  Jacoby opinions on the testimony of Bradley
       S. Jacobs as it relates to XPO's
10     Activities and Responsibilities
11  3  Jacoby Rebuttal Expert Report of Gerald
       Sabino
12
    4  LinkedIn Profile of Jacoby        11
13
    5  Home-GDP-a.org                    69
14
    6  Home-David Steven Jacoby          70
15
    7  Education Selector ASCM           89
16
    8  XPO Timeline notes 210531        104
17
    9  XPO Timeline notes 210531a       104
18
    10 XPO Timeline notes 210531 (Desktop-Q8DGU5H's
19     conflicted copy 2021-05-31)      104
20  11 XPO Logistics-Most Corrupt Company  123
21  12 (Not marked)
22  13 Boston Strategies International
       Reviews_Glassdoor.pdf            135
23
    14 Boston Strategies International
24     Interview                        138
```

Page 5

```
 1       P R O C E E D I N G S
 2         DAVID JACOBY, having been duly sworn,
 3  testified as follows:
 4         DIRECT EXAMINATION
 5  BY MS. MOTLEY:
 6    Q.  Good morning, Mr. Jacoby.  We met briefly
 7  off the record.  My name is Martha Motley.  I'm
 8  counsel for the XPO entities.  Thanks for being here
 9  this morning.
10        MS. MOTLEY:  Before we get started, I
11  think there's some stipulations we need to put on
12  the record, namely that the parties consent to the
13  administration of the oath.  Although you're not
14  physically located with the court reporter, you
15  agree that you're under oath as though you were
16  physically located in the same location as you.  Is
17  that consistent with your understanding, Tony?
18        MR. BETTA:  Yes.
19        (Discussion off the record.)
20        MS. MOTLEY:  To further our
21  understanding, the parties are consenting to the
22  remote administration of the oath and are waiving
23  any of the procedural objections related to the
24  same.  Tony, is that consistent with your
```

1 understanding?

2     MR. BETTA: Yes, it is.

3 BY MS. MOTLEY:

4     Q. Mr. Jacoby, I take it you've been deposed

5 before?

6     A. Once, yes.

7     Q. When was that?

8     A. It was roughly 2014. I can't remember.

9 2015, maybe.

10     (Recess taken.)

11 BY MS. MOTLEY:

12     Q. Mr. Jacoby, I apologize for that slight

13 delay. I think you were telling me about the prior

14 time you were deposed. Was that in connection with

15 a personal lawsuit, a business lawsuit, or an expert

16 witness engagement?

17     A. It was an expert witness engagement.

18     Q. You said that was in 2014 or 2015?

19     A. Or 2013. I don't remember. I would have

20 to look back at the dates.

21     Q. Just high level, what was the nature of

22 that litigation?

23     A. It was a trademark infringement case.

24 Yeah, there were disputes about the use of a word as

1 it's used in different industries.

2     Q. What industries did that implicate?

3     A. Energy. Different facets of oil, gas,

4 coal, and power.

5     Q. And what was the nature of the expert

6 opinion that you rendered in that case?

7     A. It had to do with the supply chain and

8 logistics and purchasing and contracting throughout

9 those different industries.

10     Q. What court was that pending in, if you

11 recall?

12     A. I don't remember. I gave the details. I

13 believe I provided the details to Tony.

14     Q. And what law firms were involved in

15 that?

16     A. It was -- just a minute. I could pull

17 that up. I think one was Dwayne Morris.

18     Q. Okay.

19     A. Yeah, I'm pretty sure the law firm that I

20 was working for was Dwayne Morris at the time.

21     Q. Were you an expert for the plaintiff or

22 the defendant?

23     A. The defendant.

24     Q. Did you testify in court? In a

1 deposition? Both? Neither?

2     A. A deposition, I believe. I mean it was a

3 very complicated case. There were some

4 countersuits, I believe. I did not testify in

5 court. I was deposed in a conference room at Dwayne

6 Reed's office.

7     Q. Do you know if your opinion was admitted

8 in the litigation?

9     A. I believe it was.

10     Q. Are you looking at something?

11     A. No, I wasn't. I believe it was and I

12 guess the reason I'm not totally sure is that I

13 believe the case was ultimately settled -- out of

14 court would not be the right way of saying it, but I

15 don't think it went to trial.

16     Q. Understood. Since you've been deposed

17 before, I take it that you understand the rules of

18 depositions, but I would remiss if I didn't remind

19 you.

20         It's important to let each other speak

21 fully without cutting the other off. I'm

22 notoriously terrible at interrupting and I will try

23 my very best not to do that today. If I can get

24 your agreement to do the same?

1     A. Okay.

2     Q. Can I presume if I ask a question and you

3 provide an answer, you understood my question?

4     A. Yes.

5     Q. If you don't understand my question, I'm

6 happy to clarify or rephrase, say it again, just let

7 me know. Okay?

8     A. Okay.

9     Q. Are you under the influence of any drugs

10 or medication that would make it difficult or

11 impossible to provide full and complete testimony

12 today?

13     A. No.

14     Q. If at any time you need a break, please

15 let me know and I'd be happy to do that. The only

16 caveat to that is we need to make sure there's not a

17 question pending. If a question has been asked, you

18 need to answer the question and then we can proceed

19 with a break. Okay?

20     A. Sure.

21     Q. Finally, at no point will I be asking you

22 to divulge attorney-client information. So if there

23 was a question that implicates that and you need to

24 confer with counsel, you're more than able to do

Page 10

1 that, just let me know. Okay?
**2 A. Okay.**
3 Q. Let's start by marking your primary report
4 as Exhibit 1 to this deposition.
5 (Exhibit No. 1 marked for
6 identification.)
7 Q. Do you have a copy of that in front of
8 you?
**9 A. I do, yes.**
10 Q. It indicates you were retained by Great
11 Southland in March of 2021; is that right?
**12 A. I think that's correct.**
13 Q. Have you been retained to consult on any
14 other tire-related cases involving the same Ponzi
15 scheme?
**16 A. No.**
17 Q. Have you had discussions with any other
18 representatives of the other plaintiffs in these
19 cases?
**20 A. No.**
21 Q. And that would be Äbington, Kirby,
22 Southern Star Capital, Lucien Tujague, none of these
23 entities?
**24 A. No.**

Page 11

1 Q. Vecron Exim?
**2 A. No.**
3 Q. Have you been retained to provide expert
4 testimony in connection with a bankruptcy related to
5 the Landash Corporation or Jason Adkins?
**6 A. No.**
7 (Exhibit No. 4 marked for
8 identification.)
9 Q. I would like to start by going through
10 your work history, and I'm going to mark as Exhibit
11 4 your LinkedIn profile which I believe was sent to
12 you. And the title of that document is David Steven
13 Jacoby managing director. Do you have that document
14 in front of you?
**15 A. Yes, I do, yes.**
16 Q. Now, in your LinkedIn profile it indicates
17 that you became the managing director of Boston
18 Scientific in January of 2005. Do you see that on
19 Page 2 of 9?
**20 A. Boston Strategies International.**
21 Q. I'm sorry, Boston Strategies. If we look
22 at your resume and your report, it indicates that
23 you became the president in 1998?
**24 A. Right, yes.**

Page 12

1 Q. And can you explain why your LinkedIn
2 indicates that it's January 2005 and your report
3 indicates it's 1998?
**4 A. Sure. I started a company in 1998 called**
**5 Business Planning Group, and it went through a name**
**6 change to Boston Logistics, and then a name change**
**7 to Boston Strategies International. So I thought it**
**8 was just more effective for communicating on**
**9 LinkedIn to list the whole thing as Boston**
**10 Strategies International.**
11 Q. And if you look at the LinkedIn profile
12 that we've marked as Exhibit 4 -- and I can share a
13 screen if that would be easier. Just let me know.
14 But if you look underneath where it says managing
15 director, it shows strategic market planning
16 commercialization and tech venture development for
17 CBMM?
**18 A. Yeah, I see that.**
19 Q. And it indicates some other companies
20 below that that would have been during the time that
21 your resume indicates that you're the president of
22 BSI?
**23 A. Correct.**
24 Q. I'm just trying to understand the

Page 13

1 significance of these dates and these companies.
**2 A. Yeah. As you can read in the detail of**
**3 each of those, these were engagements performed by**
**4 Boston Strategies International for these companies.**
**5 For example, the first one says as president of**
**6 Boston Strategies International, blah, blah, blah,**
**7 he did this. And the second one said "founded and**
**8 led Boston Strategies limited and serving these**
**9 clients such as."**
**10 So these are intended to give the clear**
**11 idea of the types of clients and work that I do and**
**12 not to -- they're deliberately and explicitly not**
**13 meant to indicate that I had, you know, payroll,**
**14 employee relationship at those companies.**
15 Q. Understood. So if we scroll down your
16 LinkedIn resume, is it fair to say that until we get
17 to A.T. Kearney from 1998 to 1996 you were not
18 employed by any of those entities that were listed
19 in your LinkedIn?
**20 A. Correct, correct.**
21 Q. And in your report you also indicate that
22 you worked for Carlisle Fagan, Gaskin, and Wise,
23 which I understand changed over to Norbridge; is
24 that right?

Page 14

1  A. Correct.

2  Q. And Kearney, Temple, Backer and Sloane

3 changed over to Oliver Wyman; is that right?

4  A. Right.

5  Q. So when I'm looking at your LinkedIn, all

6 of these entities were engagements through those

7 other companies and not your direct employment

8 relationship; is that right?

9  A. That's -- let me correct. That's not

10 completely right. All of these were either

11 engagements through Boston Strategies or through one

12 of those other companies. I did not have any direct

13 relationships, payroll-type relationships with those

14 companies except for a few of them which I think

15 were very minor -- for example, the economist. I

16 may have had a direct relationship with the

17 economist intelligence unit. I don't remember.

18  And some of the very old ones I may have

19 had a direct relationship as well, such as -- I'm

20 not sure Ford France is in there, but that would be

21 a very, very long time ago.

22  Q. I'm sorry, I missed the last one that you

23 said.

24  A. Ford. Is Ford France on there?

Page 15

1  Q. I see a Ford Motor Company from 1983 to

2 1983.

3  A. That might have been direct. That wasn't

4 through a consulting.

5  Q. And were these engagements overlapping

6 each other? In other words, were you completely

7 dedicated to, for example, CSX and Transportation

8 Intermodal and Fiat Chrysler or was there overlap

9 between the time you worked for the two?

10  A. In the vast majority of cases, they were

11 dedicated during those time frames.

12  Q. And is this circumstance similar to like

13 the accounting firms when they have folks come

14 in-house and they physically sit at the location to

15 perform their audits, or did you physically sit at

16 the companies that directly employed you during

17 these times?

18  A. That varies case by case. But I would say

19 that on average, I mean, most of the -- more recent

20 engagements were dedicated but not physically

21 located at the clients'. That depends. That

22 depends. Each one is different. Some of them were

23 I led teams and was on-site for a long time and some

24 of them are desk and remote work leading teams and

Page 16

1 doing work off-site.

2  Q. Let's sort of count back. For Aramco, for

3 example, were you on-site or off-site?

4  A. Both, but mostly off-site.

5  Q. For Vattenfall were you on-site or

6 off-site?

7  A. On-site.

8  Q. And what is the -- I'm not familiar with

9 that company. What do they do?

10  A. Vattenfall?

11  Q. Yes.

12  A. It is the Swedish Power Company, power

13 utility. They're involved in, yeah, power

14 generation.

15  Q. And Cisco, were you on-site or off-site?

16  A. Off-site, and that was through the

17 economist, actually.

18  Q. For US Department of Transportation, were

19 you on-site or off-site?

20  A. Off-site.

21  Q. For Minerals Technologies, Inc., were you

22 on-site or off-site?

23  A. On-site.

24  Q. What does Minerals Technologies, Inc. do,

Page 17

1 although it sounds it might be evident from the

2 name?

3  A. They make different specialty minerals,

4 actually, five multiple divisions. Some of the

5 them -- one of them makes precipitated calcium

6 carbonate. One of them makes custom thermal

7 insulation for refractories that are used in kinals

8 for burning purpose coal and furnaces for industrial

9 use. One of them -- they do some -- they do some

10 mining and some importation of various kinds of

11 minerals and processing them.

12  Q. Were those all five of the divisions you

13 just described?

14  A. There are more divisions. I didn't

15 describe them all.

16  Q. Were any of those divisions a captive on

17 House Logistics Company?

18  A. Not the direct situation of those

19 companies, no.

20  Q. Did they have a captive on-site logistics

21 company?

22  A. They used multiple logistics companies for

23 each of those divisions.

24  Q. When I say captive, I mean, was there a

1 company within the organization that supplied the
2 logistics services to that organization, or did they
3 outsource that to someone like an XPO, FedEx, CSX?
4   **A.   They outsourced those activities.  Most of**
5 **the activity took place outsourced.  I mean,**
6 **off-site and outsourced and delivered between two**
7 **plants by parties that were not on-site.**
8        **They did have some staff that handled**
9 **logistics work, and I was working with those people,**
10 **but they did not by any means do most of the**
11 **logistics themselves.**
12   Q.   Understood.  When we look at SAP, was that
13 on-site or off-site?
14   **A.   That was mostly off-site and then a little**
15 **bit on-site.**
16   Q.   What does SAP do?
17   **A.   It's an enterprise resource planning**
18 **software company.  They make systems that large --**
19 **almost all these other large companies use**
20 **information systems.**
21   Q.   And information systems used in the
22 transportation of logistics industry or otherwise?
23   **A.   They do have logistics, transportation**
24 **manufacturing, and supply chain modules to their**

1 **information systems, yes, and materials management**
2 **as well. So they're used across a wide variety of**
3 **industries.**
4   Q.   And is it fair to say that your consulting
5 work for that entity did not involve advising on the
6 technical aspects of the modules?
7   **A.   No, it's not fair to say that.  It was --**
8 **my work was involved in the technical development of**
9 **some of their supply chain modules.**
10   Q.   What specific experience did you have in
11 connection with transportation logistics modules?
12   **A.   The work for SAP was related primarily to**
13 **the procurement module, insofar as procurement of**
14 **logistics and transportation, yes, but no.**
15   Q.   But not in terms of, you know, the WMS
16 module on the software, you weren't advising on how
17 that should be configured, for example?
18   **A.   No, but I did that for many of these**
19 **companies.**
20   Q.   We'll get to that.  Let me make myself a
21 little note.  For Mercedes-Benz was that on-site or
22 remote?
23   A.   On-site.
24   Q.   In Brazil?

1   A.   Yes.
2   Q.   And the time that you were in Brazil was
3 that all of 2003 and 2004?
4   **A.   Well, I was in Brazil multiple times**
5 **during the early part of my career.  I probably**
6 **wasn't there for the 24 months of 2003 and 2004, but**
7 **I was on-site during at least part of that time**
8 **during those years.**
9   Q.   And the cross-sectional process
10 improvement program that you did work on, did that
11 touch on transportation and logistics issues?
12   **A.   Yes.**
13   Q.   How so?
14   **A.   I was optimizing the process for**
15 **completely knocked down vehicles being imported from**
16 **Malaysia to Brazil.**
17   Q.   When you say "knocked down," what do you
18 mean?
19   **A.   There were vehicles which are the trucks**
20 **and different industrial vehicles which are box.**
21 **All the pieces come in a box.  And then they are**
22 **assembled on the other side.  Instead of importing**
23 **the whole truck or the scraper or the mining**
24 **vehicle, whatever it is, they put all these pieces**

1 **into crates and they ship the crates and the**
2 **assembly, the truck is assembled on the other**
3 **continent.**
4   Q.   And did that shipping consultation involve
5 these freight forwarders?
6   **A.   Yes.**
7   Q.   Who is the freight forwarder, if you
8 recall?
9   **A.   I don't recall.**
10   Q.   And what specifically do you do with
11 regard to the freight forwarding of that engagement?
12   **A.   The work I was doing involved a close look**
13 **at the customs, activities, and the shipping.  So it**
14 **included the shipping, the clearance of the customs,**
15 **the movement through -- through customs and on to**
16 **the, you know, the manufacturing or the assembly**
17 **site and everything connected with it.**
18        **So they've broken it down to different**
19 **flows; the physical flow, the paper flow, the money**
20 **flow, et cetera.  And we were optimizing that to try**
21 **to reduce 30 percent each of the time frame, the**
22 **cost, and the overhead in doing all that.**
23   Q.   So that was looking at high level how to
24 make this more efficient, is that fair?

1     A.  It's not fair to say it was high level.
2  It was very low level.
3     Q.  What do you mean by very low level?
4     A.  The process maps and the flows that we did
5  were the department-specific, like
6  shipment-specific, vehicle-type specific.  It was
7  not a conceptual type project.  It was -- it was
8  very measurable and the client was very quantitative
9  and granular in its approach to everything.  It
10  wouldn't be satisfied with anything high level of
11  conception.
12     Q.  Give me an example of something granular
13  that you advised on that would relate to a freight
14  forwarder.
15     A.  Well, that's one, the minerals technology
16  example.  They used a lot of different transport
17  companies and service providers, and we sent out
18  bids and hired different third-party logistic firms
19  to work for them.
20     Q.  I'm sorry, that was a bad question.
21  Hopping back to the Mercedes engagement.  What
22  specifically with the Mercedes engagement did you do
23  on a granular level related to freight forwarding?
24  Were you looking at bills of lading?  Were you

1  looking at customs clearance?  Where you looking at
2  where customs cleared?  That's what I'm looking for.
3     A.  We looked at the paperwork, the
4  information flow and the documentation requirements
5  for the flow -- the flows, and we were determining
6  whether they could reduce the complexity of the
7  documentation flows.
8     Q.  Specifically what document or types of
9  documents were you looking at?
10     A.  Bills of lading, customs clearance
11  documents, re-shipping documents, and approvals that
12  go from customs to the assembly site, bills of
13  material for the reconstruction of the vehicles, for
14  example.
15     Q.  And to be clear, you were providing your
16  work to Mercedes and not to the freight fowarders
17  involved; is that right?
18     A.  Correct.
19     Q.  So it's fair to say you were not making
20  recommendations to the freight fowarders on how they
21  should change their protocols or their documents; is
22  that fair?
23     A.  That's correct.
24     Q.  And in connection with that engagement,

1  did you review warehouse receipts or inspection
2  reports from the freight forwarder?
3     A.  Yes.
4     Q.  And you can't recall who that freight
5  forwarder was?
6     A.  No, I really can't.  I'm sorry.
7     Q.  What specifically would you have been
8  looking at the warehouse receipts to evaluate?
9     A.  Whether the information was necessary.
10     Q.  What do you mean by that?
11     A.  Well, anything that was not necessary was
12  potential for elimination.  It caused excess cycle
13  time, processing time.  So we were -- our primary
14  objective was making sure that everything got done
15  correctly with the least amount of resources.
16     Q.  Do you recall whether those warehouse
17  receipts would have had the letterhead of the
18  freight forwarder on them?
19     A.  No, I don't.
20     Q.  Can you recall any of the content that
21  would have been on those warehouse receipts?
22     A.  I can't recall as I sit here today.  I
23  might be able to dig some of it up.
24     Q.  Do you recall if those warehouse receipts

1  had terms and conditions on them?
2     A.  Some of them were -- no, I don't.  Some of
3  them were internal and everything was in Portuguese.
4  So I'm trying to recall back a little bit to the
5  specifics of the documents, but no, I don't
6  recall.
7     Q.  (Speaking in Portuguese)
8     A.  (Speaking in Portuguese)
9     Q.  In terms of the warehouse receipts
10  themselves, were they one page or multi pages?
11     A.  I don't recall.
12     Q.  In terms of whether they were issued
13  through a WMS or generated by Mercedes itself, do
14  you recall?
15     A.  I think the answer is neither.  I think
16  they were generated by a different system, a
17  materials management system.
18     Q.  Would that have been the freight forwarder
19  management system or a Mercedes management system?
20     A.  Both.  And I believe they were integrated,
21  because the only way they could actually make sure
22  all those parts were packaged properly and ready for
23  disassembly and reassembly was by having integrated
24  systems.

Page 26

1    Q.  Was this an asset-based freight forwarder
2  or a non-asset-based freight forwarder?
3    A.  Asset-based.
4    Q.  Do you know if in connecting with the
5  freight forwarding they performed other services
6  like kitting, pick and pack, et cetera?
7    A.  They did not.  That was done by Mercedes.
8    Q.  Was this a captive freight forwarder, in
9  other words, simply dedicated to Mercedes?
10   A.  No.
11   Q.  Do you remember where the freight
12 forwarder was based?
13   A.  No.
14   Q.  Did they use one freight forwarder or
15 multiple freight fowarders?
16   A.  For the export of the CKD, completely
17 knocked down vehicles in question, there was one
18 freight forwarder, if I remember correctly.
19   Q.  Was this Intermodal Transport?
20   A.  Yes.  Yes, I mean, by definition it was.
21 There was ground transport on one side, ocean
22 transport in the middle, and ground transport...
23   Q.  Did the freight forwarder own all of those
24 assets, do you know?

Page 27

1    A.  No.
2    Q.  No, you don't know, or no, they did not?
3    A.  I don't think they owned all of them.
4    Q.  Got you.
5    A.  It said based.  I mean, they had some
6  assets.
7    Q.  Some assets but not all of the assets.
8  Some was brokered?
9    A.  Right, right.
10   Q.  And you mentioned that you were in Brazil
11 at other points in your career as well?
12   A.  Yes.
13   Q.  Are you putting your money on Brazil this
14 weekend?
15   A.  This weekend?  I'm sorry, what is this
16 weekend?
17   Q.  Argentina Brazil soccer match.
18   A.  Okay.  I'm not that, but when I was there,
19 safety was a huge concern at that time, so I didn't.
20 But maybe I'll catch it on TV this weekend.  Are
21 you?
22   Q.  It's a big one.  With regard to the next
23 engagement on your LinkedIn, Iron Mountain, were you
24 in-house or remote?

Page 28

1    A.  Well, I think there are a couple other
2  engagements after Mercedes and Brazil before -- I'm
3  sorry, I see it.  Let's see.  I was on-site.
4    Q.  And did that involve the use of a freight
5  forwarder?
6    A.  No.
7    Q.  With regard to the UPS M&A due diligence,
8  were you on-site or remote?
9    A.  On-site.
10   Q.  And what was the nature of your
11 engagement?
12   A.  There were several engagements during that
13 time.  And I should mention there are
14 confidentiality agreements that I signed with UPS,
15 so I'm not sure if what I say here -- is this safe
16 to say it wouldn't violate the confidentiality
17 agreement?
18   Q.  I don't know the answer to that, but we
19 can put this section under seal if you prefer.
20   A.  I mean, it was very relevant to freight
21 forwarding.
22        MS. MOTLEY:  The other option is,
23 Tony, I think you have thirty days to designate
24 portions of the transcript as confidential.  So if

Page 29

1  you need to do that, I don't have an issue with
2  that.
3        MR. BETTA:  Okay, yeah.  David, you
4  and I can discuss your testimony after with regard
5  to this and we can see if we can mark anything
6  confidential.
7        THE WITNESS:  Okay.
8  BY MS. MOTLEY:
9    Q.  So in other words, it wouldn't be filed
10 publicly with the Court.
11   A.  Okay.
12   Q.  So what was the nature of your engagement
13 with UPS that related to freight forwarding?
14   A.  There were several.  One of the
15 engagements was related to the acquisition by UPS of
16 Fritz.  Fritz was a freight forwarder when UPS was
17 going into the freight forwarding business and they
18 bought Fritz.
19   Q.  What specifically did you do?
20   A.  We were looking -- my team was looking at
21 customer -- basically how they use that information
22 to improve the UPS service capability; for example,
23 understanding the information that could be
24 exploited by UPS such as the identity of a consignee

Page 30

1 and the exact location of the shipment and the
2 timing of them.
3        For example, there were a lot of strategy
4 and technical elements to that particular project,
5 but there were other projects too at UPS during that
6 time such as the acquisition of less than truckload
7 freight carrier in the acquisition of a truckload
8 company and one or two more.
9    Q.  Were you part of a due diligence team that
10 was assessing the acquisition?
11    A.  In the case of -- it varied, both.  In the
12 case of Fritz, it was before.  It was due diligence
13 before and during.  In the case of the LTL it was --
14 I'm sorry, it was in the case of Fritz, it was
15 during and after, so it was due post-merger.
16        And in the case of the LTL work, it was
17 pre due diligence, and the case of the truckload it
18 was pre due diligence.
19    Q.  Focusing on the Fritz acquisition, when
20 you say that you did an analysis post-acquisition,
21 what were you analyzing?
22    A.  Integration opportunities, how to
23 integrate Fritz's operations into UPS.
24    Q.  Understood.  As part of that project, did

Page 31

1 you review warehouse receipts?
2    A.  No.
3    Q.  Do you recall if you reviewed inspection
4 reports or scope of work inspection reports?
5    A.  Let me clarify my prior answer.  There
6 were receipts, information in data files, so in that
7 sense, yes.
8    Q.  And I guess my question is a little bit
9 different.  In terms of looking at the documents
10 that Fritz used in its regular course of business,
11 did you look at what warehouse receipt they were
12 using and make recommendations on that, for
13 example?
14    A.  I may have, but I don't recall.
15    Q.  Do you recall any specifics about the
16 warehouse receipts that Fritz was using at that
17 time?
18    A.  No.
19    Q.  Did you review UPS' warehouse receipts?
20    A.  I don't remember the specifics of which
21 documents I looked at during that engagement.
22 Honestly, I've done hundreds of engagements and I
23 looked at lot of paperwork over time, so I can't
24 remember.

Page 32

1    Q.  I'm asking specifically, and it sounds
2 like the answer is no, but do you recall whether you
3 recall any particular characteristics of the UPS
4 warehouse receipts?
5    A.  No, I don't.
6    Q.  Any other parts of your engagement with
7 UPS that related to freight forwarding that we
8 haven't talked about?
9    A.  No.  I did look at lot of warehouse
10 receipts, by the way, for Iron Mountain, the one we
11 just talked about, but I think that's my answer
12 during your question.
13    Q.  Sure, that's helpful.  The warehouse
14 Mountain -- I'm sorry, the Iron Mountain warehouse
15 receipts that you looked at, were those issued by a
16 freight forwarder, LTL, since different?
17    A.  It was -- as far as I recall -- well, Iron
18 Mountain ran its own warehouses, so there were
19 internal receipts.  And then they bought a lot of
20 companies that involved their warehouses in the end.
21 At various stages there were internal receipts or
22 external receipts.
23    Q.  Did you review the external receipts, do
24 you recall?

Page 33

1    A.  I don't remember.  I just don't remember
2 which receipts.
3    Q.  And is it fair to say if you don't
4 remember the specific receipts, you can't recall
5 specific characteristics of the receipts?
6    A.  No.
7    Q.  You don't remember specific
8 characteristics of the receipts?
9    A.  No.  I mean, I've seen so many receipts
10 for lots and lots of engagements.  I see them every
11 day, so I can think of dozens of engagements where I
12 looked at them.  But if you ask me specific
13 warehouse receipts for specific engagements, it's
14 kind of -- I don't remember specific documents and
15 how they looked through that.  I could find it out,
16 but I don't remember.
17    Q.  In connection with this engagement did you
18 make any effort to go back to look at any of the
19 warehouse receipts that you would have reviewed in
20 your career?
21    A.  No, I didn't really.  I know from my
22 accumulative experience I really didn't feel the
23 need to go back and look.  Also, if I were to go
24 back and look, I couldn't use them as exhibits

Page 34

1 because all of those engagements were
2 confidential.
3    Q. Sure. I guess my question is, you didn't
4 look at the warehouse receipt at issue in this
5 litigation side by side with the warehouse receipt
6 from other entities, is that fair?
7    A. That's correct. I knew I couldn't use the
8 other one anyway, so...
9    Q. Did you look on the Internet or try to
10 find any publicly available resources related to
11 warehouse receipts?
12    A. No.
13    Q. You are going solely off your memory?
14    A. Yes.
15    Q. If we keep moving down through your
16 LinkedIn profile, we looked at Fiat Chrysler
17 Automobiles. Did any of the work here involve
18 freight forwarder?
19    A. Well, some of it did, but most of that
20 work was related to inside the warehouse.
21    Q. Was it a Chrysler Fiat owned warehouse or
22 a third-party warehouse?
23    A. That one was for Chrysler Fiat but others
24 in the same engagement were third-party.

Page 35

1    Q. What company third-party warehouses were
2 those?
3    A. The one I'm thinking of is Caterpillar
4 Logistics.
5    Q. Did you Chrysler Fiat use Caterpillar to
6 store Chrysler Fiat products?
7    A. No, they were two different flows of
8 products. Auto parts need to fit Chrysler's
9 warehouse in Italy and auto parts going into the
10 Caterpillar Logistics warehouse in Brussels.
11    Q. Is Caterpillar owned by Chrysler?
12    A. No.
13    Q. I'm missing the significance of
14 Caterpillar to the Fiat Chrysler engagement.
15    A. Fiat Chrysler was one of a multi-party
16 study that I did where Fiat was one client and
17 Caterpillar Logistics was another. And there were
18 about four or five others. So I didn't put
19 everything on my LinkedIn profile.
20    Q. Who were the other four or five others, if
21 you recall?
22    A. General Motors, Ford Winno, BMW, perhaps,
23 and Volvo, I believe.
24    Q. Were you retained by all of those

Page 36

1 entities, or was there a special purpose entity that
2 retained you or a trade organization?
3    A. This was each -- yes, I was retained by
4 all those entities through that company you
5 mentioned earlier, Carlisle, Fagan, Gaskin and Wise.
6 So all those parties contributed to a multi-party
7 study.
8    Q. Understood. And what was the high level
9 focus, like in a nutshell, of that mulit-party
10 study?
11    A. Parts, auto parts, warehousing,
12 performance, measurement, and management.
13    Q. Performance, measurements by management,
14 did you say?
15    A. Performance, measurement, and
16 management.
17    Q. Got you. And did that involve
18 specifically looking at how the freight forwarding
19 element fit into that?
20    A. It looked at incoming freight and divided
21 it in a lot of ways especially looking at
22 performance on time and service levels.
23    Q. I should have asked this at the beginning,
24 but if you were -- if you were invited to an

Page 37

1 elementary school career day, how would you describe
2 what supply chain operations is? Like how would you
3 describe what your company does if you were in front
4 of a room of fourth graders?
5    A. Yes, somebody asked me this the other day
6 and I actually sent them some pages from my book,
7 Guide to Supply Chain Management, which included the
8 definition.
9      Supply chain is everything that it takes
10 to get a product from its raw material state to its
11 in consumer, in layman's terms, I would say. And
12 that's only for products, but that's what concerns
13 us here. So it includes logistics, transportation,
14 warehousing, production, and point of sale.
15    Q. That's helpful. If we drop down to CSX
16 Transportation Intermodal, is this part of that
17 consortium that you talked about earlier?
18    A. No, that was a separate client.
19    Q. And what specifically did you look at for
20 CSX?
21    A. There was a multitude of engagements over
22 several years for CSX.
23    Q. Were any of those specific to freight
24 forwarding?

Page 38

1   A.  Yes, some of them dealt with intermodal
2   marketing and management.
3   Q.  Does CSX have a separate freight
4   forwarding division?
5   A.  That is basically CSX Intermodal.
6   Q.  And what type of advice or recommendations
7   did you provide to CSX with regard to freight
8   forwarding specifically?
9   A.  Some of it was about the migration of
10  their transportation management system from a Legacy
11  system to, you know, to a -- best in class or best
12  of breed system which was an external vendor,
13  third-party vendor.  And some of it was related to
14  intermodal marketing channel strategies and some of
15  it was related to post-merger integration planning
16  after CSX bought Conrail.  And, again, some of that
17  is probably covered by confidentiality agreement.
18  Q.  Sure.  Just to hop back a couple of
19  questions.  When you say freight forwarding, are you
20  using intermodal as the synonym for freight
21  forwarding?
22  A.  No, but in this case CSX Intermodal
23  effectively served as a freight forwarder.
24  Q.  Asset-based freight forwarder?

Page 39

1   A.  Yes.
2   Q.  And in connection with that engagement,
3   did you review warehouse receipts or inspection
4   reports specifically?
5   A.  Yes.
6   Q.  And did you provide recommendations on the
7   content of those warehouse receipts or inspection
8   reports?
9   A.  The nature of consulting was about the
10  system migration.  So I was trying to determine the
11  most effective and accurate way to move from the old
12  system of paperwork and information flows for all
13  these intermodal moments to the new system.
14  Q.  And specifically did you provide
15  recommendations regarding the content of warehouse
16  receipts?
17  A.  I would say yes, because the content is
18  the data and the data moves through those systems.
19  Q.  Would you have looked at a warehouse
20  receipt and said, This doesn't look right, it should
21  have different elements, you need to include this,
22  et cetera?
23  A.  Not for this engagement.
24  Q.  Would you have looked at inspection

Page 40

1   reports in connection with this engagement?
2   A.  No, I would not have.
3   Q.  Moving on to General Motors, did any of
4   this work involve freight forwarding?
5   A.  Yes.
6   Q.  How so?
7   A.  The global sourcing work involved a major
8   program to switch suppliers from Brazilian suppliers
9   to -- well, from one case from Brazilian suppliers
10  to international suppliers.  So all of those parts,
11  auto parts, needed to be purchased from abroad, and
12  I was in charge of various facets of the program
13  that -- to accomplish that which involved price
14  comparisons and vendor transitions and a lot of
15  freight forwarding and a lot of landing cost-type
16  challenges that occurred during the migration of
17  that for hundreds or thousands of types of vehicle
18  parts.
19  Q.  Does G.M. have a captive freight forwarder
20  or does it outsource that?
21  A.  It did not -- did not have a captive
22  freight forwarder.  Actually, I'm not going to use
23  the word because that's not the way I look at it.
24  An in-house freight forwarder, is that what you

Page 41

1   mean?
2   Q.  Yes.
3   A.  They didn't have in-house freight
4   forwarder.
5   Q.  They did not?
6   A.  Did not.
7   Q.  Is it fair to say you did not review any
8   warehouse receipts and provide feedback on them in
9   connection with the G.M. engagement?
10  A.  Let me think about that for a minute
11  because I was involved in many projects for G.M.
12  No, it's not fair to say.  I did a lot of that for
13  different engagements for G.M.
14  Q.  What would you have done in connection
15  with warehouse receipts or inspection reports?
16  A.  To redesign their materials flow and
17  materials management for --
18      (Technical difficulties.)
19      (The partial question was read back.)
20  A.  I helped redesign the entire materials,
21  material management flow and the associated
22  paperwork and systems for stamped auto parts.
23  Q.  Did G.M. issue its own warehouse
24  receipts?

1   A.  Yes.

2   Q.  In G.M. operated warehouses?

3   A.  Yes.

4   Q.  So the freight forwarder in that
5  circumstance is not issuing warehouse reports --
6  receipts?

7   A.  Correct, was.  This is in the past.  I
8  don't know what is happening today.

9   Q.  Understood.  And did the freight forwarder
10  perform inspections services in connection with
11  that?

12   A.  Not that I'm aware.

13   Q.  Moving on to your FedEx engagement in the
14  the greater Memphis area.  Which division of FedEx
15  were you engaged with?

16   A.  Multiple divisions that took place over
17  about a three-year period.  And I worked for mostly
18  corporate and also air operations.  And we did some
19  sourcing that covered ground and other divisions on
20  behalf of corporate.  That's what I can remember off
21  the top of my head.

22   Q.  And did you deal with FedEx's freight
23  forwarding division?

24   A.  Not at that time.  That was actually in --

1  if you think about the timing of that, that was in
2  the late '90s. FedEx Custom and FedEx Solutions, so
3  those organizations weren't getting existing or
4  weren't yet developed very much.

5   Q.  What is the name of FedEx's freight
6  forwarding arm?

7   A.  FedEx has -- I believe FedEx has
8  Solutions, FedEx has Custom Critical, is has a whole
9  variety of different divisions set up around
10  operations...

11   Q.  Specifically as it relates to the freight
12  forwarding arm, what is the name of that entity?  Do
13  you know?

14   A.  I think it's called FedEx Supply Chain.

15   Q.  Is it FedEx Trade Network?

16   A.  No.  That's actually specific to
17  information flow behind -- at least that's the last
18  that I was aware of.  This was an information system
19  company.  To my understanding it was not licensed as
20  a freight forwarder on an NVOCC to my knowledge.

21   Q.  What is NVOCC?

22   A.  A non-vessel operated carrier, a
23  non-vessel operating and common carrier.

24   Q.  FedEx Freight is not freight forwarding;

1  is that right?

2   A.  Correct.

3   Q.  It's LTL?

4   A.  It's -- yes.

5   Q.  We got a little side tracked.  I'm sorry
6  if I'm repeating myself now.  What work did you do
7  specifically with regard to FedEx freight
8  forwarding?

9   A.  Corporate work related to real estate
10  information systems and other overhead shared
11  costs.

12   Q.  Overhead and shared costs meaning like the
13  FedEx parent company and the subsidiaries utilize
14  shared accounting and legal services?

15   A.  They buy property together.  They
16  coordinate their human resources policy, their key
17  business process flows.  That kind of thing.

18   Q.  Understood.  Anything else with regard to
19  FedEx in connection with freight forwarding that you
20  did that we haven't talked about?

21   A.  Not that I can remember right now.

22   Q.  How about FedEx warehouse operations?
23  Anything you did with FedEx in connection to
24  warehouse operations?

1   A.  I did very detailed work on some
2  warehouses within the air operation division.

3   Q.  And what detail work was that?

4   A.  For the record, it's air operations with
5  an S. I redesigned the flow of everything related
6  to jet engine parts.

7   Q.  Is FedEx air operations with an S, is that
8  its airplane branch?

9   A.  It's an airline -- it's a registered
10  airline, yes.

11   Q.  Understood.  With regard to Safran, you
12  worked in corporate strategy in the
13  maintenance/repair business.  Can you tell me what
14  that was?

15   A.  This was a strategy study scoping
16  potential mergers and acquisition opportunities in
17  the aircraft maintenance and nacelle division and
18  nacelle markets.

19   Q.  And did any of that engagement involve
20  freight fowarders or the operation of warehouses?

21   A.  No, it was higher level.

22   Q.  When you were at A.T. Kearney, are the
23  engagements listed below A.T. Kearney engagements
24  you had while you were at A.T. Kearney or were you

1 employed by those entities?

2     A.  I see now where it says A.T. Kearney.

3 Some of them above were through A.T. Kearney, and

4 FedEx was partly through A.T. Kearney. Safron was

5 through A.T. Kearney. G.M. was through A.T.

6 Kearney. FedEx was part through another firm. And

7 the ones below it -- of the ones below it only

8 Schneider and Orange were through A.T. Kearney.

9     Q.  Galeries Lafayette logistics

10 transformation, what was of the nature of that

11 project?

12     A.  That was also through A.T. Kearney. This

13 was a warehousing redesign and reconfiguration of

14 260 stores in France.

15     Q.  And Galeries Lafayette is the department

16 store?

17     A.  It's a holding company that has the sort

18 of the cornerstone store in Paris called Galeries

19 Lafayette. Then they also own retail and

20 convenience chains throughout France.

21     Q.  What banner did those operate under?

22     A.  Multiple banners, but the ones that I was

23 focused on were Monoprix.

24     Q.  And what was the nature of the advice you

1 were providing regarding the warehousing?

2     A.  Exactly how to do warehousing operations

3 from transportation and receiving through store

4 logistics, meaning putting it on the shelves,

5 counting, running reports, managing reconciliations

6 and discrepancies, et cetera.

7     Q.  Were those in-house warehouses?

8     A.  They were. They were.

9     Q.  And did that engagement involve freight

10 forwarders?

11     A.  If it did, it was a not a major component.

12 I'm trying to remember all the flows that occurred.

13 And the freight forwarding was not a major part of

14 my job at that time.

15     Q.  With regard to the Galeries Lafayette

16 warehouses, did they issue warehouse receipts?

17     A.  Yes.

18     Q.  And do you recall the content of those

19 warehouse receipts?

20     A.  There weren't really receipts. They were

21 like a physical paper document like you may be

22 thinking of. A lot of it was checklists, and

23 information dumps out of a system and information

24 system lists by category, by day or internal

1 reports. It looks like more internal reports than

2 external legal documents.

3     Q.  Understood. Did the Schneider Electric or

4 Orange engagements in France involve freight

5 forwarding or warehousing?

6     A.  No.

7     Q.  Did your World Bank engagement involve

8 freight forwarder or warehousing?

9     A.  No.

10     Q.  When you were a business analyst to Oliver

11 Wyman, did you work on freight forwarding and

12 warehousing issues?

13     A.  Yes.

14     Q.  Can you tell me about that?

15     A.  Yes.

16         THE WITNESS:  Do you mind, are we up

17 for a break anytime soon?

18         MS. MOTLEY:  Sure.  We can take a

19 break.  There's a question pending, but I'll let it

20 slide since we're moving into a different territory.

21 Let's take a quick five minute break.

22         (Recess taken.)

23         (The question was read back.)

24     A.  Yes, I did.

1     Q.  Can you talk about that a little bit?

2     A.  I was in the maritime and international

3 trade group. We consulted to companies in the

4 business of ocean freight including Maersk and

5 Sealand and Evergreen and others, and one of the

6 projects in particular had to do with a crossmodal

7 merger and acquisition CSX bought Sealand. And

8 that's just one example, but a lot of the projects

9 involved freight movement and the organization and

10 integration of companies to achieve that freight

11 movement global.

12     Q.  Specifically can you think of any

13 engagements that involved examining warehouse

14 receipts and advising on the content?

15     A.  I think one, actually, at least comes to

16 mind. I did some support work for a case at that

17 time which was -- had to do with importation of

18 plywood and glass, several cases, to the United

19 States. And at that time we were looking at

20 shipments and receipts and dates, yes.

21         So we were constructing like some

22 alternative scenarios and recasts of what might have

23 happened in a different scenario.

24     Q.  That was between 19 -- I'm sorry 1985 and

1  1987?
2      A.   Right.
3      Q.   And do you specifically recall providing
4  recommendations on content that should or should not
5  be contained on warehouse receipts?
6      A.   No, I did not provide that.
7      Q.   In the course of the engagements we talked
8  about, would you ever be the person to interview
9  warehouse managers?
10     A.   Yes.
11     Q.   Which engagements did you interview
12 warehouse managers?
13     A.   So many, many of which we didn't even talk
14 about.  So Monoprix, Georgia Pacific.
15     Q.   Was that an in-house warehouse or a
16 third-party warehouse?
17     A.   General Motors, Iron Mountain, just one
18 more -- what was the question?
19     Q.   I'm trying to get a sense of which of
20 those circumstances where you interviewed warehouse
21 managers, would those have been in-house warehouses
22 or third-party warehouses?
23     A.   So Monoprix was in-house.  Georgia Pacific
24 was outsourced through 3PL.  Iron Mountain was

1  in-house.  Yeah, just of what I just mentioned.
2  G.M. was in-house.  I'm sure there are others that
3  outsource as well, but Georgia Pacific is one
4  example.
5      Q.   Sitting here, Georgia Pacific is the one
6  you recall?
7      A.   Right.
8      Q.   And who was the 3PL that operated that
9  warehouse?
10     A.   DSC Logistics.
11     Q.   DSC?
12     A.   Yes.
13     Q.   Is DSC Logistics still in operation, do
14 you know?
15     A.   I'm not sure.  They might have been
16 sold.
17     Q.   What approximate year was this?
18     A.   2006, maybe.
19     Q.   2006?
20     A.   I think so.
21     Q.   What was the purpose of interviewing the
22 DSC warehouse manager?
23     A.   My company was building for them a
24 crossdock information system.  They were trying to

1  move from a warehousing mode to a crossdock mode.
2      Q.   And was that transfer from warehousing to
3  crossdocking, that engagement ran to Georgia Pacific
4  and not to DSC; is that right?
5      A.   What was the question?
6      Q.   The engagement that you had where they
7  were switching to a warehousing to crossdocking,
8  that engagement ran to Georgia Pacific and not to
9  DSC, right?
10     A.   When you say it ran to Georgia Pacific,
11 you mean it was paying the bill?
12     Q.   Who engaged you?
13     A.   Georgia Pacific.
14     Q.   So you were providing advice to Georgia
15 Pacific to optimize Georgia Pacific's processes
16 rather than providing advice to DSC to optimize
17 DSC's processes?
18     A.   Correct.
19     Q.   Is it fair to say you did not make advice
20 and recommendations to DSC with regard to how they
21 operated their warehouse?
22     A.   That is not totally true because we
23 developed a software that Georgia Pacific used and
24 they needed to do it in collaboration with DSC.  It

1  was a joint effort.  They could not deploy the
2  software without DSC's active engagement and
3  approval.
4      Q.   Were you advising on the day-to-day
5  operation of the warehouse, or were you advising on
6  the integration of the software?
7      A.   Day-to-day, because the software was based
8  on a day-to-day work flow.
9      Q.   And what specific day-to-day operations
10 did you make recommendations on?
11     A.   Receiving, unpacking, put away, storage
12 mode, whether dynamic or kicks, for example.  Pick,
13 pack, ship.  And integration with TMS flows,
14 transportation management system, meaning incoming
15 and outgoing trucks.
16          We were actually on the floor with the
17 fork-lifts going in and out of trucks, making sure
18 that the flow was properly captured and piling it to
19 make sure the way the software presented alternative
20 outbound shipping opportunities was working on the
21 warehouse floor.
22     Q.   The purpose of this was to optimize
23 efficiency?
24     A.   It was bigger than that.  The purpose for

Page 54

1 Georgia Pacific, as was the purpose for many
2 companies over the last twenty years, was to tighten
3 up their supply chain and have it become more
4 flexible and less based on storage, more based on
5 just in time flows. So that would improve their
6 responsiveness to fluctuations in demand on
7 unexpected surges and increase customer satisfaction
8 as well as reduce asset requirements, fewer trucks,
9 less space in the warehouse, less labor. So there
10 was a lot more than just cost reduction or
11 optimization.
12     Q. And that explanation that you just gave,
13 is that consistent with the advice that you've given
14 to all of these different entities over the years?
15 In other words, is that the primary thrust of your
16 involvement, what you just described?
17     A. Well, that's a really broad statement, so
18 I couldn't say yes, a blanket statement, but I
19 document a lot of that in some of my books. So it
20 has clearly been a theme in the industry. Different
21 requirements and different reasons, they call them
22 consultants, so they're not always for that. I was
23 just describing a trend that is taking place in the
24 industry.

Page 55

1     Q. Has that trend been one of the more
2 significant focuses of your practice?
3     A. It's been the subject of many
4 engagements.
5     Q. More than 50 percent of the engagements?
6     A. Probably not more than 50 percent, but
7 along.
8     Q. Between 25 and 50 percent?
9     A. Probably, that's fair.
10     Q. Are there any other engagements we haven't
11 talked about yet that involved providing specific
12 advice related to the content of warehouse
13 receipts?
14     A. There is one that was -- there is one
15 project where my team reviewed and improved
16 controlled documents for a company.
17     Q. What --
18     A. What you mean by controlled documents?
19     Q. What company was that?
20     A. It was called Tasnee.
21     Q. Can you spell that?
22     A. T-A-S-N-E-E.
23     Q. And what industry is Tasnee in?
24     A. Petro chemicals.

Page 56

1     Q. When you say controlled documents, what do
2 you mean by that?
3     A. Controlled, C-O-N-T-R-O-L-L-E-D. This
4 means documents that have been approved by corporate
5 and that are in the system as expressly approved
6 documents for use by employees.
7     Q. When was that engagement?
8     A. 2017.
9     Q. And what specifically did you provide
10 advice on in that engagement?
11     A. The exact documents and handbooks and
12 procedures manuals indicating which documents were
13 to be used for what purpose.
14     Q. Were these operations manuals? HR
15 manuals? Other financial manuals?
16     A. More operations manuals mostly.
17     Q. And operations related to what?
18     A. The capital projects and operating and
19 maintenance requirements for various production
20 facilities.
21     Q. And the production facilities were
22 petroleum production facilities?
23     A. Generally petro chemicals, plants,
24 plastics, different ethylene derivatives.

Page 57

1     Q. Were you the one who drafted the policy
2 manuals or were they existing manuals that you
3 advised on?
4     A. Both. The firm had databases of thousands
5 of controlled documents that they thought were not
6 perfect, and they wanted us to review every document
7 and make it perfect and then write the manuals for
8 how to use them, because they had kind of an issue
9 that the information on certain documents wasn't
10 sufficient or that there weren't signatures where
11 there should be signatures, et cetera.
12     Q. Was this part of a team from your company
13 that worked on this?
14     A. Yes.
15     Q. Did the team involve subject matter
16 specialists like engineers or HR professionals?
17     A. Yes.
18     Q. Were you the lead drafter on these
19 documents?
20     A. No.
21     Q. Who else was on that team?
22     A. We had about five or six people or seven
23 people on the team.
24     Q. And what --

1    A.  Yeah, people with experience in those
2 types of operations.
3    Q.  Is that fair that for all of the
4 engagements it's a multi-person team?
5    A.  Not necessarily.  Most of the cases, yes.
6 Most of the cases were multiple person teams which I
7 led and was an active consultant on.  Some of them
8 were individual.  Most of them were teams.
9    Q.  And for the Tasnee project, was there an
10 HR professional that your team had as a member?
11    A.  If you don't mind me taking a look at
12 that -- my files for a minute.  Should I do that or
13 should I answer to the best of my ability?
14    Q.  If you want to refer to your files, that's
15 fine, but then I'll want to see a copy of what
16 you're referring to.
17    A.  Let me just remember who was on the team.
18 We had a -- I don't know if I call any of those
19 people specifically an HR professional, although I'm
20 sure that some of them had long histories with HR, I
21 mean, been in the business and being in management
22 positions for decades.
23    Q.  Do you report to the HR professional?
24    A.  I don't usually present myself that way,

1 although I've done organizational studies and
2 companies think them very, very useful and want to
3 hire us to do them again.
4    Q.  What companies have you done
5 organizational studies for?
6    A.  A large one for Al-Suwaidi, which is
7 listed on my CV, I believe, yeah.  I did a number of
8 them for FedEx, and I think I did some for Charles
9 River Laboratories.  I'm sure there are others as
10 well.
11    Q.  Generally speaking, what do those
12 organizational studies report on?
13    A.  They usually -- oh, Iron mountain as well.
14 They involve writing job descriptions and posting
15 job requisitions, sometimes actively hiring staff on
16 behalf of the company involved, drawing organization
17 charts, explaining the relationship between people
18 and their responsibilities, who should do what
19 exactly and who should report to whom.
20         (Technical difficulties.)
21         (The last question was read back.)
22    Q.  Did I hear you correctly that your
23 company, BSI, is involved in hiring for those
24 entities?

1    A.  Sometimes.  Can I just make sure that
2 Jennifer got the answer to the question, because she
3 went out for a minute?
4         THE WITNESS:  Did you capture my
5 answer to that question?
6         THE COURT REPORTER:  I believe I
7 did.
8         (The answer was read back.)
9         THE WITNESS:  Was the word "hiring
10 people" in there?  I'm not sure.
11         THE COURT REPORTER:  "Hiring staff on
12 behalf of the company."
13    Q.  Other than Al-Suwaidi, FedEx, Charles
14 River Labs, Iron Mountain, any other entities for
15 whom you prepared organizational studies?
16    A.  I'm sure the answer to that is yes, but I
17 would have to think about it some more.
18    Q.  Well, as we go on, if you think of any
19 others, just let me know and we can come back to
20 this topic.
21         Did any of those organizational studies
22 advised practices of e-mail habits for the CEO?
23    A.  Let me -- yes, because -- let me add to
24 that list, actually.  My own company which has --

1 BSI, Boston Strategies. which has its own procedures
2 and has -- I developed organizational charts and job
3 descriptions, et cetera, for that, and we do have
4 standard procedures -- and yes, I think also the
5 standard operating procedures generally have
6 sections on external communications and internal
7 communications and protocols.
8    Q.  I'm asking specifically as it relates to
9 the CEO and the functionality of his e-mails and how
10 that works.  Have you provided that specific advice
11 to any company other than your own?
12    A.  I don't believe so.  I can't remember.
13    Q.  Well, would it have been for any of those
14 entities we talked about, Al-Suwaidi, FedEx, Charles
15 River Labs, Iron Mountain?  Any of those did you
16 provide advice to the CEO on how he should function
17 with his e-mail, he or she?
18    A.  For Al-Suwaidi we definitely detailed who
19 should communicate different aspects, whether it
20 should be the outbound communicator.
21    Q.  Specifically as it relates to the CEO?
22    A.  Yes.
23    Q.  What were the recommendations specifically
24 as it relates to the CEO?

Page 62

1    A.  We had a clear delineation of
2 communications between the CEO and the Board and the
3 various people who worked for him.
4    Q.  And when you say clear delineation, what
5 do you mean by that?
6    A.  Each person's job responsibilities had
7 specific -- very specific detailing of their
8 responsibilities.  And so his assistant and first
9 level staff each had a job description which was
10 explicit about who they were responsible for
11 managing and how they were supposed to manage them,
12 including the Board member and the CEO and the
13 vice-president under the CEO.
14    Q.  Was that written in a policy or was it in
15 the job descriptions?
16    A.  It was in the job descriptions.
17    Q.  And what level of granularity did those
18 job descriptions have?
19    A.  They were a couple of pages long.  I mean,
20 also in other cases, Iron Mountain job descriptions
21 were very much detailed.  They broke down time
22 allocations by task, by person.
23    Q.  Specifically as it relates to the folks
24 servicing the CEO?

Page 63

1    A.  Branch managers, transportation planners,
2 yes.  So in the case of Suwaidi, it was the CEO
3 level.  In case of Iron Mountain, it was
4 operating.
5    Q.  In the case of Al-Suwaidi, were there
6 particular concerns given the nature of that entity
7 that required special regulations?
8    A.  I'm not sure what you mean.
9    Q.  Where is Al-Suwaidi located in?
10    A.  It's in Saudi Arabia.
11    Q.  Were there certain like US tariff
12 restrictions, trade restrictions, et cetera, that
13 would require a heightened level of attentiveness by
14 the CEO?
15    A.  No, it's just business operations.  That's
16 the way they like to operate.
17    Q.  And what specifically did you advise the
18 CEO with regard to his e-mail flow?
19    A.  Now you're asking about a specific job
20 description which I would have to dig out.  I don't
21 remember it anymore.
22    Q.  So specifically you can't recall if you
23 advised on how he and his secretary should
24 interact?

Page 64

1    A.  We did advise on how he and his secretary
2 should interact, but I don't remember the details.
3    Q.  Do you recall whether his secretary had
4 e-mail permissions and could respond to e-mails on
5 behalf of him?
6         MR. BETTA:  Objection.  You can
7 answer.
8    A.  He didn't not answer on behalf of him.  It
9 was a male secretary, and he did not answer on
10 behalf of the CEO.
11    Q.  Was that a recommendation that you made or
12 is that a practice that was in existence?
13    A.  That's a practice that was in existence.
14    Q.  Did you make any specific recommendations
15 as to how those two should interact in terms of who
16 would respond to what e-mails?
17    A.  No.
18    Q.  Did you make any specific recommendations
19 as to how those two should interact in terms of what
20 e-mails were provided directly to the CEO and which
21 were handled by the admin?
22    A.  That would be in the job descriptions,
23 yes.
24    Q.  And what did the job descriptions say

Page 65

1 about that?
2    A.  I don't recall those details.
3    Q.  Generally speaking, what did the job
4 descriptions say about that?
5    A.  They indicated the nature of the job
6 responsibilities and what type of activities the CEO
7 should be concerned with and what type of activities
8 the secretary should be concerned with.
9    Q.  I'm asking what was the division, do you
10 recall?
11         MR. BETTA:  Objection.  You can
12 answer.
13    A.  I don't recall, really.
14    Q.  For Iron Mountain were there that type of
15 granular recommendations regarding what the CEO
16 versus his admin should handle?
17    A.  As I said, I was not at the CEO level.
18 That was at the operating level.
19    Q.  Understood.  And what were the
20 recommendations regarding the operational level
21 e-mail protocols?
22    A.  To the extent that I can remember the
23 specifics of job descriptions, they did not spell
24 out e-mail communication protocols.

1    Q.  Do you have a secretary?

2    A.  No.

3    Q.  Do you have anyone who is designated as a

4 delegate on your e-mail account who can answer

5 e-mails on your behalf?

6    A.  No.

7    Q.  Have you ever?

8    A.  No.

9    Q.  So any experience you have regarding the

10 delegate on an e-mail account would be through one

11 of the engagements we talked about?

12    A.  No, that's not correct.  I actually have

13 the ability to designate anybody on my account, and

14 I do have the authority to respond on other people's

15 behalf.  So I'm very familiar with the situation.

16    Q.  Who would be the individual for whom you

17 have delegate permissions?

18    A.  My company's partners, corporate partners,

19 who have access to Boston Strategies e-mail

20 accounts, and I can see what they're doing if I

21 want.

22    Q.  Do you know --

23    A.  On their behalf or take over if I want.

24    Q.  What is the e-mail software that your

1 company uses?

2    A.  It's a Google platform.  So the e-mail

3 aspect of that is under a category called Workspace.

4 And in the app called Workspace a corporation uses

5 a -- or in the platform called a Workspace, a

6 company uses Gmail is one of those apps in

7 Workspace.

8    Q.  Within that application are there

9 abilities to set different permission levels for

10 delegates?

11    A.  There were many configurations, but yeah,

12 I would say yes.  I mean, the permissioning is done

13 by how you set up the account in the first place.

14 If you set it up and you provide credentials to

15 somebody, then they can access it.  They have to

16 know the user name and password.  I have the ability

17 to change their password and monitor their usage and

18 their content if I wish and to forward it.

19    Q.  And do you have the ability to forward

20 e-mails as though you are the respondent of the

21 e-mail?

22    A.  Yes.

23    Q.  Or you have the ability to respond to

24 e-mails as though you're Mr. Jacoby?

1    A.  I have the ability to respond under their

2 name if I wanted to.

3    Q.  And do you have the ability to change the

4 permissions once the account has been established?

5    A.  Yes, and I have the ability to delete

6 accounts as well.

7    Q.  Have you ever examined this same structure

8 that we talked about in Microsoft Word?

9    A.  Microsoft Word?

10    Q.  I'm sorry, Microsoft Outlook.

11    A.  Yes.  I used Outlook for years.

12    Q.  When you use Microsoft Outlook, were you

13 either a delegate or a delegate team?

14    A.  We had separate accounts.  I'm trying to

15 remember whether at the time I did have an assistant

16 and used Microsoft Outlook.  She had a separate

17 account from me.  Did I have the ability to -- in

18 Outlook we had separate accounts -- no, that's not

19 true.  I understand we had -- I had multiple

20 accounts and the ability to configure multiple

21 accounts in Outlook, but we never mixed -- we never

22 mixed identities or conflated e-mail accounts from

23 one person to another.

24    Q.  What year are you talking about?

1    A.  Roughly -- I mean, through about 2015.  So

2 for every year up until 2015.  We went on the Google

3 platform in about 2015.

4    Q.  And up until you went on to the Google --

5 I'm sorry, I cut you off.

6    A.  Until then we used Outlook.

7    Q.  Until you went onto the Google platform in

8 2015, did you have anyone designated as a delegate

9 for your e-mail account?

10    A.  No.

11    Q.  Were you designated as a delegate for

12 anyone else's e-mail account?

13    A.  No.

14        (Exhibit No. 5 marked for

15 identification.)

16    Q.  I am going to mark as Exhibit 5 a document

17 that I sent to your counsel, the title of which is

18 Home-gdp-a.org.PDF.  Do you have that document?

19    A.  Yes.

20    Q.  Is GDP-a one of your companies?

21    A.  No.

22    Q.  I'll represent to you this is a screen

23 print of something that I found linked to the Boston

24 website.  Do you know what this company is?

Page 70

1    A. I'm familiar with it. It's not a company
2 at all.
3    Q.  What is it?
4    A.  This is an idea that is proposed in a
5 public way. It has nothing to do with my company,
6 Boston Strategies International.
7    Q.  Do you know why it would be linked from
8 your website?
9    A.  It shouldn't. I don't, and it shouldn't
10 be linked in any way. So I'm not sure where -- I'm
11 not sure in what way you mean it's linked.
12   Q.  Okay. I'm going to show you or direct
13 your attention to another exhibit that we'll mark as
14 Exhibit 6.
15         (Exhibit No. 6 marked for
16 identification.)
17   Q.  And the subject of this file is
18 home_DavidStevenJacoby.pdf.
19   A.  Yes.
20   Q.  Do you have that up?
21   A.  I do, yes.
22         MR. BETTA: I'm sorry, I don't know,
23 my exhibit is printed, but is that the one with
24 pictures of him on the front page?

Page 71

1         MS. MOTLEY: Yes, it has a picture of
2 him and a gentleman holding a huge bottle of
3 Monet.
4         MR. BETTA: Thank you.
5 BY MS. MOTLEY:
6    Q.  If you look on this document, the page
7 splits between the first and the second page. It
8 looks like it identifies some industries that you do
9 work in. Do you see that right under CSX?
10   A.  Right, yeah.
11   Q.  And is this a fairly comprehensive list of
12 the industries that you perform work for?
13   A.  No, it's not intended to be comprehensive;
14 it's intended to be illustrative.
15   Q.  I understand that the client list might
16 not be comprehensive, but in terms of the industry
17 services, which looks like they're to the left in
18 bold underline, are those industries
19 comprehensive?
20   A.  No.
21   Q.  What other industries does your company
22 service that are not on this list?
23   A.  We've worked a lot in heavy industry,
24 which I'm not sure is on here.

Page 72

1    Q.  Forgive me. What does heavy industry
2 mean?
3    A.  For example, mining, mining in metals.
4    Q.  Would that fall under power/energy?
5    A.  No. There are other companies like Valet
6 and Alcoa and ThyssenKrupp and others which are very
7 heavy industry which are not on here.
8    Q.  Would those fall under industrial
9 manufacturers where we see ThyssenKrupp?
10   A.  Some of it. Industrial metal, one metals
11 company I see is there. And I see -- mining I see
12 there. I don't see Alcoa on this list. So I would
13 say -- again, I would say this is not comprehensive.
14 This is just meant to give people an idea of
15 companies that might be like theirs.
16   Q.  On this list, are there one or more of
17 these industries that you spend or have your focus
18 on?
19   A.  Well, it's varied over time a lot. As you
20 can see, I do -- often I do one-to-three-year-type
21 engagements in different -- for different companies
22 and that means that my industry focus may also
23 evolve over time.
24   Q.  So let's just talk about from 2015 to the

Page 73

1 present. Is there one particular industry that has
2 been more prevalent than the others with your
3 work?
4    A.  I've worked a lot in energy and
5 information systems industries since 2010.
6    Q.  From 2010 to 2015 was there an industry
7 that had more predominant focus?
8    A.  Just a second. Let me just view my
9 account files.
10   Q.  I'm sorry, what are you reviewing?
11   A.  My account files.
12   Q.  Anything that you're reviewing I'm going
13 to want to look at.
14   A.  All right, I won't review it. I can
15 remember it. 2010 to 2015 was heavily based on oil
16 and gas and metals and mining, that kind of heavy
17 industry that we just talked about.
18   Q.  How about 2005 to 2010?
19   A.  I think logistics, on logistics
20 information systems.
21   Q.  And 2000 to 2005?
22   A.  Software and mining and pharmaceuticals
23 and transportation and logistics.
24   Q.  In the arch of your career, what has been

Page 74

1 the industry that's been the most prominent?
2 **A. Transportation and logistics.**
3 Q. I think what you just testified to is that
4 during those five-year segments that we went
5 through, it sounded like oil and gas and mining were
6 the energy industry more generally, I guess, were
7 the focus, and now you're saying transportation and
8 logistics?
9 MR. BETTA: Objection. You can
10 answer.
11 **A. I've been consulting for almost 35 years,**
12 **and you just asked me about a 10 or 15-year**
13 **period.**
14 Q. I think I asked from present back to the
15 year 2000.
16 **A. And I answered that from 2000, 2005. I**
17 **think I answered very heavily transportation and**
18 **logistics was part of that mix in those years. So I**
19 **mean -- what I meant is that from 2005 or '10 to the**
20 **present, I could understand what you're saying but**
21 **not prior to that.**
22 Q. How old are you?
23 **A. Fifty-seven.**
24 Q. Where is your primary residence? What

Page 75

1 city?
2 **A. New York City.**
3 Q. Where is your company based?
4 **A. New York.**
5 Q. Where did the Boston name come from?
6 **A. It was based in Boston for many years.**
7 Q. When did it move?
8 **A. 2018.**
9 Q. What caused you to move to New York in
10 2018?
11 MR. BETTA: Objection. You can
12 answer.
13 **A. For personal reasons.**
14 Q. It didn't deal with the industries or
15 clients you were servicing?
16 MR. BETTA: Objection. You can
17 answer.
18 **A. No, it didn't. It was purely personal.**
19 (Technical difficulties.)
20 **THE WITNESS: Should I explain the**
21 **personal reasons?**
22 MR. BETTA: No, I'm going to instruct
23 you not to explain your personal reasons. It's
24 irrelevant.

Page 76

1 BY MS. MOTLEY:
2 Q. Is it relevant to your consulting work?
3 **A. No.**
4 Q. You have never been the direct employee of
5 a freight forwarder; is that right?
6 **A. That's correct.**
7 Q. You've never been a direct employee of a
8 warehouse?
9 **A. Do you mean of a warehousing company?**
10 Q. Yes.
11 **A. That's correct.**
12 Q. And you've never been a direct employee of
13 a 3PL more generally; is that right?
14 **A. I would say there are a couple of cases**
15 **where I could be classified as an interim manager.**
16 Q. Of a 3PL?
17 **A. Of a logistics service company.**
18 Q. What are those examples?
19 **A. Iron Mountain and FedEx.**
20 Q. And were you drawing a salary from Iron
21 Mountain and FedEx?
22 **A. No, it was on contract.**
23 Q. So for tax purposes you would not have
24 been considered -- you got a W9 or W2 from those

Page 77

1 entities; is that right?
2 **A. Correct.**
3 Q. And when you say you acted as an interim
4 manager as a 3PL for Iron Mountain, can you tell me
5 about that?
6 **A. And also I would add to that Al-Suwaidi.**
7 **So for Iron Mountain we were responsible for rolling**
8 **out a transportation and -- a transportation**
9 **management program across the United States for its**
10 **branches.**
11 Q. How were you the interim manager of that
12 3PL?
13 **A. They didn't have a national transportation**
14 **manager but they knew that they needed to -- they**
15 **knew that they needed this program rolled out and**
16 **they didn't have internal resources. So rather than**
17 **hiring an internal position, they hired a**
18 **consultant -- consultants in this case to help them**
19 **answer all of the pivotal important planning and**
20 **financial questions first before embedding it and**
21 **then hiring the person to run it.**
22 **So I was one of those people who helped**
23 **design the program, select software for**
24 **transportation management, decide how it would be**

1 integrated with warehouse management, decide what
2 kind of vehicles they should use, decide who should
3 be -- how responsibility should be delineated
4 between national, corporate, regional, and branch
5 management and set -- write job descriptions and
6 everything that would be done typically by an
7 internal transportation vice-president or manager.
8     Q.  Did you manage the hiring and firing for
9 Iron Mountain?
10     A.  Not directly, but, you know, in many of
11 the cases where I serve in these roles, people ask
12 what I think of certain people, and I do do some
13 assessments as well, the formal HR assessments that
14 are weighted very heavily, put it that way, by
15 senior executives.  And some people have been hired
16 and some people have been fired as a result of my
17 consulting advice.
18     Q.  Did you have the final say on who was
19 hired or fired for Iron Mountain?
20     A.  For Iron Mountain, no.
21     Q.  Did you manage the day-to-day operational
22 aspect?  For example, if someone called off sick,
23 would you be the one with dealt with finding a
24 replacement?

1     A.  No.  In that specific example, no.
2     Q.  For FedEx, what was the nature of the
3 managing of 3PL that you mentioned?
4     A.  Basically the branding of the air
5 operations maintenance division for a while.
6     Q.  What qualifications do you have to run the
7 air operations maintenance division?  Were you a
8 mechanic?
9     A.  It is a management role and I had -- the
10 primary expertise required, I'd say it was logistics
11 and planning.  And I had a lot of that experience
12 and they trusted my judgement based on my analysis
13 of the situation and my analysis of people running
14 the division.
15     Q.  In terms of Al-Suwaidi, what 3P management
16 experience did you have there?
17     A.  I recruited staff and I arranged for
18 negotiation of their hiring and compensation
19 packages, and I reported to the Board on individual
20 performance levels and capabilities and potential
21 which fed into certain decisions about hiring,
22 firing, and retention.
23     Q.  Have you ever done work for XPO before?
24     A.  No.

1     Q.  Have you ever done work, to your
2 knowledge, for any of the XPO acquired companies
3 like Norvair, Pacer, Conway, CGL?
4     A.  Well, companies like that, yes.  I mean,
5 as I said, I worked for -- my clients have included
6 companies like CSX or Norfolk Southern, BNSF
7 Railroad.  Like my father -- I didn't mention it but
8 I worked for my father's company which was a
9 trucking company or a truck leasing company.  And I
10 probably got a paycheck from that, but I don't
11 remember.
12     Q.  Was that in high school?
13     A.  No, it was out of college.
14     Q.  The list that I was providing of Novair,
15 Pacer, and Conway and CGL, I just meant illustrative
16 of some of the companies that XPO has acquired.  Do
17 you know if you worked for any of the companies that
18 XPO acquired pre-acquisition?
19     A.  I did not work for those specific
20 companies.
21     Q.  Are you aware of any companies that XPO
22 has since acquired that you did work for
23 pre-acquisition?
24     A.  I'm not aware of any.

1     Q.  Do you hold stock in XPO?
2     A.  No.
3     Q.  Do you have any engineering degrees?
4     A.  I have a partial engineering degree.  I
5 didn't get the full degree.
6     Q.  What is that degree?
7     A.  It's engineering.
8     Q.  Is it petroleum engineering?
9     A.  Yes.  I think it's on my LinkedIn
10 profile.
11     Q.  What years were you enrolled in the
12 petroleum engineering degree program?
13     A.  I think it was around 2013, but I don't
14 remember exactly.
15     Q.  For what purpose did you enroll in that
16 petroleum engineering program?
17     A.  A lot of the work that my company gets
18 involved in has an engineering component to it, and
19 I wanted to make myself more creditable as a
20 business developer and a salesperson for those
21 engagements.
22     Q.  How many courses or credits did you obtain
23 to work that petroleum engineering degree program?
24     A.  I don't remember.  It was about a year's

1 **worth of study.**
2  Q.  Where was that study done?
3   **A.  University of North Dakota.  Well, it was**
4 **physically done remotely.**
5  Q.  Was it a graduate level program?
6   **A.  Undergraduate.**
7  Q.  And it was a remote program?
8   **A.  Yes.**
9  Q.  At the University, I'm sorry, of North
10 Dakota?
11   **A.  Yes.**
12  Q.  What type of courses did you take?
13   **A.  Mechanical engineering and applied math,**
14 **geology, chemistry.  Yeah.**
15  Q.  Were you -- I'm sorry, I cut you off.
16   **A.  Basic engineering.  It was year-one**
17 **information, year-one courses that most engineers**
18 **would take, plus some geology and petroleum**
19 **engineering aspect.**
20  Q.  Were you auditing those courses or were
21 you taking them for grades?
22   **A.  I was graded.**
23  Q.  Did you complete the first year?
24   **A.  I did, yeah.**

1  Q.  And after the first year you declined to
2 pursue that any further?
3   **A.  Right.**
4  Q.  Are there any other degrees that you've
5 obtained began to pursue from a university or
6 college?
7   **A.  You probably know from my background of**
8 **materials you read.  I have three degrees from the**
9 **University of Pennsylvania and I have about six or**
10 **seven professional certifications in transportation,**
11 **logistics, resource management,**
12 **materials management, and production.  That you**
13 **know, right?**
14   **A.  That, I'm looking at.  I'm now looking at**
15 **Exhibit 1 which is your report.  I'm looking at page**
16 **35 of 49, if you want to follow along.**
17    **I see the Wharton School, the Master of**
18 **Arts, the Bachelor's of Science.  I don't know that**
19 **I see the petroleum engineering degree on here.  I'm**
20 **wondering -- petroleum engineering, attempt at a**
21 **degree.**
22    **Are there any other degrees that you've**
23 **begun to pursue that you've not completed to**
24 **fruition?**

1   **A.  No, I don't think so.**
2  Q.  And the certifications that we see on the
3 bottom five bullets, are those all through the same
4 accrediting agency or organization?
5   **A.  Did you say you're looking at page 35?**
6  Q.  35 of 49 of Exhibit 1 which is your
7 report.
8   **A.  No, they're not from the same**
9 **organization, no.**
10  Q.  Who was the CFPIM issued through?
11   **A.  Well, it's hyperlinked so you can actually**
12 **go on it and get all the details, but it's issued**
13 **through what used to be call APICS, which is now**
14 **called the Association for Supply Chain**
15 **Management.**
16  Q.  And are any of the other five bulleted
17 certifications issued through APICS?
18   **A.  The second one is and the third one is.**
19  Q.  The first three are APICS?
20   **A.  Yes.**
21  Q.  And can you for the court reporter, can
22 you spell out APICS?
23   **A.  A-P-I-C-S.**
24  Q.  And the CPM?

1   **A.  It stands for the American Production and**
2 **Inventory Control Society.**
3  Q.  The CPM, who that issued through?
4   **A.  APICS.**
5    (Technical difficulties.)
6  Q.  What education was required for the
7 CFPIM?
8   **A.  It was a pretty extensive series of tests.**
9 **If I remember correctly, it was a battery of five**
10 **tests over about two years or three years.**
11  Q.  What year did you obtain that?
12   **A.  I don't remember.  Maybe 2003.**
13  Q.  And the CSCP certification, what was
14 required to obtain that certification?
15   **A.  Same thing.  I think there was a battery**
16 **of tests.**
17    (Technical difficulties.)
18    (The last question and answer was read
19 back.)
20   **A.  I added to that that they included things**
21 **such as operations management, logistics management,**
22 **warehousing, resource management, and production**
23 **management.**
24  Q.  What year did you obtain the CSCP

Page 86

1 certification?
2        (Technical difficulties.)
3        (The last question was read back.)
4    **A. I said I would guess 2005.**
5    Q. How about the CIRM, what year did you
6 obtain that?
7    **A. Again, I don't remember. I would guess**
8 **2007.**
9    Q. The CPM, what year did you obtain that?
10   **A. It was obtained over many years. I**
11 **believe the initial certification was granted based**
12 **on tests in about 2001, but then the lifetime**
13 **component is awarded based on credits for service**
14 **including speaking, teaching, and writing and**
15 **contribution to industry, and I think that was**
16 **awarded in something like 2008.**
17   Q. How many CPM certified individuals are
18 there in the United States, do you know?
19   **A. No.**
20   Q. How about the CTL, when did you obtain
21 that?
22   **A. It was about maybe 1990.**
23   Q. Are there any continuing education
24 requirements for any of these certifications?

Page 87

1    **A. They were for the CPM. And one or more**
2 **for APICS may have an expiration date, but I don't**
3 **remember.**
4    Q. Are all of these certification current as
5 far as you know?
6    **A. As far as I know, yes.**
7    Q. Are any of these considered to be elite or
8 prestigious certifications that require advanced
9 training or schooling or some other experience to
10 obtain them?
11       MR. BETTA: Objection. You can
12 respond.
13   **A. I would say they all are.**
14   Q. That was maybe a bad question. Like
15 within the industry of appraisers, for example,
16 there is only a certain handful that could be
17 considered a particular type of appraiser.
18       Are these certifications open to anyone or
19 do you have to attain a certain level of credential
20 experience to apply?
21   **A. That is a compound question. They're**
22 **available to anyone who can meet certain experience**
23 **and education requirements. So they're not like --**
24 **I think what you're getting at is are they licenses**

Page 88

1 **in a way? They're not licenses. I mean, I don't**
2 **think any -- I don't think they're required to do**
3 **any particular work like a Notary Public requires a**
4 **Notary license, but they're demonstrations of**
5 **expertise on a body of knowledge, and several of**
6 **them have prerequisites.**
7        **So unless you've got, for example, ten**
8 **years of experience in a certain industry, you**
9 **cannot even enter the program. So that's basically**
10 **designed to give that valuable career enhancing**
11 **component that I think you were alluding to**
12 **earlier.**
13   Q. Which heavy experience requirement, like
14 you just mentioned ten years or more experience?
15   **A. I really don't remember. Obviously the**
16 **lifetime CPM does because there is no other way you**
17 **get awarded the lifetime component without having**
18 **service over many years. But I think -- also I**
19 **think at least one or more of the APICS ones has**
20 **prerequisite field experience required for admission**
21 **to the program.**
22   Q. Let me ask you it in a different way
23 that's just real focusing. If you were to go to a
24 conference, are there any of these credentials

Page 89

1 somebody would say, Oh, he has that CSCP, he's only
2 one of eleven hundred in the country who has a CSPC.
3 Are any of those that are limited in their
4 awarding -- do you understand sort what I'm getting
5 at?
6        MR. BETTA: Objection. You can
7 respond.
8    **A. Yes, I think they all do. These are**
9 **things that people tout, people use on their**
10 **signatures, put his initials like an MBA or a JD**
11 **behind their name within a certain community as**
12 **people who do logistics management, materials**
13 **management, production management, these are**
14 **meaningful. That's why I even mention. I don't --**
15 **to be honest, I don't mention them on all places.**
16 **It just depends on sort of if you're in a crowd that**
17 **would value that.**
18   Q. I am going to mark as Exhibit 7 a document
19 that was provided to -- I think by your counsel that
20 is entitled "Education Selector_ascm.pdf."
21       (Exhibit No. 7 marked for
22 identification.)
23   Q. Do you have that in front of you?
24   **A. I do, yes.**

1    Q.  Are these the credentials that you're
2  talking about?  I couldn't quite get the acronyms to
3  match.
4    A.  Yes, some of them are.  The CPIM is.  The
5  CSCP is on there.  They don't offer the CIRM
6  anymore.  They merged it into some other program.  I
7  think they merged it into the CLTV, but I'm not
8  sure.
9    Q.  And scrolling through here, are these
10 education professional prerequisites accurate as far
11 as you know?
12   A.  Where does it show --
13   Q.  If you look at the second page, I think.
14 I'm sorry, yes, the second page.
15   A.  Well, if you found it on APICS' site, I'm
16 sure it's accurate, but it may also be different
17 from what it was when I entered the program.
18   Q.  Understood.
19   A.  But the other thing that relates to all
20 this is that the tests are not really what I did.  A
21 lot of what I did during that time frame was I was
22 on the Board of various parts of these
23 organizations.
24     So for example, I was the president of

1  APICS' regional chapter and the vice-president, so a
2  whole series of successional leadership
3  responsibilities within APICS and also have been
4  ISM, Institute for Supply Management, and maybe
5  another one too.
6    Q.  Let's turn to Exhibit 1 which is your
7  expert report in this case.  And my first question
8  is, Why is it marked confidential, do you know?
9    A.  I mark confidential in a lot -- I put it
10 there because I put almost all client work that I
11 do.  It's frequently confidential.  So if I have a
12 question or unsure, I usually mark it
13 confidential.
14   Q.  Got you.  If you look at Page 4 of 49 of
15 your report.  Again, if it's easier for me to share
16 a screen, I'm happy to do that.  I'm in Section 1.1,
17 the second paragraph.
18   A.  Just one second.
19     MR. BETTA:  Are you talking about the
20 paragraph that starts with "I reviewed"?
21     MS. MOTLEY:  Correct.
22   A.  I see.  Okay.  "I reviewed the prior
23 testimony"?
24   Q.  Yes.  I'm looking at the second sentence

1  that says "I consulted some of my prior client
2  files."  Do you see that?
3    A.  Yes.
4    Q.  Which prior client files did you
5  consult?
6    A.  I remember looking at a few documents from
7  Iron Mountain.
8    Q.  Which documents?
9    A.  The organization charts.
10   Q.  For what purpose?
11   A.  To refresh my memory on their branch and
12 regional structures.
13   Q.  What other client files did you review?
14   A.  I don't remember any others,
15 specifically.
16   Q.  You also say you did a small amount of
17 research on certain aspects of the case.  What did
18 you do to research certain aspects of the case?
19   A.  Whatever is served, which is included in
20 some documents which I shared.
21   Q.  Other than what is indicated in the report
22 and the documents produced in response to the
23 subpoena, is there other web research that you
24 did?

1    A.  Nothing that I relied upon.  So I would
2  say no.
3    Q.  What web research did you do on Great
4  Southland?
5    A.  Very basic research such as what is the
6  company name and where are they located.
7    Q.  Other than the case documents, the
8  pleading, the legal pleadings, did you review any
9  pleadings from any of the other lawsuits?
10   A.  Not from a content point of view.  I
11 pulled up a prior expert report for the template of
12 the cover page and outline structure of my report.
13   Q.  And what is the prior expert report that
14 you looked at?
15   A.  Well, I either used the one from American
16 Energy or RTA.
17   Q.  You're referring to an exert report that
18 you authored in a prior litigation, not an expert
19 report authored by another expert, Adkins?
20   A.  No, I didn't use like Sabino's report, for
21 example, as a template for mine.
22   Q.  Have you reviewed the expert reports from
23 any of the other litigations?
24   A.  I listed all the files that I reviewed.

Page 94

1 And to be quite honest, I'm not totally aware of
2 which ones were used for which litigations. I know
3 there were several cross-litigations and multi-party
4 complaints. And so I mean, that might be kind of a
5 complicated answer.
6    Q.  Sure.
7    A.  My focus was on Great Southland.
8    Q.  Do you remember if you reviewed a report
9 issued by a gentleman named Evan Armstrong?
10   A.  Yes, I did.
11   Q.  And I'm not seeing that listed in your
12 materials reviewed.
13   A.  I mean, I didn't spend much time on it so
14 I don't know if that's relevant. But yes, so it's
15 not under the lists of files conveyed to me?
16   Q.  It doesn't look like it to me, but if
17 you'd like to take a moment to look through?
18   A.  Yeah.
19   Q.  While you're looking, if you could let me
20 know if there is any others in addition to the
21 Armstrong report that you reviewed that are not
22 listed in this document?
23   A.  Okay. Evidently I omitted to put it in
24 there. These are in a separate folder, the expert

Page 95

1 reports, so I forgot to include Armstrong and
2 Charles Sabino's report in there and the expert
3 report on the Evan Armstrong.
4    Q.  In which case did you look at the
5 Armstrong report from?
6        (Technical difficulties.)
7        (The question was read back.)
8    A.  My answer is I looked at all the materials
9 that were given to me and several copies of
10 Armstrong's report were given to me. I don't think
11 I relied on Armstrong's report for any of my
12 statements.
13   Q.  I think you cite it in one of your
14 reports.
15   A.  Where did I cite it? I see here I cited
16 Armstrong Page 7.
17   Q.  Page 19 of 49?
18   A.  Yeah, there is one reference to it, not a
19 citation.
20   Q.  And I guess I'm wondering which Armstrong
21 report is that? Maybe your testimony was that you
22 have several of Armstrong's prior reports?
23       MR. BETTA: Objection. You can
24 answer.

Page 96

1    A.  Honestly, I don't remember which ones,
2 because as far as I was concerned, he was making
3 generalizations about the logistics of warehouse
4 management and forwarding industries. In fact, I
5 know his practice, and he's an industry benchmarking
6 expert, so I didn't really interpret any of these in
7 the context of a case other than what I was also
8 reading about the --
9    Q.  Did you know Mr. Armstrong before this
10 litigation?
11   A.  No -- well, I have heard of Armstrong and
12 I knew either him or I had a conversation once with
13 either him or his father. So they have a name in
14 the industry, but I don't know them personally and
15 I've never met them.
16   Q.  And it sounds like his report was not
17 relevant to your analysis?
18   A.  I'm looking for Page 19. What was it?
19 Page 19 that I cited?
20   Q.  Yes.
21       MR. BETTA: Very top page.
22   A.  Can we tell which document file name that
23 would have been for?
24   Q.  That's why I'm asking the question.

Page 97

1    A.  Yes, I'm sorry. I would have to go back
2 and kind of clarify exactly which report it came
3 from without doing a little bit of research and
4 reading and coming back.
5    Q.  We can do that on a break. I also note
6 that was not in the subpoena response that we
7 received from your counsel yesterday.
8        (Technical difficulties.)
9        (Recess taken.)
10 BY MS. MOTLEY:
11   Q.  We are back on record after a little
12 break. During the break, Mr. Jacoby, did you look
13 at your files to see which Armstrong report you
14 reviewed?
15   A.  I did. It looks like there is one for
16 Äbington. It says, "Expert report of Evan Armstrong
17 for Äbington XPO."
18   Q.  Were there other Armstrong reports that
19 you looked at or just that one?
20   A.  As I said, I looked at everything quickly
21 but that's the one I cited. The page numbers should
22 be Page 7.
23   Q.  I'm sorry, the page reference in your
24 report should be citing to Armstrong report 7?

1   A.  Well, let me check.  19 doesn't -- it says
2  19, right?
3   Q.  Yes, Page 19 of 49 cites to Armstrong, 7
4  at the top?
5   A.  Page 7, that is the table where SP is
6  listed as system in use by XPO.  I apologize for
7  that.
8   Q.  Have you ever reviewed any briefing
9  related to Mr. Armstrong filed if either this case
10  or litigation?
11   A.  I'm not even sure what that means.
12   Q.  Any court pleadings written by the lawyers
13  about Mr. Armstrong?
14   A.  I think there was a rebuttal report, as I
15  mentioned, rebuttal expert report by Gerald Sabino
16  about Armstrong's report.  Does that fall under your
17  category you just mentioned?
18   Q.  It is does not, but that is helpful to
19  know as well.  It sounds like you also reviewed the
20  Sabino report issued in another litigation?
21   A.  I don't know.
22   Q.  Okay.  I can follow up with your counsel
23  about getting a full listing of this at the end of
24  today.

1       Are there any other documents as you
2  scroll through pages 5, 6, and 7 of your report that
3  you reviewed that you don't see on this list?
4   A.  Not that I am aware of, no.
5   Q.  And for what purpose did you review items
6  16 through 19?
7       (Technical difficulties.)
8   A.  Just to be thorough and review, I reviewed
9  all of the documents that were provided to me.
10       (Recess taken.)
11   Q.  You're not intending to offer an expert
12  opinion on the UCP financing statements that are 16
13  through 19 and 41 through 46, are you?
14   A.  I don't believe so.  If they are
15  important, they'll most likely be cited or
16  referenced in the appropriate sense.
17   Q.  Understood.  Number 36 it looks like you
18  reviewed the Landash Corporation bank statement in
19  question.  Do you intend to offer an opinion on the
20  Landash bank statement?
21   A.  Just a second.  I have trouble with my
22  electronic version of my report.  Just one moment,
23  please.  I see Landash Corp. bank statements.  I
24  don't believe so.  There was something in my report

1  which itemized cash and non-cash payments to file
2  names --
3   Q.  I understand.
4   A.  -- that were on bank statements, but I
5  believe those were on different file names, and
6  frankly I don't remember which was included in this
7  Landash Corp. bank statements.
8       (Reporter asks for clarification.)
9   A.  Landash, L-A-N-D-A-S-H.
10   Q.  I'm sorry?
11   A.  Nothing.
12   Q.  I'm now looking at Page 8 of 49, the
13  extended summary at 2.1.
14   A.  Yes.
15   Q.  And the second sentence controls that have
16  been previously -- I'm sorry, controls that had
17  previously been in place were not replaced with
18  management of the rolled-out entities.  Do you see
19  that sentence?
20   A.  Yes.
21   Q.  What is the basis of that opinion?
22   A.  Some of the exhibits to the deposition
23  contain CGL procedures and control documents such as
24  standard operating procedures and HR documents.

1  There were not similar or coinciding documents under
2  the XPO label.
3   Q.  Is it your understanding from the
4  testimony that you reviewed that freight forwarding
5  personnel continued to operate under the CGL policy
6  operations manual?
7   A.  I would not assume that.  I would --
8  probably not, because the company name officially
9  changed.  So I'm not sure if they would still use it
10  in a manual that had been misbranded.
11   Q.  I guess my question to you is, Did you see
12  that in the testimony somewhere that they stopped
13  using the CGL manual?
14   A.  No, I'm just basing it on my experience
15  that a company would not, especially legally, would
16  not typically rely on the document that have the
17  wrong company's name on it.
18   Q.  If you flip to Page 9 of 49 -- well, I
19  guess, let me go back for a second.  It says
20  something about they wouldn't legally be able to use
21  the --
22   A.  Legally or not, I really don't know.  If
23  those documents were in fact existing and updated by
24  XPO, I think they would have been in the exhibit.

Page 102

1    Q.  Do you recall seeing testimony that Mr.
2 Baltagi was trained on the CGL manual?
3    A.  No.  I remember seeing some documentations
4 where he and everybody else was supposed to sign
5 that they were given the code of ethics presentation
6 or information.  That may not have been the same
7 thing as a whole operations training.
8    Q.  So this opinion that the controls have
9 been previously in place that were not replaced by
10 suitable management, that is based on your
11 understanding of the testimony that Baltagi was
12 never trained on the CGL manual?
13    A.  No, it's based on the fact that I didn't
14 see anything comparable labeled XPO.
15    Q.  And if that manual has simply been
16 rebranded XPO, would that be sufficient in your
17 view?
18    A.  Not necessarily.  I mean, the fact that
19 the manual exists is a classic sort of trick that
20 companies can play even if it is not understood and
21 embedded in practice.  So the fact that the manual
22 would have existed alone would not have been -- of
23 that.  I want to see corresponding behavior that
24 shows -- that demonstrates an understanding and an

Page 103

1 implementation of those practices within the
2 company.
3    Q.  Do you have an understanding of how long
4 after the CGL acquisition that the freight
5 forwarding business unit continued to go by CGL?
6    A.  Yes, I have a general understanding.  And
7 I remember seeing in some of the research that I did
8 that the company rebranded to XPO.
9    Q.  Do you remember what year that was?  Are
10 you looking at something?
11    A.  I'm looking at my report.  In September of
12 2011 CGL rebranded as XPO according to the timeline
13 on page 10 of my report.
14    Q.  What is that timeline based on?  Where did
15 you find the underlying data?
16    A.  I don't remember right now as we're
17 speaking.
18    Q.  And your understanding -- I'm now skipping
19 ahead a little bit.  On page 10, the figure to
20 timeline of events, April 2011, that's when you
21 believe that Baltagi was hired?
22    A.  That's what the timeline says and that was
23 my understanding when I wrote this report, unless
24 it's a mistake.

Page 104

1    Q.  I think that might be a typo.  I am
2 looking at the subpoena response that your counsel
3 provided and there's three Word documents in there.
4 And I'll tell you one is titled "XPO timeline note
5 210531.cocx.  The second has the same name, but it's
6 got an A at the end.  And there's the third one that
7 has a parenthetical that says, desktop, conflicted
8 copies, or something to that extent?
9    A.  Okay.
10    Q.  Do you have those documents handy, or I
11 can share my screen?
12    A.  Can you share your screen, please?
13    Q.  Of course.  Hang on just a second.  Let me
14 know when you can see this.
15    A.  I can see it, yes.
16    Q.  Let's just -- I'm notoriously horrible at
17 remembering which exhibit I'm marking as which, so
18 I'm marking as Exhibits 8, 9, and 10, the three
19 timeline documents.
20          (Exhibit Nos. 8, 9, 10 marked for
21 identification.)
22    Q.  And I'll do them, the one that looks to be
23 the original is timeline note 210531.doc.  The
24 second one is marked as Exhibit 9 will be the same

Page 105

1 document with an A at the end.  And the third
2 document I'll mark as Exhibit 10 is the desktop
3 version.
4          What I'm looking at, the Exhibit 8, this
5 shows that Mr. Baltagi was hired in September of
6 '12?
7    A.  September of '12?  You mean September
8 2012?
9    Q.  Yes.
10    A.  Those are notes.  So I would look to an
11 actual force document for a more definitive answer
12 than that document.
13    Q.  So if you flip back to your figure 2
14 timeline of events where it shows April 2011 CGL
15 Logistics hires Baltagi, that is not -- either your
16 notes are incorrect or the figure is incorrect, but
17 they can't both be right.  Is that fair?
18    A.  That's probably fair.
19    Q.  Sitting here, you're not sure which one is
20 correct either, your note or the timeline?
21    A.  No, I'm not sure.
22    Q.  Let me just flip to the next Exhibit No.
23 9.  I think it shows that same start date in Exhibit
24 9.  And then if we look at Exhibit 10, it looks like

Page 106

1 it has that same start date.
2     And I guess the question is, Is XPO
3 timeline note, pretty assume your subpoena response
4 Word doc, is an iteration of each other, or can you
5 tell which is the earlier version or which is the
6 final? Is there one the final version?
7     **A. Well, the final version is the timeline in**
8 **the report. And you can tell the difference between**
9 **them by the date which is in --**
10         (Reporter asks for clarification.)
11         MS. MOTLEY: I think he said year,
12 month, day.
13         **THE WITNESS: Correct.**
14     Q. Then I think I might have asked another
15 question, but what I'm trying to answer is one of
16 these final and one is the draft, or -- sitting
17 here, can you tell what the significance of these
18 three documents is?
19     **A. They're all drafts. The only thing that's**
20 **final is the timeline in the report.**
21     Q. Understood. Did you use software that --
22 through the data to put into the report or is there
23 a separate program used to generate the timeline?
24     **A. There is a separate program.**

Page 107

1     Q. Looking at the timeline that's Figure 2
2 from page 10 of your report, in February of 2017
3 there is a note "Star Funding sues XPO." Then I'm
4 wondering -- I'm not familiar that Star Funding did
5 sue XPO, and I'm wondering what is the basis for
6 that timeline entry, if you recall?
7     **A. I can't remember exactly. I would have to**
8 **go back and look at the documents that I reviewed**
9 **and figure out which document supported that. It**
10 **may be Star Funding threatened to sue XPO, is**
11 **possible.**
12     Q. But sitting here you're not sure where you
13 would have gotten that?
14     **A. No. I'm not sure that either of those**
15 **materially -- never mind. Cross that out.**
16     Q. In this note you have in January of 2013
17 CGL published its employee training manual. What is
18 the employee training manual that you're thinking of
19 from January 2013?
20     **A. I believe it's a document that has the**
21 **title "Employee Training Manual" on it.**
22     Q. An exhibit CGL document or XPO document,
23 do you remember?
24     **A. I believe it is a CGL document.**

Page 108

1     Q. And do you remember where you would have
2 seen that, because I'm not familiar with what you're
3 referencing?
4     **A. In an exhibit in one of the depositions.**
5     Q. But sitting here, you're not sure which
6 one?
7     **A. No, I would need to dig it up.**
8     Q. I will stop sharing my screen. On the
9 figure 2 timeline of events you had a note March
10 2014 XPO acquires Pacer. What business unit did
11 Pacer become an XPO, if you know?
12     **A. I don't recall.**
13     Q. Is Pacer an intermodal?
14     **A. It was.**
15     Q. So do you know if Pacer was acquired as a
16 stand-alone entity how XPO Global Forwarding is a
17 stand-alone separate entity?
18     **A. The Pacer was branded, so I don't really**
19 **know it existed as a legal entity.**
20     Q. But Pacer was not freight forwarding,
21 right?
22     **A. Pacer was intermodal management.**
23     Q. In other words, Pacer did not merge into
24 XPO Global Forwarding, right, or do you know?

Page 109

1     **A. I don't think so, but I really don't know**
2 **how exactly it was integrated.**
3     Q. And Norbert Dentressangle, I'm not sure if
4 I'm say that correctly or not. that would be a
5 Europe arm of XPO; is that right?
6     **A. That's correct.**
7     Q. And do you know whether Norbearer merged
8 with XPO Global Forwarding or it existed as a
9 separate entity?
10     **A. I don't know.**
11     Q. And Conway, that was LPL; is that right?
12     **A. That's correct.**
13     Q. And do you know if Conway was merged into
14 XPO Global Forwarding or still a separate entity?
15     **A. I don't know.**
16     Q. Do you know if any of the entities that
17 are referenced in this acquisition section you're
18 talking about actually rolled into the XPO Global
19 Forwarding freight forwarding enterprise?
20     **A. I don't think they did.**
21     Q. Do you have an understanding of how, if at
22 all, XPO Global Forwarding expanded in the 2013 to
23 2018 time period?
24     **A. Yes, based on Shook's testimony. I**

Page 110

1 believe it's Shook and maybe also Muzi. But Shook
2 was asked and answered a number of questions about
3 the assets and employees and infrastructure of XPO
4 Global forwarding, and I do remember his answers
5 indicating that it was very asset-liked.
6    Q. Is it your understanding that XPO Global
7 Forwarding is a non-asset-based freight forwarder?
8    A. It was.
9    Q. Is it your understanding that changed at
10 some point?
11    A. The whole company XPO went from a
12 non-asset-based model to an asset-based or
13 asset-like model, so over the time that we're
14 talking about. So it is not a black or white thing.
15    One of the biggest proceduric changes was
16 the acquisition of LTL's business which effectively
17 threw XPO from a non-asset-based to a somewhat
18 asset-based company.
19    Q. I'm sorry, my question was unclear. I'm
20 asking specifically as to Global Forwarding, the
21 freight forwarding division. Is it your
22 understanding that was not asset-based?
23    A. In the conventional understanding of the
24 term, yes. They had -- I'm sure they had some

Page 111

1 assets. I assume they had some assets regarding
2 stations and brands and whatever, but I think
3 fundamentally was at the time we're really
4 examining, which is in like the 2015 period, 2016
5 period of, it was primarily non-asset-based.
6    Q. That's because it's my understanding too,
7 but I wanted to make sure it was not something
8 different that you've seen. I think that you
9 indicated somewhere in either -- or maybe in your
10 rebuttal report that you reviewed some SUP filing by
11 XPO?
12    A. I think I looked up the FMCSA file of XPO
13 Global Forwarding.
14    Q. And what did that tell you?
15    A. I recall two things. One is that it
16 was -- it was incorporated in the State of Florida
17 at some time -- or there was an entity that was
18 established in Florida at some point around 2014,
19 '15, and I never -- the filing I saw indicated that
20 it was -- that some XPO entity was filed as a
21 carrier for the FMCSA.
22    Q. Do you know if it was XPO Global
23 Forwarding that was registered to do business in
24 Florida?

Page 112

1    A. Yes, it was.
2    Q. That that's where the FMCSA issued from or
3 that's where that entity was incorporated?
4    A. The latter. That's where -- there was an
5 entity established. There was a -- that had the
6 title Global XPO Forwarding in it in Florida. And
7 separately XPO was registered as a carrier with
8 FMCSA. I don't know if the two were connected.
9    Q. Did you review the 10Ks?
10    A. Yes.
11    Q. And did those 10Ks indicate the manner in
12 which freight forwarding was expanding if at all?
13    A. I don't know, because I was primarily
14 reviewing them to see if this lawsuit or collection
15 of lawsuits was referenced in the last few years of
16 10Ks.
17    Q. So you didn't specifically review anything
18 in the 10Ks regarding how freight forwarding was
19 expanding its branches?
20    A. I don't recall seeing that.
21    Q. Do you know about how many freight
22 forwarding locations there were between 2012 and
23 2018?
24    A. Well, that's -- Shook comments in his

Page 113

1 deposition that there were only four at the time
2 frame concerned.
3    Q. Between 2012 and 2018?
4    A. I think he was answering a question about
5 a policy that pertains to 2016.
6    Q. If I told you there were more of a
7 magnitude of 16 freight forwarding locations in the
8 time period, would that be consistent to what you
9 saw?
10    A. Within which document time? It would be
11 about five years.
12    Q. Sure. How about 2014?
13    A. I think that was would be inconsistent
14 with Shook's testimony.
15    Q. It is your understanding that there were
16 only four XPO Global Freight forwarding locations in
17 2014?
18    A. That's my recollection of the Shook
19 testimony. Again, Shook, he did not always seem
20 very authorative or knowledgeable about some of XPO
21 Global Forwarding. For example, he didn't know if
22 it is a separate registered legal entity or not.
23    Q. So what is the significance from a
24 day-to-day operation whether there was a separate

Page 114

1 entity or not?
2 **A. It may or may not be significant. I'm**
3 **just saying if I were Shook and I was responsible**
4 **for -- I was the president or vice-president of a**
5 **business unit, I would -- I think I would know**
6 **whether it was a legally registered entity or not.**
7 Q. But that doesn't have a material effect on
8 the functionality of the business, does it, whether
9 or not he knew if it had an EIN or not?
10 **A. It does. He describes it in one case that**
11 **it's a cost center. Sorry?**
12 Q. Shook did?
13 **A. I believe it was Shook. Maybe Mutton.**
14 Q. I'm not familiar with that testimony.
15 **A. I point it out in my report and I cited.**
16 **I referenced it. It's a cost center within another**
17 **legal entity, then it's probably not run as a profit**
18 **and loss basis. And if it's not run on a profit and**
19 **loss basis, then it may tend to share more**
20 **infrastructure with other organizations and it may**
21 **have less institutional infrastructure of its own.**
22 Q. I think you testified earlier that your
23 experience with FedEx is that it has shared services
24 including HR, finance, legal, for example; is that

Page 115

1 right?
2 **A. Yes, it does have a corporate area that**
3 **takes care of those things.**
4 Q. Is it also your understanding that XPO
5 uses shared services like HR, finance, legal?
6 **A. No, not from what I read.**
7 Q. What did you read that made you think
8 there's not shared services?
9 **A. Clearly there was a legal department**
10 **handling legal matters at the corporate level, but I**
11 **didn't see any evidence of the kind of -- for**
12 **example, a customer service function, which would**
13 **have been often a shared service, I didn't see any**
14 **evidence of that. I didn't see any evidence of**
15 **their, you know -- there may be procurement**
16 **activities.**
17 Q. But you saw evidence of shared HR,
18 right?
19 **A. I saw that shared HR from CTL. I don't**
20 **recall whether I saw it from XPO.**
21 Q. Well, it looks like you reviewed the XPO
22 employee code of conduct that was issued by XPO's
23 parent company. It's number eight in your list of
24 documents considered. It looks like you reviewed

Page 116

1 the Baltagi contract termination letter, which is
2 No. 3. It looks like you reviewed the Baltagi
3 deposition.
4 **A. The manual could have easily been farmed**
5 **out to an outside company. It was kind of -- it had**
6 **the look to me of boilerplate, so I'm not sure how**
7 **much internal resources was spent on it or not.**
8 Q. You just don't know either one of the HR
9 manuals you're talking about?
10 **A. Right, I mean, I've seen UPS' manual like**
11 **that too. Some cases those manuals are designed**
12 **for -- you can smell and feel the culture of the**
13 **company in them. To be honest, this one looked more**
14 **like the one that was produced with a lot of help**
15 **from outside consultants, but I don't know.**
16 Q. Outside consultants like you?
17 MR. BETTA: Objection. You can
18 respond.
19 **A. No, there are companies that specialize in**
20 **HR policies.**
21 Q. And that's not your company, right, you
22 don't specialize in HR policies?
23 **A. Generally not. As I said, we get asked.**
24 **The organization and HR kind of renders opinions on**

Page 117

1 **that sometimes, but that's not our core practice**
2 **area.**
3 Q. If a company asked you to generate a
4 company policy from scratch, that's not something
5 that would be within your expertise?
6 MR. BETTA: Objection. You can
7 respond.
8 **A. We do pieces of that. For example, when a**
9 **company asks us to look at a gift, to design a gift**
10 **policy, which is actually part of a general code of**
11 **ethics, we reviewed and helped. Corporate ethics**
12 **policy --**
13 Q. When you say we, is that you or is that a
14 HR progressional that works for you?
15 **A. I actually did some work on the gift**
16 **policy.**
17 Q. But you are purporting to give expert
18 testimony on HR policies?
19 **A. No, I don't. Actually -- well, this was**
20 **under A.T. Kearney at the time.**
21 Q. So you're not purporting to give expert
22 testimony on HR policies?
23 MR. BETTA: Objection. You can
24 respond.

1    A.  Yes, I would disagree with that.  I mean,
2 I did make comments in my report and I do have
3 opinions on the management of people and the
4 management of processes related to HR in this
5 situation.
6    Q.  And I guess I'm not seeing the manual, the
7 HR manual.  Are you offering expert opinions on
8 whether it would be drafted appropriately, not
9 drafted appropriately?
10    A.  Specifically to your question about
11 whether they had a policy manual or not, no, I'm not
12 testifying that I think it was an externally
13 produced document.
14        (Off the record.)
15        (Jennifer Doherty, CSR, exits the virtual
16 room at 12:50 p.m.)
17
18
19
20
21
22
23
24

1        AFTERNOON SESSION
2    Q.  Let's look at page 13 of 49 of your report.
3 The fourth full paragraph on that page that starts
4 "The name XPO Global Forwarding."
5    A.  Mm-hmm.
6    Q.  And you say "The name XPO Global Forwarding
7 seems to imply that the organization is a freight
8 forwarder implying that it issued a bill of lading
9 for transport, takes possession of the goods, is
10 responsible for intransit storage while XPO claims
11 that the organization was doing nothing more than
12 brokering cargo."  Do you see that?
13    A.  Yes.
14    Q.  Okay.  We talked a little bit earlier about
15 how XPO Global Forwarding was a non-asset based
16 freight forwarder.  Do you remember that testimony?
17    A.  Yes.
18    Q.  So my question here is are you offering an
19 opinion that there's something inherently wrong with
20 being an non-asset based freight forwarder?
21    A.  No.  I'm not saying -- obviously lots of
22 companies are non-asset based freight forwarders.
23    Q.  What is the significance of that paragraph?
24    A.  There's a duplicity in what XPO is saying

1 through the depositions that I've read.  On the one
2 hand the company is claiming that it's only a broker
3 of the services and so; therefore, it's not
4 responsible for what happens.  And -- to the cargo
5 or anything to do with the cargo.  It seems just to
6 be an agent.  And on the other hand it is claiming
7 to be a forwarder with end to end responsibilities
8 for ensuring complete and successful conclusion of
9 the shipment transaction.
10    Q.  Are you saying that you reviewed testimony
11 that in all circumstances XPO says it's not
12 responsible for the goods or just in this
13 circumstance that XPO is not responsible for the
14 actions of the rouge employee?
15    A.  In this case, the depositions that I read
16 and the testimony of Sabino seems to claim that XPO
17 was not responsible for what happens to almost any
18 aspect of the transaction with Great Southland
19 because it's only a broker of the transaction.
20        And while in other -- in public facing
21 activities and messaging it -- during the same time
22 period it claims to be a total solution provider
23 responsible for everything.
24    Q.  What other external facing documents are

1 you talking about?
2    A.  Well I'm referring to a lot of the
3 messaging internally about -- that I call out in my
4 report like we or warehousing.  And the fact that
5 Baltagi gave a tour of the warehouse to the
6 customer.  And the fact that XPO Global Forwarding
7 even existed as an entity.  These and other things
8 were designed to really -- seemed designed to convey
9 an image to the customer that the company would take
10 full responsibility from beginning to end of a
11 customer relationship.
12    Q.  I guess that's my question.  Have you seen
13 any testimony, evidence, documents, et cetera that
14 outside of the circumstance that we find ourselves
15 in today where a rouge employee was doing things he
16 ought not to be doing, that XPO Global Forwarding
17 had otherwise ever stated its responsibility to its
18 customer?  Or is that opinion limited to what you've
19 seen related to Afif Baltagi?
20        MR. BETTA:  Objection.
21        You can answer.
22    A.  My report relates specifically to this
23 case.
24    Q.  Okay.  So there is not other documentation,

1  external materials that you've seen where you know
2  something happens to the cargo and XPO has not taken
3  responsibility for it.  It's just this case; is that
4  right?
5      A.  Yes.
6          MR. BETTA:  Objection.
7      A.  Yes, I -- my report is focused on this --
8  the context and situation of this matter.
9          I did -- there is supporting evidence in my
10  report from other parties about a more general
11  nature of abrogating the responsibility of XPO.
12      Q.  Would that be the glassdoor.com reviews?
13      A.  That's one example.
14      Q.  Okay.  Let's look at that.  You cite the
15  glassdoor.com reviews several times in your report.
16  It looks like that is -- the first is footnote 4,
17  which is on page 13 of 49.  And that -- are you at
18  page 13 of 49?
19      A.  I'm on page 13, I'm trying to find the text
20  that you're referring to.
21      Q.  It's at footnote 4 on the bottom that
22  references up to the first full paragraph.
23      A.  Baltagi's offer letter?  Yes.  Okay.
24      Q.  I'm going to probably share screen.  This

1  is Exhibit 11, Glassdoor response from your
2  subpoena.  I'll share the screen real quick.
3          Okay.  And in that footnote 4 we see a URL
4  listed on the second line of footnote 4.  Do you see
5  that?
6      A.  I did see it just a minute ago.  Is this
7  the URL you typed in?
8          (Exhibit No. 11, marked; XPO Logistics -
9  Most Corrupt Company Imaginable_Glassdoor.pdf.)
10      Q.  The document that I'm showing you on the
11  screen now is Exhibit 11.  I believe this is from
12  your subpoena response that corresponds to footnote
13  4.  Is that right?
14      A.  I think so.  I don't see the text exactly
15  there, but maybe it's on the next page.  No, the
16  text is there.  Yes, that's it.
17      Q.  Okay.  And this May 11th, 2017 Glassdoor
18  report relates to The Dispatcher in Vancouver, BC.
19  Do you see that?
20      A.  Yes.
21      Q.  Are you aware that XPO Global Forwarding
22  did not have a Canadian operation in 2017?
23      A.  No.
24      Q.  You think that XPO Global Forwarding did

1  have a Canadian location?
2      A.  I don't know one way or the other.
3      Q.  I will present to you it did not.  And I
4  guess I'm wondering, do you know which XPO business
5  unit this Dispatcher in Vancouver BC related to?
6      A.  No, I don't know.
7      Q.  You later cite glassdoor.com at footnote 6,
8  and this one does not have a URL listed.  And I'm
9  wondering is this review found at the same URL as
10  the one we looked at in footnote 4 or do you know?
11      A.  It could be.  Do you see this text in the
12  same document?
13      Q.  I don't.
14      A.  Is it the same posting date?
15      Q.  It indicates in footnote 6 that it is.  I
16  will represent to you that all of the footnotes -- I
17  believe it's footnote 6 and footnote 11 and footnote
18  4 all reference the same URL that we see on
19  Exhibit 10 in front of us.  But I'm not sure that
20  the posting dates are correct or I don't know that I
21  even have the correct reviews that you're citing.
22      A.  Will you show your screen again, please.
23      Q.  Sure.  Can you still see it?
24      A.  Yeah.  Because I can't see it as clearly as

1  you probably can because on my screen it's a very
2  small text.  But I'm reading the cons right now.
3  Can you go down and go --
4      Q.  Sure.  I guess what I'm trying to
5  understand is Footnotes 4, 6 and 11 all reference a
6  post from May 11th, 2017.  But then here we see one
7  that's May 10th of 2021 regarding customer service
8  representative in Butte, Montana.  And I'm just not
9  sure which Glassdoor reviews were the ones that you
10  were relying on.
11      A.  I can -- maybe I can clarify that.
12      Q.  Okay.  I'll help you out here.  Footnote 11
13  which cites to a post of May 11th, 2017, looks like
14  it maybe actually relates to the review I have on my
15  screen here on May 10th, 2021, related to customer
16  service in Butte, Montana.
17      A.  Mm-hmm.
18      Q.  I'm just not sure.
19      A.  Does it say disorganized and understaffed?
20      Q.  It's on page 22, "The company was great
21  when Con-Way Freight."  This text.
22      A.  Right.  And there's more to the text.  Can
23  you just go down a little bit?
24      Q.  Sure.  And, again, Con-Way is LTL, right?

1    A. Yes. Was. But I -- I'm looking for the
2  word disorganized in here which -- is there more to
3  this on the next page? Yeah, here we go. Is this
4  what actually was in my folder or is this --
5    Q. Yes.
6    A. -- everything together?
7    Q. This is what was provided to me by your
8  counsel.
9    A. Yeah. On the one that says -- I think it's
10 the previous one, it's from Vancouver, British
11 Columbia. It cites disorganization and
12 understaffed.
13   Q. Okay. And I'm just trying to understand,
14 it looks like you got a couple cites to
15 glassdoor.com in your report, and I'm seeing two
16 reviews here, one of which of is dated May 11, 2017.
17 One of which is a positive review that you don't
18 cite, one of which is the negative review dated May
19 10th, 2021, and I'm just trying to understand the
20 footnotes all cite May 2017 and that doesn't look
21 right to me. So are there different reviews that
22 I'm missing or is the report incorrect or we're not
23 sure?
24       MR. BETTA: Objection.

1    You can respond.
2    A. Can I just take a minute and see if I can
3  answer the question?
4    Q. Sure.
5    A. Thank you.
6    Q. What are you looking at to aid you?
7    A. I'm seeing what comes up when I Google my
8  folder for Glassdoor. I would have to look at it,
9  but obviously you found two different ones, right?
10 And they have the keywords that -- that I mentioned
11 in the text. So I think the only question is is the
12 exact citation that's the -- that's the only one
13 known here, right?
14   Q. I'm not sure if these are what you're
15 citing or if they're not, or if you're citing
16 something different.
17   A. They seem to have the text that I reference
18 so yes. One cites disorganization and understaffed.
19 And also -- and it also says "all you need is a GED
20 and no experience." And those are the comments that
21 I make in my report, in those -- on those two pages
22 that you mentioned. So both of them refer to this
23 -- this Glassdoor posting. The same posting called
24 "Most corrupt company imaginable."

1    Q. And this posting that we're looking at from
2  May 11th, 2017, the Dispatcher in Vancouver, BC, you
3  don't know what business that ties back to, right?
4    A. No. And honestly I don't think it makes a
5  difference.
6    Q. Okay. And same with this May 10th, 2021,
7  customer service representative in Butte, Montana.
8  It looks to me like this relates to LTL based on the
9  reference to Con-Way, but I don't know that I know
10 one way or another, do you?
11   A. I don't know and, again, I don't think it
12 makes a difference.
13   Q. Okay. Glassdoor.com are anonymous reviews;
14 is that right?
15   A. Generally true, yes.
16   Q. Do you know if employers have the ability
17 to edit or refute reviews on glassdoor.com?
18   A. I don't believe they do.
19   Q. And we don't know who the posters were of
20 those two reviews that we just looked at in
21 Exhibit 10, do we?
22   A. No.
23   Q. And you -- I mean, I don't know and you
24 don't have any special information that would let

1  you know that, do you?
2    A. No. And I don't think it matters.
3    Q. And there's not an ability for an employer
4  to challenge the reviews; is that right?
5       MR. BETTA: Objection.
6       And you can respond if you wish.
7    A. I don't know whether employees can object
8  to refute or appeal or not.
9    Q. Do you know what the average company rating
10 is on glassdoor.com?
11   A. No, but I have seen a lot of ratings with
12 high stars.
13   Q. If I represent to you that the average
14 company rating is 3.5, do you have any reason to
15 disagree with that?
16   A. Out of what? 4?
17   Q. I think it's out of 5.
18   A. Well that makes a difference.
19   Q. Do you have any reason to disagree that the
20 average employee -- employer rating is 3.5?
21   A. It depends on whether it's out of a 4 point
22 scale or 5 point scale.
23   Q. Yeah, and I'll represent it's a 5 point
24 scale.

Page 130

1    A. No, I don't have a reason to dispute that.

2    Q. Do you know what XPO's rating is?

3    A. You mean the average rating? Because I

4 showed you what I found.

5    Q. Yeah, the average rating.

6    A. I don't know if there's a way to know the

7 average rating.

8    Q. If I told you XPO's average rating is 3.6,

9 would you have any reason to disagree with that?

10    A. Yes. I mean, the anecdotal ones that I've

11 seen were lower, so I would -- I would expect it to

12 be a little bit lower than the average.

13    Q. But if I represent to you that that's in

14 fact what its rating is, you wouldn't have a reason

15 to disagree with me?

16    MR. BETTA: Objection.

17    You can respond if you can.

18    A. No.

19    Q. Okay. Why don't we go ahead -- this is

20 going to get a little tricky, but what else can go

21 wrong today? I'm going to share my screen. Give me

22 a second.

23    MR. BETTA: Martha, are we going to take a

24 break for lunch, even a ten-minute break?

Page 131

1    MS. MOTLEY: Whatever you want.

2    MR. BETTA: How much -- roughly do you have

3 any idea of how much time you're going to need?

4    MS. MOTLEY: Well, we're on page 15 of 49 of

5 the first report and there's two additional reports.

6    MR. BETTA: So you're saying probably

7 another three or four hours?

8    MS. MOTLEY: I would intend to go all day.

9    MR. BETTA: Okay. That's fine. How about

10 if we take a lunch break at 1:30 for even like

11 15 minutes.

12    MS. MOTLEY: Sure. That's fine with me.

13    MR. BETTA: Okay.

14    MS. MOTLEY: Let me try, unsuccessfully, do

15 this again.

16    Q. (By Ms. Motley) Okay. I'm going to share

17 my screen now. Let me know when you can see it.

18    A. All right. I can see it.

19    Q. Okay. Just so there's no need for you to

20 rely on my representation, I have pulled up on my

21 screen glassdoor.com/xpologistics. Can you see

22 this?

23    A. Yes, I can.

24    Q. Okay.

Page 132

1    MR. BETTA: We weren't shown this

2 beforehand.

3    MS. MOTLEY: Well the witness -- first of

4 all, I don't know that I have an obligation to show

5 you publicly available sources. Second of all, the

6 witness is challenging whether he will agree with my

7 assumption that XPO Logistics has a 3.6 review on

8 glassdoor.com. I'm only substantiating that.

9    MR. BETTA: So we're supposed to exchange

10 exhibits a day before the deposition.

11    MS. MOTLEY: Sure. That was the

12 understanding that we had, but I'm entitled to view

13 additional exhibits as things come up.

14    MR. BETTA: So you can just pull exhibits

15 out of thin air during the deposition and not give

16 us -- not provide them beforehand?

17    MS. MOTLEY: Yes.

18    MR. BETTA: I'm going to object to that.

19    MS. MOTLEY: That's fine.

20    Q. (By Ms. Motley) Having seen my screen in

21 front of you, do you have any reason to disagree

22 this is what is reported on glassdoor.com?

23    MR. BETTA: Objection.

24    You can respond.

Page 133

1    A. I have a reason not to give it credence.

2 It's not really clear what this represents to me.

3    Q. Well you're the one who is relying on

4 glassdoor.com. So it's either reliable for your

5 review or not reliable. Which is it?

6    MR. BETTA: Objection.

7    You can respond.

8    A. Yeah, I disagree with that logic. I have

9 seen employee reviews on Glassdoor before. I've

10 never seen company review averages, and I don't know

11 how -- I don't know exactly which entity this is

12 referring to. And I don't know how they calculate

13 the average. The community in any way of

14 calculating averages means, mediums, modes. I don't

15 know whether the companies have any role or

16 influence in the -- in the calculation, the

17 methodology or the presentation of this. It might

18 be a paid engagement. I have no idea.

19    Q. You're just not that familiar with

20 glassdoor.com?

21    MR. BETTA: Objection.

22    Can you respond.

23    A. Yeah, I didn't say that. I'm familiar with

24 it's ratings by employees feature. I'm not familiar

1  with it's ratings by employers feature.
2      Q.  Okay.  What is your company's rating on
3  glassdoor.com?
4          MR. BETTA:  Objection.
5          You can respond if you can.
6      A.  Yeah, I think it's between 4 and 5 stars
7  out of 5.
8      Q.  And do you review the content posted on
9  glassdoor.com related to your company?
10     A.  Not really.
11     Q.  Have you reviewed it?
12     A.  I took a look recently.
13     Q.  Are there reviews that you had seen that
14  you disagree with?
15     A.  No.  I didn't actually look at it that
16  closely.
17     Q.  So you're not sure if you agree with the
18  reviews that you saw, the recent reviews?
19         MR. BETTA:  Objection.
20         You can answer if you can.
21     A.  That's too broad a generalization.  I'm
22  sure there would be things about certain reviews
23  that I would disagree with, but I don't have the
24  details in front of me.

1      Q.  Okay.  Then let me share my screen.  I'm
2  showing you what we're marking as Exhibit 13.
3          (Exhibit No. 13, marked; Boston Strategies
4  International Reviews_Glassdoor.pdf.)
5      Q.  This is -- I'm going to scroll up.  This is
6  your company, right?
7          MR. BETTA:  Objection.  Again, same
8  objection.  This is completely irrelevant and was
9  not provided to us before the deposition as was
10  agreed upon.
11         MS. MOTLEY:  Your objection's noted.
12     Q.  Is this your company that we see, Boston
13  Strategies International?
14     A.  It could be.  Probably is.
15     Q.  And if we scroll down, here's a nice
16  review.  "Great place to learn a lot quickly."  And
17  here's a negative review from 2016 that says "Run
18  the other way.  Pros are far and few between -- I'm
19  sorry -- few and far between.  Work remotely and at
20  your own will.  All employees are all over this
21  world.  Run the other way."
22         Do you agree or disagree with this review?
23     A.  Which review?  Because you just showed a
24  few things there.

1      Q.  Sure.  The April 7th, 2016, review that you
2  can see right here on my screen -- oops.  I'm sorry,
3  it clicked off.  Here we go.  It says cons.  Do you
4  see where I'm circling with my mouse?
5      A.  Yes.
6      Q.  Okay.  "Run the other way.  Work is
7  relatively boring and incongruous.  If you do not do
8  the work precisely the way the president wants you
9  will be a goner.  You are the gopher.  Company is
10  nowhere as big as the website states.  President is
11  a slandering man yet cheeky fellow.  Turnover at the
12  company is very high.  There is no culture in the
13  company."
14         Do you see that?
15     A.  Yes.
16     Q.  Do you agree with that review?
17     A.  I have no opinion on that review.
18     Q.  Do you know who posted this review?
19     A.  I have a suspicion who did.  Can you show
20  it a little larger, please?  So I can read it.  I
21  can't really tell -- you just read it, but you read
22  it really fast.
23     Q.  Sure.  Let me see.  I think that's about as
24  big as I can make it.

1      A.  No, I actually don't know who wrote it.
2      Q.  Okay.  And you don't have an opinion one
3  way or the other whether this is accurate or not
4  accurate?
5          MR. BETTA:  Objection.
6      A.  No opinion on it.
7      Q.  Okay.  No opinion on whether this is an
8  accurate review or an inaccurate review?
9      A.  No.
10     Q.  "The president is a slandering man yet a
11  cheeky fellow."  Would that be referring to you as
12  the president?
13         MR. BETTA:  Objection.  Objection.
14  Completely irrelevant.  This has nothing to do with
15  what we're here for.
16         MS. MOTLEY:  It absolutely does.  He is
17  relaying on glassdoor.com for the veracity of the
18  statements contained therein.  I'm entitled to ask
19  him about whether he thinks all of the statements on
20  glassdoor.com are reliable.
21     Q.  (By Ms. Motley)  My question was do you
22  agree with the statement "president is a slandering
23  man yet cheeky fellow"?
24     A.  I think they need to be interpreted in the

Page 138

1  context, and there's no context in this case.
2      Q. Okay. So without context this is a fairly
3  meaningless blurb.
4      A. People can make whatever they want out of
5  it.
6      Q. People can make up things that they want to
7  and post it on here.
8          MR. BETTA: Objection.
9      A. I don't know if that's true or false.
10     Q. And the president that this is referring to
11 as a slandering man, that president would you in
12 2016, right?
13         MR. BETTA: Objection.
14         You can respond if you can.
15     A. Probably.
16     Q. There's some nice reviews in here too, but
17 the point is you don't know who wrote these nice
18 reviews or these bad reviews, do you?
19     A. No, I don't.
20     Q. Okay. And I'm just going to show you a
21 second set of reviews we'll mark as Exhibit 14 also
22 from glassdoor.com.
23         (Exhibit No. 14, marked; Boston Strategies
24 International Interview Questions_Glassdoor.pdf.)

Page 139

1      Q. That talks about interview questions and it
2  says at the bottom here where my mouse is -- I'm
3  sorry this is small. It says "Now I can second the
4  statement run away." Do you see that?
5      A. I can't read that. It's too small.
6      Q. Sure. Let me just share my screen a
7  different way then.
8      A. And I wasn't provided this in advance.
9          MR. BETTA: Yes. The same objection's made
10 again. I'm making the same objection.
11         MS. MOTLEY: Okay.
12     Q. All right. Let me know if you can see that
13 a little bit better now. Can you see my screen?
14     A. No, I cannot read that. I'm sorry, it's
15 too small.
16     Q. There you go. Can you see it now?
17     A. I can see part of it.
18     Q. Okay. And you can see where my mouse is,
19 "when I read the previous Glassdoor review on the
20 company and it said run away, I decided to still
21 give it a try. Now I can second the statement run
22 away."
23         Can you see that?
24     A. Yes.

Page 140

1      Q. And do you agree or disagree with this
2  opinion?
3      A. No opinion. I mean if it were in the case
4  -- in the context of a pending litigation, I could
5  say it could be relevant.
6      Q. So without context this has no relevance?
7      A. Right.
8      Q. Was that a yes?
9      A. Yes.
10     Q. Let's flip back to page 14 of your report
11 which we marked as Exhibit 1.
12     A. Okay.
13     Q. The first full paragraph. It says "Ian
14 Oliver claims he had only a dotted-line, quote,
15 reporting relationship to Baltagi, but it's not
16 clear if anybody would describe their relationship
17 as a solid-line one."
18         Do you see that?
19     A. Yes.
20     Q. What does that mean?
21     A. It means that it's not clear who Afif
22 Baltagi was ultimately responsible for or
23 accountable to from the material that I reviewed.
24     Q. From the materials that you reviewed.

Page 141

1      A. Right.
2      Q. And the only basis for that opinion would
3  be based on the material reviewed, right?
4      A. Right. I've read over 14,500 pages of
5  material though.
6      Q. Mm-hmm. But if the particular question
7  wasn't asked, at what time period did Afif Baltagi
8  report to you, right, if that question wasn't asked
9  during the deposition, it wouldn't be reflected in
10 the transcript. So that's fairly common sense,
11 right?
12         MR. BETTA: Objection.
13         You can respond if you're able.
14     A. I still would make that point for a couple
15 reasons. One is that no organization chart existed
16 in the entire documentation provided. And the
17 second is that -- is that he had no job description
18 or any details in his offer letter that helped
19 characterize or understand his role in the
20 organization. So from multiple angles that I can
21 see, he was left to define his own accountabilities
22 and role in the organization.
23     Q. Is it your opinion that it's always a bad
24 thing to have a dotted-line relationship?

Page 142

1    A. I would not say always, but in most cases,
2 yes.
3    Q. Is it your understanding that the executive
4 team was comprised of Shook, Muzi, Jorgensen, and
5 Oliver based on what you reviewed?
6    A. What was the last one, Shook, Jorgensen,
7 Oliver?
8    Q. And Muzi.
9    A. And Muzi. So this was the -- his immediate
10 supervision, as I understand. That was his
11 immediate layer of supervision, yes.
12   Q. Okay. And -- sorry, go ahead.
13   A. That's my understanding. I did -- I was --
14 that's based on the testimony of these people that
15 they -- that he reported to them each.
16       So, again, based on what I reviewed, that's
17 what they said. If there's additional information
18 or testimony or organization charts that provide
19 more clarity, then that would -- that could help me
20 understand better his role. But that's what they
21 said.
22   Q. Okay. If you turn to page 26 of your
23 report and flowing over to page 27 of your report,
24 you talk a little bit about the reporting structure.

Page 143

1 I'm look at 2.6.2. Let me know when you're there.
2    A. Yes. I'm there.
3    Q. Okay. And you say "Between 2015" -- is
4 that 1/1 of 2015?
5    A. That's what I meant.
6    Q. Okay. "Through 2018," which you understand
7 Baltagi was terminated in April of 2018, right?
8    A. Right.
9    Q. That he was managed by at least four
10 managers: Shook, Oliver, Jorgensen, and Allen. Do
11 you see that?
12   A. Yes.
13   Q. Okay. Is Allen supposed to be Muzi there?
14   A. I think so.
15   Q. Okay. And then we roll on to page 27 and
16 you say "The bosses of those four churned
17 excessively," and you reference Katrina Lidell in
18 2020, Josh Allen in 2018, Dominic Muzi in 2017 and
19 Henrik Jorgensen in 2016, and Ian Oliver.
20       Do you see where I read that?
21   A. Yes.
22   Q. And then you calculate there's nine people
23 responsible for overseeing the Houston branch over
24 four years, right?

Page 144

1    A. Right.
2    Q. Now I'm not very good at math, and I will
3 readily admit that, but this -- I'm not getting nine
4 people. Who are the nine people? I see Shook,
5 Oliver, Jorgensen, Allen, Katrina, Dominic Muzi, and
6 then it looks like you double counted Oliver and
7 Jorgensen. So I get six. Not nine. But tell me
8 where I'm going wrong.
9    A. Yeah, the difference is that I'm referring
10 to people in the context of their specific roles.
11 So, for example, Muzi in the first capacity as a
12 direct manager is different than Muzi in the second
13 context as a vice president. So the reporting
14 relationship and the person are unique such that go
15 together.
16       So when somebody -- so what I'm referring to
17 is a given person in a given role in this context
18 has changed around eight or nine times during that
19 period.
20   Q. Okay. Well that's not what this says. It
21 says nine people were responsible for overseeing the
22 Houston branch. And I'm wondering -- it's not nine
23 people, it's six people, right?
24   A. I just explained what I meant by people in

Page 145

1 that case so yeah.
2    Q. Okay.
3    A. If you want to take it that way you can.
4    Q. Okay.
5    A. I just ....
6    Q. And the next sentence says "At an average
7 of 5.3 months each, 48 months divided by 9 people,"
8 you say he was able to pull the wool over their
9 eyes. But an average of 5.3 months each, it's
10 assuming the 9 people had different responsibilities
11 or how does that math work?
12   A. Yes, it assumes that they were in a -- that
13 they're -- see, if you're new in a role you need to
14 go up a learning curve. So each of these people as
15 they came into a role, they probably were not
16 totally aware for the first couple months of exactly
17 everything going on. Probably took them a little
18 while.
19       So even for Muzi in the one role, as he
20 moves to the other role it takes time for him to get
21 used to the new role and the new responsibilities.
22 So that's the basis for dividing one number by the
23 other number.
24   Q. And the 48 months, where do you get

1 48 months from?

**2 A. It's 4 years times 12 months.**

3 Q. Okay. But you understand that Baltagi was

4 separated from the company in April of 2018, so

5 actually 1/1/2015 to 4/2018 is 39 months, not

6 48 months, right?

**7 A. Yeah, that would make the number even**

**8 worse.**

9 Q. And Katrina Lidell, here you have parens

10 2020. She was there two years after -- she wasn't

11 there two years after Baltagi was terminated, right?

**12 A. Yeah, but I don't know when she started is**

**13 the thing. It's very unclear from some of these**

**14 things, except for where I could pick specific**

**15 reference points that these people mentioned in**

**16 their deposition, I was unable to put together a**

**17 precise timeline of when they each came and went**

**18 from certain positions.**

19 Q. Okay. And you're aware that the Houston

20 location was shuttered as of July 2017, right?

**21 A. Yeah. And I don't remember that specific**

**22 fact, but I don't think it changes the basic**

**23 analysis.**

24 Q. So you're standing by your math is what

1 you're telling me.

**2 A. And the -- with the clarifications I've**

**3 given, yeah.**

4 MS. MOTLEY: Why don't we take a quick break

5 now. How long do you want, Tony?

6 I'm sorry, did I cut you off, Mr. Jacody?

**7 THE WITNESS: I was just going to add that**

**8 it still tells the same story even after Baltagi**

**9 left.**

10 MR. BETTA: How long do you need, David? I

11 don't know if you had anything to eat today.

**12 THE WITNESS: I don't need very, very long.**

**13 I can do 15 minutes as you suggested. Or I can do a**

**14 half hour.**

15 MR. BETTA: Why don't we do 15 minutes. Is

16 that okay?

17 MS. MOTLEY: Super.

18 MR. BETTA: All right.

19 MS. MOTLEY: All right. Thanks.

20 (Recess was taken at 1:30 p.m.)

21 (Reconvened at 1:51 p.m.)

22 MS. MOTLEY: We are back on the record after

23 a brief break.

24 Q. (By Ms. Motley) I'd like to talk about the

1 Spruce Point Capital report that you referenced many

2 times in your complaint -- in your report, and I'm

3 going to mark that as Exhibit 15.

4 Do you have a copy in front of you?

**5 A. I can get it up here. Hold on a second.**

6 (Exhibit No. 15, marked; Spruce Point

7 Capital Management Report.pdf.)

**8 A. I think I pasted it into the report.**

9 Q. Yeah, and then I think we had the actual

10 document.

**11 A. Yeah, it was referenced three times.**

12 Q. Do you have it up?

**13 A. Yeah, I do. Yeah.**

14 Q. Okay. All right. What is your

15 understanding of what Spruce Point Capital is?

**16 A. It's my understanding it's a -- sort of an**

**17 activist investor group in XPO.**

18 Q. And it's not just XPO specific, right?

19 Their whole schtick is for activist investors. It's

20 broader than XPO, right?

**21 A. It could be.**

22 Q. Were you familiar with Spruce Point Capital

23 prior to this engagement?

**24 A. No.**

1 Q. Do you take investing advice by Spruce

2 Point Capital since this engagement?

**3 A. No.**

4 Q. The basic understanding that I have of

5 Spruce Point Capital is as you said, they're an

6 activist investor such that they profit if the

7 shares tank. I mean, is that your general

8 understanding too?

**9 A. I wouldn't say that I could have a general**

**10 understanding like that, no. I just don't know.**

11 Q. Okay.

**12 A. I imagine it depends on each investment**

**13 that they make and exactly what they say. And I**

**14 think activist investors usually flex their agendas**

**15 quite a lot depending on their holdings and their**

**16 intentions.**

17 Q. And you would agree to have an agenda,

18 right?

**19 A. Well every investor group has an agenda.**

**20 And as you said, activist investor groups usually,**

**21 you know, might form an agenda before they even**

**22 invest. So I don't know what their agenda was for**

**23 this case.**

24 Q. Generally speaking, as it relates to Spruce

Page 150

1  Point, they would buy shares low and sell them at a
2  higher price with the idea being that once the share
3  price falls, the investor can find a match cheaper
4  and then pocket the difference, right? Is that your
5  understanding of what Spruce Point does?
6      MR. BETTA: Objection.
7      You can answer if you can.
8      **A. It's not my understanding, no. I mean --**
9  **no.**
10     Q. What investigation did you do, if any, into
11 Spruce Point Capital?
12     **A. Spruce Point Capital, when I saw this**
13 **report I noticed their website and Googled them.**
14     Q. Okay. Did you do anything to prove or
15 disprove the veracity, the truth of the statements
16 contained in the Spruce Point report?
17     MR. BETTA: Objection.
18     You can answer if you're able.
19     **A. I compared some of what they were saying**
20 **with what I was observing through my review of the**
21 **material provided me about this case.**
22     Q. Did you do any work to review other media
23 produced at or around the same time of Spruce Point
24 Capital's report to see if others were agreeing with

Page 151

1  them or refuting what they said?
2      **A. Googled a little bit about the stock price**
3  **of XPO during this time frame. And on what was**
4  **happening with XPO around this time frame. But I**
5  **didn't do due diligence in any particular companies.**
6      Q. Yeah, and I guess my question is when you
7  read this Spruce Point report, did you look for
8  other publications at or around the same time that
9  either agreed with or disproved the statements in
10 the Spruce Point report?
11     **A. No. I did notice that the stock price**
12 **predictions -- there were stock price predictions**
13 **and the XPO stock price varied over time.**
14     Q. And do you know if as of a year later, for
15 example, if the doomsday prediction in the Spruce
16 Point report was true or not true?
17     **A. Yeah, I think it was not true. Well, I**
18 **shouldn't say it was not true, because it may have**
19 **been -- yeah, as I said, the stock price of XPO was**
20 **volatile. Like had significant ups and downs over**
21 **the one- to two-year period before and after this**
22 **report. I know that eventually it recovered and did**
23 **very well.**
24     Q. And I guess just to confirm, you did not

Page 152

1  review XPO's responses to the Spruce Point report?
2      **A. I did not see that, no.**
3      Q. Do you know Ben Axler, principal of Spruce,
4  personally?
5      **A. No.**
6      Q. Okay. In your -- I guess do you have the
7  Spruce Point report in front of you?
8      **A. The one that's in an appendix on page 29 of**
9  **my report.**
10     Q. No, I have one that's a standalone version
11 that your counsel provided when the -- when your
12 report was produced to us. Do you want me to pull
13 it up?
14     **A. Well I think I have it, because I pasted**
15 **that entire document onto page 31. Is that exactly**
16 **what you're looking at as separate --**
17     Q. No. No, I'm looking at the full report and
18 the first page is what I'm looking at in particular,
19 the truck. Do you have that or do you want me to
20 pull it up?
21     **A. Is it a document that my counsel or that**
22 **Carlile gave to you?**
23     Q. Yes.
24     **A. Through me?**

Page 153

1      Q. Yes.
2      **A. Let me see. And what's the file name?**
3      Q. Oh golly. This was what we sent to your
4  counsel and it's titled Spruce Point Capital
5  Management report with some numbers. Do you have
6  that or do you want me to pull it up?
7      **A. I'd rather try to find it myself if it's**
8  **what you provided. Because then I can read the**
9  **text.**
10     Q. Sure.
11     **A. Spruce Point Capital Management report,**
12 **right? Okay. Yes, I have it now. I have not seen**
13 **this before, just so you know.**
14     Q. You have not reviewed this?
15     **A. This specific file that you're just asking**
16 **me to look at, I have not seen it.**
17     Q. Okay. The 68-page report that has a red
18 truck on the front, you have not seen this before?
19     **A. Correct.**
20     Q. So the extent of the Spruce Point Capital
21 materials that you reviewed are what's attached to
22 your report?
23     **A. Yes.**
24     Q. That we see as page 31?

Page 154

1    A. Yes.
2    Q. That's the only Spruce Point materials that
3  you reviewed?
4    A. Yes.
5    Q. Okay. And the first time you're seeing
6  this Spruce Point full document is today?
7    A. Yes.
8    Q. Okay. Well I'm not really sure what to do
9  with this, because your counsel produced this
10  68-page report to us along with your report. I was
11  under the impression that you relied on this report.
12  It sounds like the answer to that is no.
13    A. I did not rely on this report.
14    Q. Okay. You relied on exhibits -- appendix
15  Spruce Point Capital investor report at page 29.
16    A. Page 29 and -- just a minute. And page 31
17  is the same text, yeah.
18    Q. I understand. Did you copy and paste the
19  text from page 31 into page 29?
20    A. Yes, I did. So that it could be the same
21  font size and more legible.
22    Q. I understand. Okay. So this summary,
23  which looks like on page 31 is not complete, you can
24  see it says "read more" at the bottom.

Page 155

1    A. When you click on that, there was no more
2  though. I will say that.
3    Q. Okay. This is the extent of the Spruce
4  Point report that you relied on?
5    A. Yes.
6    Q. Okay. So I suppose you don't know the
7  graphic on the front of the report we marked as
8  Exhibit 15, is the red truck. Do you see that?
9    A. I did see that, yes. I can see it, yes. I
10  can see it now.
11    Q. This is the first time you've seen this
12  document?
13    A. Correct.
14    Q. And the driver of that truck, who is that?
15    A. It looks like a muppet.
16    Q. And POS Logistics, do we have the same
17  colloquial understanding of what POS means?
18    A. Probably not. I don't know what POS
19  Logistics means in this case. I probably will find
20  out by reading the report.
21    Q. In your report you also say on -- looking
22  at page 18 you say "another source elaborates," and
23  then you have some italicized inset text. Do you
24  see that?

Page 156

1    A. Right.
2    Q. Okay. And then keep your finger on that,
3  and I'm going to direct you also to your subpoena
4  response, the document entitled "Why XPO Logistics
5  Appears To Be Using A Nearly Identical Playbook."
6  That's the document title. Do you have that
7  document up?
8    A. I will get it up here.
9    Q. And while you're pulling that up, I'll just
10  note in your report at page 18 after that italicized
11  text footnote 8 links down to a hyperlink on seeking
12  Alpha. And I believe that's what you're pulling up
13  as Exhibit 16. Do you have that article up?
14    A. Not yet.
15    Q. Okay.
16    (Exhibit No. 16, marked; Article entitled
17  Why XPO Logistics Appears To Be Using A Nearly
18  Identical Playbook To United Rentals, Which Was
19  Charged With Accounting Fraud.)
20    Q. Let me know -- I can pull it up on my
21  screen.
22    A. I have it.
23    Q. Okay. In your report at page 18 you say --
24  the top of page 18 "another source elaborates," and

Page 157

1  then you insert some text, footnote 8 links down to
2  the hyperlinked article, and I believe what you're
3  looking at as Exhibit 16 is that hyperlinked
4  article; is that right?
5    A. Yes.
6    Q. Okay. But it's not another source, is it?
7  This is a blog authored by Ben Axler, right?
8    A. The blog authored by Ben Axler is a
9  different source than this Spruce Point Capital
10  source.
11    Q. But Ben Axler is the principal of Spruce
12  Point Capital, right?
13    A. To be honest, I didn't even know that.
14    Q. Okay. If I were -- I'm sorry?
15    A. I said that's why I said another source.
16    Q. I understand. If I represent to you that
17  Mr. Axler is the principal of Spruce Point Capital,
18  would you agree with me that's not really another
19  source? It's another iteration of Mr. Axler's
20  opinion.
21    MR. BETTA: Objection.
22    You can answer.
23    A. Yeah -- I mean, yeah, I probably wouldn't
24  have called it another source if I had known that.

Page 158

1    Q. And, again, with this article, Exhibit 16,
2 did you do anything to verify the underlying
3 assumptions and data contained in this article
4 either to confirm it or to disprove it?
5    **A. I did look at the audit committee structure**
6 **of XPO. And while reviewing the 10Ks I read some**
7 **content about the audit committee's composition and**
8 **activities.**
9    Q. Okay. Have you reviewed a Deutsche Bank
10 analysis by Amit Mehrotra in connection with Spruce
11 Point?
12    **A. I don't think so.**
13    Q. Are you aware of any entity or agency
14 opening an investigation as a result of the Spruce
15 Point report?
16    **A. I'm not aware of that no.**
17    Q. Do you know if Spruce Point covered it's
18 short position?
19    **A. No idea.**
20    Q. Do you know the company Echo Global
21 Logistics?
22    **A. I've heard the name but I don't know them,**
23 **no.**
24    Q. Okay. So fair to say you've not reviewed a

Page 159

1 Spruce Point Capital report of Echo Global
2 Logistics?
3    **A. I'm sorry, I may have heard that name. I**
4 **don't know the company.**
5    Q. Okay. So fair to say you have not reviewed
6 a Spruce Point report related to Echo Global
7 Logistics?
8    **A. Correct.**
9    Q. All right. We're hopping around a little
10 bit, so I apologize. So if you flip back to
11 Exhibit 1, which is your report, we're still on
12 page 18.
13    **A. Okay.**
14    Q. And you say in the last full paragraph "The
15 accurate and thorough financial information would
16 have caught the aging receivables problem and could
17 have potentially revealed the Ponzi scheme even
18 before Adkins applied to GSL for a loan in March of
19 2016."
20    Do you see that last full sentence?
21    **A. Yes.**
22    Q. Okay. And what is your understanding of
23 when Jason Adkins or Landash or Midwest, his
24 companies, had aging account receivable with XPO?

Page 160

1    **A. I believe that there was -- some of the**
2 **Adkins accounts were past due in at least the second**
3 **half of 2015.**
4    Q. Do you know how much past due they were?
5    **A. It's a little hard to tell, because the**
6 **monthly operating reports and financial information**
7 **submitted by Baltagi was incomplete.**
8    **There were some aging receivables 0 to 30,**
9 **30 to 60, 90 day indications that I saw which**
10 **indicated, I believe, some of them were more than**
11 **90 days.**
12    Q. And at what point were they more than
13 90 days?
14    **A. The information I reviewed was from 2015,**
15 **2016. I think it was from those two years. So**
16 **during those two years.**
17    Q. And do you recall how past due the accounts
18 were?
19    **A. Like I said, more than 90 days was my -- is**
20 **my memory of that.**
21    Q. Do you know the magnitude of the amount
22 past due?
23    **A. You mean beyond 90 days, like how far**
24 **beyond 90 days? 180 days or 360 days?**

Page 161

1    Q. No, I'm sorry. The dollar amount past due.
2    **A. I'm sure it varies by time bucket. But at**
3 **one point I saw numbers of 40- to $50,000 a month,**
4 **for example.**
5    Q. Do you have a sense of what the overall
6 branch revenue would've been in that time period?
7    **A. The documents that I saw indicated target**
8 **revenues of about $400,000 a month.**
9    Q. Is the amount of aging AR relative to the
10 amount of the branch's overall financial
11 performance?
12    **A. It could be. It could be presented that**
13 **way, yes.**
14    Q. Okay. So were these significant AR as in
15 terms of the branch or not significant in your
16 opinion?
17    **A. It probably varied by month. In some**
18 **months they may not have been. In other months they**
19 **probably were.**
20    Q. Yeah, I guess that's what I'm asking you.
21 What is the threshold for you to consider aging AR
22 to be significant?
23    **A. I'm sure companies set both dollar values**
24 **and percentage for this. So it wouldn't necessarily**

Page 162

1  just be a percentage that they would look at.
2  Especially with companies in the transportation
3  business, which are familiar with the way fraud
4  works and how money kind of leaks out in small
5  amounts here and there.  So they wouldn't only look
6  at percent.  If they were to look at percentage they
7  would probably, order of magnitude, come up with
8  some kind of -- I guess I would just -- it would
9  vary from company to company.
10      I would suggest that ten percent, if it hit
11  ten percent, any company would be looking at it.
12      Q.  Okay.  And I guess that's what I'm asking
13  you.  In your expert opinion at what point did the
14  aging AR cross that threshold?
15      A.  Yeah, and I can't answer that for sure
16  because the information didn't show month by month
17  match up between the aging receivables from these
18  accounts and the revenue from the branch.
19      But my point also related to you, you know,
20  assets under control or under liability.  Not just
21  the revenue, an aging receivable, it's also the --
22  whether or not those tires and inventory stuff
23  should've been counted as -- you know, somewhere in
24  the financial statement.

Page 163

1      Q.  I appreciate that.  My question's a little
2  different.  I'm asking you in your opinion, based on
3  what you're saying in your report, what is the time
4  period, and I'm not asking for a day, but generally
5  when would the trigger have been tripped that
6  somebody, in your opinion, should have said we got
7  to look into this AR?
8      A.  Yeah, based on my recollection of the
9  material, sometime in 2015.
10      Q.  And what would have been the trigger that
11  tripped that investigation, in your opinion?
12      A.  In the context of what I just wrote there,
13  it was AR.
14      Q.  Right.  And that's what I'm asking about.
15  What is the AR trigger that should've tripped an
16  investigation?  That's what I'm trying to
17  understand.  Is it 10,000 aging 90 days or 20,000
18  aging 180?  Where's the threshold in your opinion?
19      A.  I think they should have better systems
20  where they're looking at percentage -- not only
21  percentage of total revenue.  That's a very gross
22  way of looking at it that could leave a lot slipping
23  through.
24      They should be looking at it as a percentage

Page 164

1  of the total business with that customer as well.
2  So if the customer's, even if they're small, is
3  largely delinquent, that should trigger action.
4      Q.  I understand that and I'm asking in your
5  opinion when was the trigger that action should have
6  been taken based on everything you reviewed and the
7  testimony you just gave about your opinion?  I'm
8  asking for a time period.  When should that trigger
9  have tripped?
10      A.  I think probably 2015, second half.
11      Q.  Second half, 2015?
12      A.  Yes.
13      Q.  Second -- third quarter or fourth quarter?
14      A.  I don't know.  Not enough information.
15      Q.  Okay.  And understanding that the revenue
16  for the branch was targeted, I think you said at
17  400,000?
18      A.  300,000 in 2015.  It rose to 400,000 in
19  2016.
20      Q.  Okay.  What's the monetary amount of aging
21  AR that should have tripped that trigger?
22      A.  That's an incorrect way of even kind of
23  framing up the way a trigger works.
24      Q.  Correct.  Tell me what I got wrong.  I'm

Page 165

1  sorry, I was talking over you.  Tell me what I got
2  wrong.  How would you quantify what the trigger is?
3      A.  A trigger should involve a little bit of
4  intelligent analytics.  So the trigger should be
5  based on multiple factors.  For example, the total
6  value of the delinquency, the extent of the
7  delinquency.  Like how many days or months overdue.
8  The percentage of the total for the branch, and a
9  percentage of total for the account.  I would think
10  those would be four reasonable metrics that would in
11  some combination trigger.
12      Q.  Okay.  In your opinion that trigger
13  would've tripped in Q3 or Q4 of '15; is that right?
14      A.  I think so because the Adkins accounts,
15  from what I remember, had individual delinquencies
16  of 40- or $50,000.  And I don't know what their
17  total revenue with those accounts were, but it was
18  -- for an individual Adkins account it was probably,
19  you know, not more than, you know, two or three
20  times that.
21      So to your -- looking at probably a company
22  delinquency of like a third of what they owe or half
23  of what they owe or more.
24      Q.  Yeah, do you know what the total amount

1 billed to Jason Adkin's companies was?

2 **A. That information was not in the material.**

3 Q. Is that information relevant to your

4 analysis?

5 **A. It could be. It could have tripped one of**

6 **the triggers.**

7 Q. Okay. Is it your experience that the 3P

8 industry has problems with AR sort of across the

9 spectrum? In other words -- that was a bad

10 question. I'll ask it differently.

11 Is it your understanding that in the 3PL

12 field it's common to have slow pay customers based

13 on the nature of the beast?

14 **A. No. Not any more than other industries.**

15 Q. In other words, if you're selling something

16 to Walmart and Walmart is at 180, and you have to

17 decide who you're going to pay, is it consistent

18 with your experience that it's often the 3PL that

19 gets paid last?

20 MR. BETTA: Objection.

21 You can answer.

22 **A. No, it's not. I mean, people structure**

23 **their contracts in a way that they -- to make sure**

24 **that they can cover their liabilities when they're**

1 due.

2 **So companies don't structure their**

3 **receivables contracts in a way that won't allow them**

4 **to cover their payables obligations.**

5 Q. Have you been specifically retained by a

6 3PL to assist in looking at aged AR?

7 **A. Not a 3PL, no.**

8 Q. Okay. And you're not an auditor, right?

9 **A. Well I am an auditor in a sense. I mean, I**

10 **do audits. I do many types of audits. I'm not a**

11 **CPA.**

12 Q. Gotcha.

13 Have you ever conducted a fraud audit at a

14 3PL?

15 **A. I would refer fraud audits to a security --**

16 **a logistics security specialized firm.**

17 Q. Okay. So your company does not provide

18 fraud audits; is that right?

19 **A. Generally speaking, that's true. If**

20 **somebody has suspicions, my company might provide**

21 **some initial analysis. If it really smells bad and**

22 **it smells like there's fraud, they would bring in**

23 **police or detectives or customs agents or somebody**

24 **else.**

1 Q. Okay. We're talking a little bit in the

2 hypothetical. Have you been involved in a 3PL in a

3 fraud audit?

4 **A. I've been involved with a company that does**

5 **these types of investigations of fraud.**

6 Q. Have you been involved with a 3PL in

7 running a fraud audit?

8 **A. No.**

9 Q. Okay. Have you reviewed a 3PL fraud audit

10 results?

11 **A. No.**

12 Q. If you flip to page 19.

13 **A. Yes.**

14 Q. It talks about "Employees should be drug

15 tested" in the middle of the page under

16 Section 2.3.4.

17 **A. Mm-hmm.**

18 Q. Is there something in your mind to indicate

19 there were drugs involved in this case?

20 **A. In this case, no.**

21 Q. When you drop down to the last paragraph,

22 "more rigger around the MOR including periodic

23 audits by independent auditors from corporate." Is

24 this referring to a financial audit?

1 **A. What page are you on, just so I can stay**

2 **with you?**

3 Q. Sure. Page 19, the last paragraph.

4 **A. I'm trying to rearrange my screen so I can**

5 **see you and the document. This kind of thing would**

6 **not happen on an in-person call.**

7 Q. I had a lot of things that wouldn't have

8 happened in an in-person today.

9 **A. Right. Yeah, I see the paragraph you're**

10 **talking about. What's the question?**

11 Q. I think the question was periodic audits by

12 independent auditors, are you referring to financial

13 audits there?

14 **A. Process and financial audits.**

15 Q. Yeah, and I'm just asking about this last

16 little paragraph. This last little paragraph, that

17 talks about financial audits?

18 **A. No, that talks about process and financial**

19 **audits. An auditing function sort of classically**

20 **involves let's say a corporate group called Internal**

21 **Audit. Internal Audit, in my experience, kind of**

22 **starts with financials usually. But I don't think**

23 **they're limited to financial analysis. Especially**

24 **if they determine that there's some underlying cause**

Page 170

1  for financial discrepancy they -- you know, the
2  company should bring in process managers to see why
3  that discrepancy is occurring.
4      Q. In this bottom paragraph that I'm looking
5  at, it refers to SOX. Is that Sarbanes-Oxley?
6      A. Yes.
7      Q. And you're not reporting to be an expert on
8  the auditing requirements derived from
9  Sarbanes-Oxley, are you?
10     A. No, I'm not.
11     Q. Okay. And you're not purporting to give an
12 opinion at all on whether or not XPO did or did not
13 comply with Sarbanes-Oxley generally?
14     A. I think I disagree with that. I mean, I'm
15 raising a question in my report. I don't answer the
16 question. I don't say that they were or were not
17 violating SOX, but there's enough flags in here
18 about the lack of controls and a pattern of
19 discrepancies that would raise a reasonable question
20 as to whether adequate safeguards were in place to
21 cover their SOX obligations.
22     Q. Okay. But you're not offering an opinion
23 yes, XPO has violated the Sarbanes-Oxley statute or
24 no. That's outside the scope of your opinion,

Page 171

1  right?
2      A. I believe so.
3      Q. The periodic audit by independent auditors
4  from corporate that you reference at the bottom of
5  page 19, that would be a financial audit; is that
6  right?
7      A. No. It would be financial and process.
8      Q. Okay. Well that's where I'm struggling a
9  little bit. It looks look the paragraph up above
10 that talks about there should have been auditing of
11 warehouse documents or bills of lading, which seems
12 to be a different audit to me from what you're
13 talking about in paragraph 19 which references PWC
14 KPMG, an accounting firm for financial and SOX
15 related audits.
16     I guess that's what I'm trying to
17 understand. Are you talking about multiple audits
18 that should've been conducted, only financial, only
19 the warehouse, all should have been audited? That's
20 what I'm trying to understand.
21     A. They're all related. So, for example,
22 suppose I go into a warehouse and a financial audit
23 is done and it shows a discrepancy of material
24 disappearing from the warehouse. In the context of

Page 172

1  the same audit the question would naturally arise
2  why is that material disappearing. So people will
3  go in, maybe it's a systems problem, maybe there's
4  something wrong with the way the information systems
5  are doing their arithmetic or their computation or
6  algorithms. Maybe it's due to a human resource
7  problem. Maybe the people are inadequately skilled.
8  Maybe it'd due -- there's a root cause analysis that
9  needs to be done as part of any audit. And to do a
10 good audit, they should do that root cause analysis
11 and understand what are the underlying problems.
12     The process -- a very common underlying
13 problem is the business process is not -- is not
14 robust or strong. So something is dropped -- the
15 ball is dropped between two interfaces of people,
16 and this is what a lot of companies -- this is what
17 I did at FedEx in fact. I helped kind of map their
18 processes and make sure that balls weren't dropped
19 in many different processes.
20     Q. The audit that we see, you reference about
21 they don't audit warehouse documents or bills of
22 lading. Does your company -- has your company
23 participated in an audit of warehouse documentation
24 and bills of lading for fraud detection purposes?

Page 173

1      A. Where is that text that you just read from?
2      Q. Sure. It's the second to last paragraph on
3  page 19.
4      A. Oh, they don't. XPO does not audit
5  warehouse documentation or bills of lading
6  provide execute --
7      Q. Yeah.
8      A. Okay.
9      Q. And my question was has your company or you
10 been involved in auditing warehouse documentation or
11 bills of lading for purpose of discovering fraud?
12     A. I honestly don't know how to answer that.
13 We've been involved in freight audits. A freight
14 audit is a very pretty common type of audit where
15 invoices and payments are reviewed of transportation
16 bill and of invoices from 3PLs.
17     Q. And is that to true-up the financials?
18     A. It usually starts off to save money where
19 -- and identify billing discrepancies and
20 overpayments. But depending on what you find -- I
21 mean, if you find abnormalities or a pattern of
22 abnormalities, that freight bill audit would
23 necessarily conclude with more than just a number of
24 loss. It would conclude with a root cause

Page 174

1  recommendation of how to stop the pattern of losses.
2      Q. And that was a little bit more to my point.
3  Have you been retained to perform the type of audit
4  to detect fraud?
5      A. No.
6      Q. And in terms of what a fraud audit would
7  entail, do you know if there's a checklist that you
8  would use or a set of guidelines with criteria for a
9  fraud audit?
10     A. The expert consultants that I referred to
11  earlier would definitely have templates and
12  checklists and standard operating procedures around
13  a fraud audit.
14     Q. But you and your firm do not do that
15  function, right?
16     A. Generally correct.
17     Q. Okay. Let's see. On page 20 you say --
18  I'm sorry, the second paragraph you say "Some of my
19  clients' IT departments monitor company email flows
20  to ensure there's management and oversight of the
21  employees. Such monitoring of emails enhances
22  customer service and roots out nefarious conduct of
23  employees, including fraud."
24         Do you see that?

Page 175

1      A. This is on page 20?
2      Q. Correct. The second paragraph.
3      A. Okay. Yeah, okay.
4      Q. Okay. Which clients' IT departments
5  monitor company email flow as you reference in this
6  paragraph?
7      A. Suwaidi does. Al-Suwaidi which we talked
8  about before.
9      Q. And what do they monitor? Is it like key
10  stroke monitoring, video monitoring, gigabyte that
11  passes back and forth? Transmittal to gmail from
12  professional account? What do they monitor?
13     A. I'm pretty sure the IT department can see
14  everything, including content.
15     Q. Including content?
16     A. Yes.
17     Q. And what software do they use to monitor?
18     A. It's not email software in the sense that
19  you might be referring to like gmail. It's in the
20  back end through their servers and I don't really
21  know.
22     Q. I guess that's what I'm asking. What's the
23  name of the product or application that they use to
24  monitor email flow?

Page 176

1      A. I think it's homegrown, but I really would
2  not know. I would need to ask a special -- somebody
3  in the company that question.
4      Q. Okay. Homegrown?
5      A. I think, but I don't know.
6      Q. Okay. And obviously what year were you
7  engaged with them? I've forgotten.
8      A. 2013 through 2017.
9      Q. And did Al-Suwaidi implement monitoring
10  software at your recommendation?
11     A. No.
12     Q. Have you ever been involved in recommending
13  to a client that they install software monitoring?
14     A. Yes, actually. Because we developed a
15  website for them and got our hands on their IT, and
16  had a lot of IT discussions with them about what
17  they should track and not track.
18     Q. Vis-à-vis the website or vis-à-vis the
19  employee emails?
20     A. Vis-à-vis the website and the employ
21  responses to inquiries on the website.
22     Q. Understood. But in terms of what email
23  flows were being monitored, did you make
24  recommendations to Al-Suwaidi about that?

Page 177

1      A. Well I mean if the inquiries -- yes, to the
2  extent the inquiries came and were responded to by
3  an email.
4      Q. Through like a website portal?
5      A. Right.
6      Q. Okay. To the extent that they did not come
7  through a website portal but simply arrived as
8  emails into an email box, did you make
9  recommendations about whether or not those emails
10  should be monitored?
11     A. No.
12     Q. Have you done that for any client, made a
13  recommendation about whether employee emails should
14  or should not be monitored?
15     A. I have not but I know that -- yeah, I have
16  not.
17     Q. Okay. And fair to say you've not made
18  recommendation about the type of applications or
19  software that should be used to facilitate that
20  email monitoring?
21     A. That's not completely true. That's almost
22  true. But I did a presentation recently and case
23  studies on artificial intelligence in procurement.
24  And a number of the companies involved actually went

Page 178

1 into detail about their artificial intelligence
2 competencies for detecting patterns within content
3 within email.
4    Q. Okay. I understand that you did a report
5 on that recently. I'm asking you about your
6 recommendations that you or your company have made
7 to clients that have retained you regarding what
8 monitoring software they should use regarding
9 employee email. And it sounds like that has not
10 been your experience, but correct me if I'm wrong.
11    A. I think not, although I do it at my own
12 company if you count that.
13    Q. Okay. And what software do you use at your
14 own company?
15    A. Gmail.
16    Q. What --
17    A. The platform. It's more than gmail. It's
18 the whole Google platform suite.
19    Q. Yeah, I guess what's the monitoring
20 software?
21    A. Same.
22    Q. It's the Google product?
23    A. Yes.
24    Q. Do you know the name of the Google product?

Page 179

1    A. It's in Google workspace.
2    Q. And what does it monitor?
3    A. Allows permissioning, redirection and
4 forwards of email from any user to any other user.
5    Q. I'm not following. Are you saying that it
6 -- this relates to the delegate conversation that we
7 had earlier about how you can have permissions on
8 other's emails?
9    A. Yes, it does relate to that. I mean, I
10 have part -- my company has partners in different
11 places and those partners are sometimes entitled to
12 Boston Strategies' email access. But I can and do
13 monitor them from time to time. When something
14 smells wrong. And I have in the past detected fraud
15 through that method.
16    Q. What fraud did you detect?
17    A. Somebody who was representing themselves as
18 Boston Strategies when they were not.
19    Q. What year was this?
20    A. 2021.
21    Q. And what was the nature of the fraud that
22 you discovered?
23    A. Misrepresentation.
24    Q. It was a stranger to the company who had

Page 180

1 hacked into your email?
2    A. No. It was somebody who had email access
3 to the company email who was purporting to represent
4 BSI legally who did not have the authority or my
5 authorization to do so.
6    Q. And how did you uncover this?
7    A. I got -- I received a copy -- I set it up
8 so I could trace his emails and I saw a copy of what
9 he sent to a third party which included information
10 he should not have presented representing --
11 misrepresenting -- well representing himself as a
12 BSI authorized signatory when he was not.
13    Q. How long did this problem persist before
14 you detected it?
15    A. I detected it instantly. Probably the next
16 day.
17    Q. How many employees do you presently have at
18 your company?
19    A. I look at it more in terms of partners and
20 people who have access to these emails. So probably
21 -- well, it was about 20 people who had access to
22 these emails. Roughly. Or magnitude.
23    Q. And I sidetracked us a little bit. I'm
24 actually -- I asked this at the beginning candidly.

Page 181

1 How many direct employees does your company have?
2    A. Now we have one. Me.
3    Q. And how many W-9 contractors do you have?
4    A. It varies widely.
5    Q. And in 2021, how many contractors?
6    A. I mean, less than five probably because a
7 lot of our work -- a lot of our work are not even
8 W-9s because it's not in the United States.
9    Q. All right. Well I'll take that follow up
10 on your offer and I'll just call them any human who
11 you retained to do work on behalf of your company
12 that's not a direct employee. We'll call it
13 contractor. Does that sound okay to you although
14 that may not be the precise legal term? Do you
15 understand what I'm asking about?
16    A. Just think of 20.
17    Q. Okay. And has it been 20 since the
18 inception of your company?
19    A. No. It's fluctuated widely.
20    Q. Okay. At the beginning, in 1998 how many
21 contractors did you have?
22    A. I had employees and not contractors at that
23 point.
24    Q. And how many?

Page 182

1    A. I hired one person and then I hired more.
2    And we had a team of about 10 or 15 employees. And
3    then developed about 30 or 40 or 50 partner
4    contractor relationships over time. So it was
5    probably around -- above 50 at a certain point.
6        Q. And would those contractors come in and out
7    so that it wasn't always 50 or would it -- like I'm
8    just trying to get a magnitude. Sometimes it was
9    13, sometimes it was 50 depending on the project?
10    A. Yes, they came in and out depending on the
11    project. If we had a lot of work they stayed on for
12    a year or two or three or four or five. And if they
13    came for just a period of time to do a specific
14    project, we would onboard them and off-board them.
15        Q. And at any given time what was the high for
16    total number of folks working for you?
17    A. Probably 16.
18        Q. And what year would that have been?
19    A. 2012 maybe.
20        Q. And then if you had to average over the
21    past five years, how many would you say you've had?
22    A. It's about 10 or 20.
23        Q. Okay. Thank you for indulging me in that
24    little detour.

Page 183

1        Back to your report at page 20. When you
2    talk about platforms that you document analysis and
3    monitor email flow and provide alerts, what are the
4    software programs called that you're referencing?
5    A. You mean where I point out IBM, SaaS and
6    others?
7        Q. Yes.
8    A. I couldn't tell you the specific like
9    platform names.
10        Q. Do you know what they monitor specifically?
11    A. It's a whole range of things. Especially
12    when you get into artifical intelligence, it's meant
13    -- it's designed to detect patterns.
14        Q. And what level of fraud detection should
15    XPO have implemented on Afif's account?
16    A. Well the first thing I probably would have
17    done is once discrepancy started arising and they
18    were unexplained, I probably would've suggested that
19    XPO tap in, look at some of his emails and see if
20    they're all legitimate.
21        Q. I guess my question is you say here that
22    there should have been monitoring emails to monitor
23    the email flow. Should they have been doing key
24    stroke monitoring, video monitoring per gig size

Page 184

1    going back and forth? What should they have been
2    monitoring?
3    A. Content monitoring.
4        Q. And what software program monitors the
5    content?
6    A. Well they could've used the Google
7    platform. I don't know what other vendors. I
8    mentioned some vendors in the next paragraph: IBM,
9    SaaS and others.
10        Q. And I understand that in 2021 there's that
11    capacity in technology, but in 2015 do you know, did
12    these vendors have that ability to monitor content?
13    A. Google had that in 2015. I'm not sure what
14    IBM and SaaS had.
15        Q. Okay. So if someone wanted a
16    recommendation what software to use, you would not
17    have that recommendation; is that right?
18        MR. BETTA: Objection.
19        You can answer.
20    A. My company rarely has the exact answer to
21    companies questions when they first ask it. We do
22    some work and we determine the answer, and then we
23    provide it to them.
24        So we would've looked into that question,

Page 185

1    that concern and proposed -- done an evaluation of
2    the options, mapped it with their requirements, and
3    then presented them with a recommendation.
4        Q. And the content that you would have needed,
5    I think you said earlier, you would have gone to a
6    third party to help you with that content; is that
7    right?
8    A. Correct.
9        Q. Okay. And is it your testimony that a
10    human should have been monitoring Afif's emails on a
11    daily basis or a live basis?
12    A. There's multiple parts of that question.
13    It wouldn't have had a human. Maybe a human, maybe
14    not a human. Maybe a part-time, maybe full-time.
15    Maybe -- you know, I would've probably started with
16    exploring these different software options. I
17    probably would have started, honestly, with just
18    checking some of his -- a human to go in and check
19    some of his emails. But depending on if -- because
20    some of that, those discrepancies were becoming
21    apparent.
22        Q. At what point in time do you think XPO
23    should have been monitoring Afif's emails?
24    A. I think after Star Funding sent a letter to

1  Brad Jacobs, it should've been a wake-up call to the
2  company to get actively involved in what was
3  happening in Houston at the branch. And that
4  would've involved some -- I'll call them invasive or
5  aggressive discussions with Baltagi and his
6  supervisors. And if those were not sufficiently
7  satisfactory, I would've initiated some detective
8  work including a possible content monitoring of his
9  email.
10  Q. Okay. And that trigger for that event
11  would have been the letter from Carter Krinsky to
12  Mr. Jacobs in mid May 2016; is that right?
13  A. That's kind of the latest point. By that
14  point it should absolutely be -- absolutely have
15  triggered it. There were earlier signals that they
16  could've picked up.
17  Q. What were the earlier signals?
18  A. The idea of accounts receivable triggers
19  which weren't in place. The monthly operating
20  review, if it were done seriously probably would've
21  detected some more irregularities. It seemed to be
22  a fairly gloss over type of process by dotted-line
23  people who weren't physically in Houston.
24  Q. Yeah, I guess I'm asking you based on your

1  opinion what is the time point that they should've
2  begun email monitoring? And you said the latest
3  would be May of 2016, but what would be the
4  earliest?
5  A. It could fall into that late 2015 category
6  where if they sat down with Afif Baltagi and they
7  started to get these incomplete and fuzzy answers
8  then, they could have done it then.
9  Q. And this is just based on the HR -- the AR
10  issues?
11  A. No, it's based on root cause analysis that
12  starts with HR problems. AR problems.
13  Q. You just did it too. I'm sorry.
14  If you look at page 20 you say "If XPO had
15  shut down this account for failure to pay, it would
16  have shut down the primary vehicle that was used for
17  the GSL fraud, potentially preventing the
18  entire scheme."
19  When you say if XPO had shut down the
20  account, what do you mean by that?
21  A. Yeah, the account references Midwest Coal.
22  (Stenographer clarification.)
23  Q. I'll ask it again. Or I'll ask a different
24  question. When you say they should've shut down the

1  account, at that point do you mean they should've
2  said you can't do any further business with us. Or
3  come get your stuff. We're kicking you out. Or
4  what do you contemplate by shutting down the
5  account?
6  A. Well step -- it's a phased approach to
7  off-boarding a nonpaying or a delinquent customer,
8  right? The first thing should be pay up before you
9  can place any more orders with us. Pay the
10  outstanding balance due. And then if they don't pay
11  that within a certain period of time, they should be
12  blacklisted from future transactions. And if they
13  don't -- if they don't, you know, basically resolve
14  the payment issue within a certain period of time,
15  they should probably be blacklisted as a customer.
16  Q. And how would that have caught a Ponzi
17  scheme?
18  A. Well Adkins continued -- Adkins and Baltagi
19  continued to Midwest Coal throughout 2016 as a
20  vehicle. So they would have removed one of the
21  vehicles that was used -- that was -- that was using
22  XPO as a conduit for their fraud.
23  Q. Okay. Assume for a moment -- and this is a
24  hypothetical. Assume for a moment someone had said

1  too much AR, shut down. You can't do any more
2  business until you get the AR cleaned up.
3  A. Right.
4  Q. Right? That wouldn't have prevented Jason
5  Adkins and Afif Baltagi from continuing to show
6  people the tires, right? It just would've shut down
7  the financial piece of it.
8  A. Well it would've -- it would've made it
9  harder for them to actually represent themselves as
10  legitimate tire purveyors to their victims like
11  Great Southland.
12  Q. You're not aware of Great Southland
13  communicating with anyone on the executive team, for
14  example, to establish that Adkins was in good
15  standing with XPO, right?
16  MR. BETTA: Objection.
17  You can answer if you're -- if you can.
18  A. I'm not even sure I understand the
19  question.
20  Q. Sure.
21  A. Can you repeat that, please.
22  Q. Sure. I'll ask it a different way.
23  Consistent with the materials you reviewed,
24  it's your understanding that the main contact point

1 and probably the only contact point between Great
2 Southland and XPO was Afif Baltagi, right?
3     **A. That's not actually my understanding. To**
4 **be totally candid, there could be a number of other**
5 **facilitators of this scheme within XPO.**
6     Q. Who are those people?
7     **A. It could include any of those managers of**
8 **Baltagi. I call him Bol-tagi, maybe that's the**
9 **correct -- I never met the guy. I don't know his**
10 **correct name pronunciation.**
11     **It could've been your Muzi, your Oliver. It**
12 **could've been -- yeah, your Oliver. It could've**
13 **been some of his underlings, like Beatrice -- no,**
14 **she was at -- there were about four or five people**
15 **who worked for Baltagi at different points in time**
16 **doing sort of clerical things there in the Houston**
17 **branch. And it could've even gone higher in the**
18 **organization. For all I know it could've -- sort of**
19 **people like -- people like the COO might've just**
20 **turned the other way instead of kind of trying to**
21 **root out the problem. It could go up to the -- I**
22 **really don't know. But because a lot of those**
23 **people were very cagey in their depositions, which**
24 **prevents a complete understanding of whether anybody**

1 else at XPO was involved or not.
2     Q. Does that support your belief that anyone
3 on the executive team was involved in this?
4     **A. Yes.**
5     Q. Well what -- you're making fairly serious
6 allegations, right? That the XPO executive
7 team, perhaps the COO up to the president was
8 involved in an Ponzi scheme. And in making those
9 serious allegations I'm asking you what is the
10 evidence you have that any of those individuals were
11 in cahoots with Adkins? Or are you surmising?
12     **A. I'm definitely surmising. But I'm basing**
13 **that on the fact that Muzi and Shook were extremely**
14 **evasive in their depositions to even basic questions**
15 **about the time frame of when things occurred and**
16 **their communications with Baltagi during that time**
17 **frame. Which simply in and of itself kind of raises**
18 **some concerns and questions about why they wouldn't**
19 **be open and transparent about those communications**
20 **and the timing.**
21     **I'm basing it on the fact that Brad Jacobs'**
22 **testimony, which I'm sure you're going to talk about**
23 **later with me, deflected any knowledge even. He**
24 **didn't even want to know about situations like this.**

1     **And I'm basing it on the fact that there were**
2 **payments to Baltagi made in a very indirect way that**
3 **may have been helped by some third parties. His**
4 **wife received a payment evidently, or more than one**
5 **payment.**
6     Q. Who's his wife?
7     **A. Baltagi. I don't remember her first name.**
8     Q. Mazen?
9     **A. Mazen Baltagi received a payment.**
10     Q. And that's his wife?
11     **A. I was told that.**
12     Q. Okay. That's incorrect.
13     **A. It sounds like a relative to me.**
14     Q. Okay.
15     **A. And it's possible that the evasiveness and**
16 **unwillingness to respond to pretty basic questions**
17 **during the deposition mean people had a lot of**
18 **communications with Baltagi that are simply not**
19 **visible to -- they're not accessible to me to pass**
20 **any kind of a judgment.**
21     Q. Are you accusing those witnesses of
22 perjuring themselves under oath?
23     **A. No.**
24     Q. What evidence do you have that anyone at

1 XPO would have knowledge about the payments that
2 Baltagi received from Adkins?
3     **A. None.**
4     Q. Let's flip to page 21 of your report.
5 Figure 4 I take it is a document you reviewed as
6 part of the files you were provided?
7     **A. Correct.**
8     Q. Okay. And there's not a standard required
9 report for a freight forwarder as set by statute or
10 legislation, right?
11     **A. Correct.**
12     Q. Are you aware of whether there's a form
13 that people use as best practices for their freight
14 forwarding reporting documents? Like in other
15 words, the International Association of Freight
16 Forwarders, do they have a recommended form for
17 branch operational reporting?
18     **A. I'm not sure whether they do or they don't,**
19 **but companies like Evan Armstong's company provide**
20 **this kind of best practice benchmarking information.**
21     Q. And if you look at -- it's very hard to
22 read, but it's 8, item 8, a key to the ranking.
23     **A. Yeah.**
24     Q. It appears to me that some of the rankings

Page 194

1 rate these branches in terms of the top one-third,
2 the middle one-third, and the bottom one-third,
3 right?
4     **A. Right.**
5     Q. But isn't it also true that when you're
6 ranking you can all be getting an A, it's just some
7 people are getting an A plus and some people are
8 getting an A mines. Or you could be ranking it and
9 the top person's getting an A plus and the bottom
10 person's getting an F, right?
11    **A. Not really. Because the way this is**
12 **designed with -- what do you call them? With three**
13 **tranches is that -- is that it's like a curved exam.**
14 **What you just referred to is the question of whether**
15 **everybody can get an A plus, which is not a curve.**
16 **Or whether all the branches are compared to each**
17 **other on a curve.**
18       **So the way this is done, the way I**
19 **understand it, top one-third, there has to be**
20 **somebody in the bottom one-third.**
21    Q. Correct.
22    **A. So, I mean, it's comparing the branches to**
23 **each other. We did this at General Motors.**
24    Q. And that's my point. In terms of comparing

Page 195

1 the branches to each other you can be in the bottom
2 one-third but still be doing pretty darn good if
3 everyone is doing well, right?
4     **A. Correct.**
5     Q. Okay. Underneath this box you say -- the
6 second sentence, "The below scorecard from by book
7 Guide to Supply Chain Management, the Economist
8 2009, as two top level results metric of effective
9 supply chain organizations." And I don't know if
10 it's because it's late on a Friday, but I don't
11 understand that sentence. What are you trying to
12 convey in that sentence? It seems likes it's
13 missing a verb.
14    **A. Has. Not as.**
15    Q. Ah. Okay. I understand. Okay. It was
16 missing a verb.
17       Okay. And if we flip to the second page,
18 page 22 of 49, Figure 5.
19    **A. Right.**
20    Q. Is this the supply chain balance scorecard
21 that you think XPO should have been using?
22    **A. Not necessarily. It's just one. There are**
23 **other balance scorecards which there are almost an**
24 **infinite number of balance scorecards that they**

Page 196

1 **could find if they wanted to put in place a balance**
2 **scorecard.**
3     Q. And in fact some of the criteria are not
4 applicable to a freight forwarder, right?
5     **A. That's correct.**
6     Q. Okay. Do you know any companies who use
7 this supply chain balance scorecard as we see it
8 depicted in Figure 5 or is this just meant to be
9 illustrative?
10    **A. This is meant to be illustrative.**
11    Q. Understood. Again on page 23, in the
12 middle right above Section 2.5 we see some
13 references to SOX, Sarbanes-Oxley again.
14    **A. Mm-hmm.**
15    Q. And you don't know whether XPO does or does
16 not do independent SOX compliance audits, do you?
17    **A. Well I don't. But what I was thinking when**
18 **I wrote this is that the type of omission that I**
19 **noticed in the monthly operating report is slightly**
20 **inconsistent with a freight firm that has tight**
21 **controls like FedEx and UPS.**
22    Q. In terms of what type of SOX auditing XPO
23 does do or does not do, you're not aware of that?
24    **A. Correct.**

Page 197

1     Q. Okay. If we flip to the next page, 24, the
2 first -- the second line you say "Muzi could not
3 confirm that Baltagi had an exit interview which
4 could have been particularly useful in diagnosing
5 the problem with his involvement in the Adkins
6 fraud."
7       Are you aware that Afif Baltagi has asserted
8 his Fifth Amendment right against self-incrimination
9 in this and other lawsuits?
10    **A. No -- well, I'm aware of that, yes, because**
11 **I read his deposition and I think he claimed the**
12 **Fifth. I think he -- yes, I'm aware of that.**
13    Q. For every question asked?
14    **A. Right. Right.**
15    Q. Including "What is your name?"
16    **A. Yes. I noticed that.**
17    Q. How would an exit interview of a
18 recalcitrant or withholding employee have provided
19 information?
20       MR. BETTA: Objection.
21       You can answer if you can. If you're able.
22    **A. Well I think -- I think timing has a lot to**
23 **do with it. I mean, when he left the company and**
24 **was offered a contractor position in April of 2016,**

Page 198

1 he might have been in a much more effusive mood and
2 willing to share more than he is in 2018, '19, '20
3 or '21 when he's the object of a multiparty
4 litigation and has to claim -- plead the Fifth to
5 everything including his name.
6     As far as I understand it, at that time most
7 of his managers were on good terms with him and the
8 fact that they offered him a contractor position
9 made him have an incentive to be quite helpful to
10 them and cooperative. So he might have shared some
11 information that would have led down a path.
12    Q. But that's speculating.
13       MR. BETTA: Objection.
14    A. Yes, and that's why I said -- that's why I
15 said in the sentence "could have been particularly
16 useful." It depends on how the exit interview went
17 obviously.
18    Q. And if we look at your next page, on
19 page 25 we can see from your report he was already
20 well into getting kickbacks from Adkins at that
21 point by June of 2016, right?
22    A. Correct.
23    Q. Do you advise your clients on when they
24 should and should not attempt an exit interview?

Page 199

1    A. I don't. No.
2    Q. Okay.
3    A. From my understanding, to clarify, is that
4 it should be standard practice of every company and
5 every employee. So that's an odd question to me.
6    Q. Are you aware of circumstances where it
7 might not be appropriate to conduct an exit
8 interview?
9    A. I never thought or heard of such
10 circumstances.
11    Q. Okay. Is it fair to say that if I wanted
12 to speak with someone who was an expert on exit
13 interviews, that would not be you?
14    A. No, that's not fair. I mean, I've
15 employed, you know, nearly a hundred people, I
16 guess, over time. And I've done a lot of hiring and
17 firing. So I don't know, some people would probably
18 consider me an expert based on that.
19    Q. Have you done any research into what the
20 literature or human resources organizations say
21 about when an exit interview should or should not be
22 conducted?
23    A. No.
24    Q. For example, if someone was leaving after

Page 200

1 they accused the company of racial discrimination,
2 could that be a circumstance where an exit interview
3 is not appropriate?
4       MR. BETTA: Objection.
5    A. I think this is not at all the case here,
6 because at this point in time the company had
7 offered him a contractor position. And based on
8 that alone it seems that they were not in an
9 antagonistic position with this person in any way,
10 shape or form.
11    Q. So it's your testimony that the exit
12 interview should have come before he became an
13 independent contractor?
14    A. Yes.
15    Q. And, again, you're not aware of any
16 circumstance where it would be imprudent or even
17 illegal to conduct an exit interview?
18    A. No, I am aware. So I don't agree with that
19 statement. I am aware that if it had been, as you
20 kind of intimated, that he was under criminal
21 investigation in April of 2016 when he left his
22 employ as a W-9 employee, it may have not been a
23 good idea to do an exit interview. But he wasn't.
24    Q. And in terms of what the human resources

Page 201

1 organizations advise on this, have you reviewed any
2 literature that suggests when an exit interview is
3 or is not appropriate? Or is this -- is that no?
4    A. No.
5    Q. Okay. And have you reviewed any forms that
6 guide what the exit interview should or should not
7 cover?
8    A. No.
9    Q. If we drop down on page 24 of 49, and in
10 the second bullet point the last sentence says --
11    A. I'm sorry, but it's on the previous point.
12    Q. I'm sorry?
13    A. Can I add a comment to my previous answer?
14    Q. I don't have a question pending, but I'm
15 not going to stop you from elaborating. You have a
16 right to do so.
17    A. Well the issue of the exit interview is not
18 an isolated question. It also harkens back to the
19 fact that it appears that there was no job
20 description when he was hired and very sparse
21 monitoring while he was employed.
22    So whether or not to do an exit interview is
23 a function not only of the circumstances of his exit
24 but maybe what happened prior. And I would think

Page 202

1 that that might create more of a reason to want to
2 do an exit interview.
3    Q. If you look at the second bullet point,
4 Section 2.5.2, the last sentence says "In addition,
5 the 28 days notice provided to him allowed Baltagi
6 ample time to cover his tracks by, for example,
7 deleting emails and text messages."
8     Do you see that?
9    A. Yes.
10    Q. Okay. Are you aware of what XPO's deletion
11 policy is and whether XPO maintains backup tapes?
12    A. I'm sorry, I thought I saw this but now I
13 can't find it. Where exactly is it?
14    Q. Section 2.5.2, the second bullet point,
15 last sentence.
16     MR. BETTA: Page 24.
17    A. I'm really sorry, it's a screen issue. I
18 have my -- I can't see everything at once, the
19 number -- the outline number, the page numbers and
20 the text. So I'm going to ask you a last time --
21 because if we were in person I would just have a
22 document in front of me. I wouldn't appear lame
23 like this. Can you tell me again where it is.
24    Q. Of course. It's on page 24, almost smack

Page 203

1 in the middle of the page.
2    A. "Given the pattern of avoiding disciplinary
3 actions"?
4    Q. Two bullets above that.
5    A. "Max Shook effectively."
6    Q. Yes. The last sentence of that bulleted
7 section.
8    A. Right. The 28 days notice, right, allowed
9 him ample time to cover his tracks.
10    Q. "By deleting emails and text messages."
11    A. Okay.
12    Q. My question is: You do not have any
13 awareness of what XPO's IT system does in terms of
14 deleted emails and backup tapes; is that right?
15    A. No, I don't.
16    Q. If we drop down on the same page.
17    A. Yes, I do actually in a way. I mean, by
18 inference because Jacobs testified that his
19 secretary systematically shreds all paper documents
20 and Ceasar, I think, the head of Roadmaster, says
21 that he systematically deletes all text messages
22 after they arrive. The pattern might indicate one
23 of nonretention.
24    Q. Well my question was you don't know what

Page 204

1 XPO's email deletion policy is and whether deleted
2 emails are actually retained on backup tapes; is
3 that fair?
4    A. Again, that's two different things. Their
5 policy could be one thing about retention and
6 deletion, and their practice of holding those
7 documents on tape could be another that might not be
8 the same as the policy.
9    Q. Okay. But you don't know either the policy
10 or the practice; is that right?
11    A. Inferences about the practice, which is
12 nonretention.
13    Q. Nonretention for hard copy documents?
14    A. For documents period. Because also based
15 on the Roadmaster, the way that was done where the
16 guy deleted text messages, those were electronic.
17    Q. But XPO doesn't control Roadmaster, right?
18    A. We disagree on that.
19    Q. Well, you don't have any reason to believe
20 that XPO sponsors Roadmaster's cell phone plans, do
21 you?
22    A. I don't know one way or the other.
23    Q. No, you don't have any reason to believe
24 that they did?

Page 205

1     MR. BETTA: Objection.
2     You can answer.
3    A. I don't know what XPO was or wasn't paying
4 for out of Roadmaster. They didn't really say that.
5    Q. Okay. Do you have any -- strike that.
6     The question down in the bottom section of
7 paragraph 24, you ask a series of questions and four
8 items, those are open questions in your mind; is
9 that right? For example, you say "Were other XPO
10 representatives present or aware?"
11     You're not saying they were. You're saying
12 that's an open question in your mind. Am I
13 interpreting that correctly?
14    A. Give me a minute. There's a lot of content
15 in there that I want to review before I answer that
16 question.
17    Q. Sure.
18    A. Yes, those are -- that's correct. Those
19 are all open questions.
20    Q. Okay. If you flip to page 26 of your
21 report.
22    A. Yes.
23    Q. You say "They should have" -- the third
24 bullet point on page 26 up at the top.

Page 206

1    A. Mm-hmm.
2    Q. You say "They should have fired Baltagi
3 when the First Amended Complaint was filed."
4       What is the document that you're thinking of
5 when you say the First Amended Complaint? Great
6 Southland's First Amended Complaint?
7    A. Yes, that's a document I was referring to.
8    Q. Okay. The second bullet you say "They
9 should have ended his contractor agreement in
10 July 2017 and compelled him to remove XPO from his
11 LinkedIn profile even today."
12       How would a company compel someone to update
13 their LinkedIn information?
14    A. I believe that's called a restraining order
15 or an injunction, but I'm not --
16    Q. They should -- XPO should have taken legal
17 action to get the LinkedIn removed?
18    A. I don't see why not.
19    Q. Okay. Have you ever been involved in a
20 company --
21    A. As far as I -- as far as I can tell, he's
22 still representing himself as an XPO employee.
23    Q. Have you been involved in a company filing
24 a TRO or an injunction -- I'm sorry, what you did

Page 207

1 say? An injunction or restraining order to get
2 someone to remove something from their LinkedIn
3 profile?
4    A. Those types of legal recourse actions are
5 part of a lot of contracts that I sign.
6    Q. My question was have you been involved in a
7 company who's resorted to legal steps to get someone
8 to remove content from their social media?
9    A. Not a company per se.
10    Q. What has been your personal firsthand
11 experience with this?
12    A. I know an individual who tried to get
13 content removed from a social media type site.
14    Q. Was it related to their employment?
15    A. No.
16    Q. Was this like a salacious photo scenario?
17    A. It was like -- what's the word? Slander I
18 guess you could call it. And so there was a -- some
19 investigation into different alternative actions.
20 And it turns out that there are quite a few
21 companies out there that actually specialize in
22 removing material on the Web in different ways.
23    Q. And when have you been involved in advising
24 a client that they should retain one of those

Page 208

1 entities, specialized companies to remove content
2 from the Web? You personally.
3    A. I have not. This is a common sense kind of
4 a bullet point.
5    Q. Gotcha.
6    A. I mean, I sign contracts -- like I said,
7 other people present contracts to me that hold me to
8 that standard that say I won't defame, et cetera.
9 And if I violate the contract they come after me
10 with injunctive relief and all sorts of other legal
11 clauses. And I'm pretty sure that somewhere in
12 there would be the ability to compel people to
13 remove or change what they put on social media.
14    Q. Okay. And you're not a lawyer, I should
15 have asked you this earlier; is that right?
16    A. Correct, yeah.
17    Q. Okay. You say they should have fired
18 Baltagi when the First Amended Complaint was filed.
19 What was it about the First Amended Complaint that
20 should have required Baltagi to be fired or
21 terminated?
22    A. Well when this advanced from a customer
23 service complaint to a litigation, there should have
24 been a very tight focus on problem resolution. And

Page 209

1 one of the obvious routes to doing that would be to
2 get rid of the person in the middle of this.
3    Q. Yeah, and I guess my question is
4 specifically why is it the First Amended Complaint
5 of Great Southland should have triggered the
6 termination as opposed to the initial complaint?
7    A. Oh, I see. It could've been -- it
8 should've been the initial. I'm sorry, the fact
9 that it was amended or not amended, I didn't mean
10 that to be material to this comment.
11    Q. Okay. If you look at page 26 you talk
12 about inadequate supervision and you talk in the
13 third paragraph near the very bottom of the page
14 about most of your clients use a regional management
15 structure. Do you see that?
16    A. I do.
17    Q. Okay. How many locations would be required
18 to use a regional management structure?
19       MR. BETTA: Objection.
20       Can you answer.
21    A. Obviously that varies, but if you look at
22 span of control as an analogy for how much is too
23 much span to cover, traditional span of control
24 wisdom is any company -- any manager shouldn't have

Page 210

1 more than about seven direct reports.
2    Q. Is that correct?
3    A. And when you put it in the context of a
4 regional structure I've -- it depends on their
5 geographic dispersion as well. So if you have three
6 facilities, let's say along the East Coast, and
7 they're located in Florida, Philadelphia and Maine,
8 you probably want a regional management structure
9 even though there are only three because they're
10 very physically separated from each other. So it
11 could be lower than seven.
12    Q. Okay. And even though your belief is that
13 there were only four global forwarding locations,
14 you still think that should have had a regional
15 management structure?
16    A. Yes, because I think the, you know,
17 underlying distinction between XPO Logistics and XPO
18 Global Forwarding was somewhat spurious or un --
19    Q. Should that --
20    A. It was not really a clear distinction. So
21 the forwarding locations were mixed in with other
22 logistics locations making the four number seem a
23 little bit misleading.
24    Q. Is it your testimony that the regional

Page 211

1 management structure should have involved different
2 business units? Like somebody should have been over
3 the Southeast which may have involved LCL and
4 intermodal and freight forwarding? Or is it that
5 freight forwarding should have had its own regional
6 management structure?
7    A. Well at the stage that it was at in 2016,
8 in 2015 with a very nascent forwarding organization
9 as far as I can tell, they may have been best off by
10 attaching them to the logistics regional structures
11 and then -- and then spinning them off later. But
12 it's kind of hard to tell.
13    Q. Okay. Okay. Let's flip now to Exhibit 3,
14 which is your rebuttal to the report of Sabino.
15    A. Yes.
16    Q. If we look at page 6 of 33 on this report.
17    A. Can you hold on please, let me just pull it
18 up.
19    Q. Of course.
20    A. Okay. I'm with you.
21    Q. Okay. I'm on page 6.
22    A. Yes.
23    Q. In the bottom of paragraph 1 you say "GSL
24 had gone through the typical vetting process for XPO

Page 212

1 and based on the Houston facility tour placed it's
2 trust and confidence in XPO so satisfactory -- to
3 satisfactorily execute whatever paperwork was
4 necessary."
5      Do you see that sentence?
6    A. Yes.
7    Q. Okay. And I'm wondering when you say they
8 had gone through the typical vetting process, is
9 that typical for Great Southland or typical for the
10 industry or something different?
11    A. It's typical for a company that needs to
12 hire a forwarder for transaction.
13    Q. And can you tell me everything that you
14 understand was Great Southland's vetting process for
15 XPO?
16    A. As I understand it, they determined that
17 they had a need. They knew what -- they defined the
18 need. They knew what that was. And then they --
19 then they saw if they knew anybody at that company
20 or had a connection to that company. And then they
21 took a tour. That was basically their vetting
22 process.
23    Q. And that is the vetting process typical for
24 the industry or typical for GSL?

Page 213

1    A. I'm really not -- some companies have a
2 more extensive vetting process than others, but
3 these are the basic steps.
4    Q. And you're not purporting to offer an
5 opinion on the sufficiency of the due diligence that
6 GSL performed, are you?
7    A. No.
8    Q. Okay. Have you ever heard of a freight
9 forwarder acting as an escrow agent?
10    A. In a sense, yes. Companies like UPS have
11 financial services divisions for trade finance
12 documentation and payment.
13      So if you're shipping something on UPS you
14 don't need to go, or didn't need to go to a separate
15 entity to take care of your -- of your -- some of
16 your financial requirements. You may or may not
17 have had to go to a bank to get a letter of credit.
18 But they're going to do everything they can to help
19 you ship your item from A to B.
20    Q. Yeah and I'm specifically asking about
21 whether you're aware of a freight forwarder that
22 will hold funds in escrow and release them upon the
23 receipt of the goods or other conditions established
24 by the lender.

Page 214

1     A. Right. And I'm not aware as we sit here
2  right now and I talk about I'm aware of a company
3  that would specifically offer to do that.
4        But I would also say that I would not be
5  surprised at all to find a company doing that. So
6  if I were in Great Southland's shoes, it would not
7  surprise me that Baltagi was offering this or
8  Adkins/Baltagi was offering this integrated solution
9  including escrow.
10     Q. Now I'll stop you right there because the
11  evidence in this case shows that there was not
12  freight forwarding services contemplated that XPO
13  would provide for Great Southland.
14        In other words, the shipment of the tires
15  was not going to be facilitated by XPO. Is that
16  your understanding of the case?
17        MR. BETTA: Objection.
18        You can answer.
19     A. The answer to your question is not clear
20  from the documentation that I reviewed.
21     Q. You have not seen a bill of lading in this
22  case, have you?
23     A. I have not seen a document that would
24  typically be known as a bill of lading, no.

Page 215

1     Q. Okay. And it's my understanding, based on
2  all of the documents and testimony, that XPO was not
3  intended to move the tires for the Great Southland
4  deal. Have you seen something different that
5  indicated that XPO was going to be the one moving
6  the tires?
7     A. It's completely unclear from the evidence
8  whether --
9     Q. Have you --
10     A. -- that I reviewed that XPO should have had
11  a hold in the logistics and transportation of these
12  tires.
13     Q. Okay. You understand that the tires were
14  supposed to have moved from Ohio to down to Texas,
15  right?
16     A. Yes.
17     Q. Okay. And based on the testimony, you
18  understood that it was not XPO that was going to be
19  moving those tires from Ohio down to Texas, right?
20     A. I don't recall whether the carrier was
21  designated in those depositions.
22     Q. Okay. And you don't have an understanding
23  of who Great Southland thought was the carrier. Is
24  that what you just said?

Page 216

1     A. Yeah. I don't recall seeing anywhere any
2  naming of a carrier who was supposed to move the
3  tires from Ohio to Texas.
4     Q. Okay.
5     A. So as far as I know, it could've been XPO
6  or it could've been an XPO company or it could've
7  been another company. I really don't know.
8     Q. Okay.
9        MR. BETTA: Martha, we've been going for
10  about -- more than an hour and a half. I've got to
11  take a five-minute break or something. Is that
12  okay?
13        MS. MOTLEY: Of course. All right.
14        (Recess was taken at 3:31 p.m.)
15        (Reconvened at 3:39 p.m.)
16     Q. (By Ms. Motley) We're on page 6 of
17  Exhibit 3, and we're down under paragraph 2.
18     A. Yes.
19     Q. Are you with me?
20     A. Yes.
21     Q. Okay. And in the second to last sentence
22  you say, referencing the email in the preceding
23  paragraph I think -- in the preceding sentence,
24  "There were no separate terms or conditions proposed

Page 217

1  or executed for warehousing, loading, unloading or
2  inspection."
3        Do you see that?
4     A. Yes.
5     Q. Isn't that fairly unusual in your
6  experience, to not have terms or conditions or scope
7  of work for the tasks in this paragraph?
8        MR. BETTA: Objection.
9        You can answer.
10     A. Yes, it is unusual.
11     Q. If we drop down to paragraph 3. "The point
12  of the documents were unauthorized by XPO," which is
13  a Sabino point, as I understand you're summarizing.
14     A. Yes.
15     Q. Okay. You say "This is wrong because the
16  problematic documents seem to have been issued from
17  a bona fide XPO employee through XPO-controlled
18  facilities and XPO-controlled email IDs who
19  supervised the XPO management and XPO's responsible
20  for the safety, security," da ta da ta da.
21        Do you see that?
22     A. Yes.
23     Q. Okay. So your position that the documents
24  were not authorized is based on the fact that they

Page 218

1 were issue by an employee?

2     **A. They were issued through a system that is**

3 **set up by XPO, including all the infrastructure, the**

4 **facilities, the control systems, the safe guards,**

5 **the security and monitoring and everything. That's**

6 **my position.**

7     Q. Okay. And if Afif Baltagi instead of

8 saying I'll give you a facility instead said I'm

9 willing to kill your mother-in-law, and he did it

10 through all the same ways, through an XPO control

11 facility, the email, has a manager, would that not

12 be outside the scope of his authority?

13     MR. BETTA: Objection.

14     You can answer.

15     Q. Or is your answer the same?

16     **A. Well that would've been outside his scope.**

17 **It's not his responsibility to the extent that it**

18 **was, A, illegal and, B, didn't have nothing to do**

19 **with the core business of XPO or XPO Global**

20 **Forwarding. But seeing as this, this claim and this**

21 **representation of his was consistent with XPO's**

22 **business and legal or apparently legal, it was very**

23 **reasonable for Dave Hodgson of Great Southland to**

24 **believe it. And the documents appear to have come**

Page 219

1 **through XPO.**

2     Q. So the fact that the document came through

3 an official XPO email address gives them the

4 impremier of authority?

5     **A. It's not just the email address, it's the**

6 **-- as we talked about a lot in this meeting, there**

7 **are patterns. And what's important is patterns and**

8 **consistency. And so the tour through the warehouse**

9 **coupled with the emails, coupled with the**

10 **transportation offer through XPO seemed to create a**

11 **representation by an XPO employee to a -- to a**

12 **potential and ending up actual customer.**

13     Q. Okay. So to summarize your response in

14 point 3, what you're saying essentially is that Afif

15 was acting within the scope of his authority; is

16 that right?

17     **A. Yes. And I guess since you brought up the**

18 **hypothetical, if somebody calls in from Microsoft**

19 **and asks for my credentials to solve my email**

20 **problem and he hacks my computer, I mean, that's --**

21 **yeah, that might be another analogy. Another way to**

22 **look at it.**

23     Q. In Section 4 on the next page, page 7, the

24 very tiptop of the page you say "Two parties

Page 220

1 disputing ownership over the same cargo is unusual."

2     Who were the two parties you are referring

3 to?

4     **A. Well two or more parties. So in this case**

5 **you had Great Southland's interest in those tires**

6 **and there's different parties to these litigations**

7 **were all claiming ownership or interest in those**

8 **tires as I understand it from Beckton to Abington to**

9 **Great Southland to other litigants as well.**

10     Q. At what point were there two parties

11 disputing ownership of the same cargo?

12     **A. Well clearly by the time Great Southland**

13 **launched it's complaint there was -- that was -- I**

14 **have to go back and look at the date, but that was**

15 **the beginning of the multiparty dispute. And then**

16 **that continued until the tires were sold at auction.**

17 **And I think, if I'm not mistaken, that period lasted**

18 **over a year.**

19     Q. Whose tires did Great Southland overlap

20 with? What entity?

21     **A. It's difficult to tell. Because as I**

22 **understand it, the same tires were promised to**

23 **multiple parties.**

24     Q. Yeah, that's what I'm asking. Who else

Page 221

1 were Great Southland's tires promised to?

2     **A. The companies that I just named.**

3     Q. Okay. And I'm asking specifically, do you

4 know which entities they were promised to?

5     **A. I think Beckton and Abington and.**

6     Q. Curby?

7     **A. And Curby, right.**

8     Q. Were all of Great Southland tires multi-

9 committed to all of those entities so there were

10 four people disputing the ownership or were some

11 only Great Southland's or do you know?

12     **A. Well this gets to the actual itemization of**

13 **serial numbers of tires in the yard. And as I**

14 **understand it, GSL understood it had an interest in**

15 **two sets of tires, 26 tires each. There was a stack**

16 **of tires in the yard and those other parties, each**

17 **claimed some of those tires.**

18     **So because I wasn't really investigating the**

19 **other companies cases I didn't try to figure out how**

20 **many of the tires overlapped. From my point of**

21 **view, whether there was even one or more tires that**

22 **were at issue, that's really kind of as far as I**

23 **went with it.**

24     Q. So when you say that there were four

Page 222

1  parties disputing the same tires, were there four
2  parties disputing Great Southland's tires or do you
3  just know there are multiple entities who have been
4  defrauded? That's what I'm trying to understand.
5      **A. I think the premises is -- might even be a**
6  **solid premise. When you say Great Southland's**
7  **tires, like those tires don't necessarily even exist**
8  **in physical form. Not all 52 of them I believe. So**
9  **they may not exist in physical form. I really don't**
10 **know whether they do or they don't.**
11     Q. Okay. Sitting here today you're not sure
12 whether those tires exist or they don't exist?
13     **A. At least some of those tires exist.**
14     Q. Okay. How many of them actually exist and
15 who claims ownership over them, you're just not in
16 the weeds on that analysis; is that right?
17     **A. That's correct. And that's partly based on**
18 **the fact that my understanding was not to be an**
19 **expert for the entire multiparty litigation, but**
20 **primarily to speak about and think about what**
21 **happened in the case of Great Southland's case.**
22     Q. I understand. Let's flip for a moment to
23 the inspection report which was provided to you I
24 believe by your counsel. And the document is

Page 223

1  entitled Complaint Exhibit 14 Inspection.PDF. And
2  we'll mark this as Exhibit 18.
3      (Exhibit No. 18, marked; Complaint Exhibit
4  14 Inspection.pdf.)
5      **A. Yes, I have it in front of me now.**
6      Q. Okay. Have you ever reviewed a warehouse
7  inspection report that's been issued by a warehouse?
8      **A. Yes. I mean for Monoprix and for Georgia**
9  **Pacific and several other of the clients that I**
10 **mentioned earlier.**
11     Q. And for Monoprix and Georgia Pacific and
12 the other --
13     **A. Inspection report. I'm not supposed to**
14 **interrupt, but I need to say when you say -- when**
15 **you asked if I ever reviewed an inspection report,**
16 **the word inspection needs clarification. And**
17 **usually when I'm saying I reviewed them for other**
18 **clients it's involved, you know, an examination of**
19 **whether the content is or isn't in stock.**
20     Q. Understood. Have you reviewed reports
21 performed by a warehouse intended to report on the
22 condition of goods as they were received at the
23 third-party warehouse?
24     **A. I don't think so. I mean Georgia Pacific,**

Page 224

1  **the data flow may have indicated whether or not the**
2  **goods were damaged, but I don't know.**
3      Q. So in terms of what a warehouse might do to
4  perform an inspection of the goods once they arrive
5  at the third-party warehouse, you don't know what
6  this form or that document would look like, do you?
7      **A. I know that it can be anything that the**
8  **third party wants it to be.**
9          **If you were a UPS facility in Louisville,**
10 **Kentucky where they do custom supply chain solutions**
11 **for many, many companies, they'll do whatever**
12 **kitting, packaging, packing, shipping operations you**
13 **want them to do.**
14     Q. Yeah, that wasn't my question. My question
15 was whether you have specifically reviewed a
16 warehouse issued inspection report. And I think the
17 answer to that was no.
18     **A. Honestly, I don't recall. I mean, I've**
19 **done hundreds of warehouse tours and site tours and**
20 **it's possible I've seen that. But I just couldn't**
21 **pinpoint one right now.**
22     Q. Okay. That's fair. In terms of the
23 exhibit we have if front of us, Exhibit 18.
24     **A. Yes.**

Page 225

1      Q. Is it your understanding that there were
2  not terms and conditions related to this document?
3          MR. BETTA: Objection.
4          You can answer.
5      Q. In other words, you've not seen a more
6  complete version of this Exhibit 18 that includes
7  little legal terms and conditions. Little, little
8  tiny writing, have you?
9      **A. Well I forget what I was going to look at**
10 **here. I -- yeah, the 15 step process that Baltagi**
11 **agreed to may have -- may be able to be interpreted**
12 **as including this kind of activity. I'd have to**
13 **look back at that.**
14     Q. Okay. And is it fair to say that you have
15 never personally conducted a warehouse inspection
16 when goods are received into the warehouse?
17     **A. I've supervised people doing it and**
18 **observed them and reported on them doing it.**
19     Q. But in terms of being the one with the
20 clipboard and the hardhat reporting what is being
21 observed in the warehouse, that's not you doing the
22 inspection report, right?
23     **A. Well that's not true. For Iron Mountain I**
24 **went out on driver tours with a clipboard and I**

Page 226

1  tracked every package coming on and off the trucks
2  to every delivery location.
3      Q. My question -- I'm sorry that it was
4  vague -- relates to a third-party warehouse. You've
5  never been the one to check in goods at a
6  third-party warehouse and perform the inspection as
7  they've been received, fair?
8      A. What I mean is that Iron Mountain was a
9  third-party logistics provider to the customers. So
10  when I was checking the goods going to those
11  locations, being dropped off at the customers'
12  storage locations, I was working for the third party
13  then checking the materials being dropped off and
14  making sure they were their correct boxes, if you
15  know what I mean.
16      Q. And did you issue an inspection report as a
17  result of that?
18      A. No. It was mostly just a box count and
19  making sure that the boxes were the right boxes.
20      Q. And this inspection report we see in front
21  of us is significantly more than a box count, right?
22  We have the serial number, the condition, the model
23  number, the brand, the tire size, and the tread. Do
24  you see that?

Page 227

1      A. Yes, I do.
2      Q. And is it your experience when there's a
3  detailed inspection required like this, there would
4  be a scope of work that identifies the metrics that
5  you should be checking against or do you not know?
6      A. It's not my experience. I mean, the scope
7  of work could be done on the fly by a supervisor who
8  issues or barks an instruction.
9      Q. In this circumstance you're not aware of
10  any scope of work being issued either orally or in
11  writing related to what Afif Baltagi should be
12  checking against, are you?
13      A. Well yes, I am. Because in the emails
14  there was a whole email chain about checking --
15  multiple chains about checking the serial numbers
16  coming from Star Funding and Great Southland and
17  Brad Jacobs and Oliver and everybody else. So those
18  were sort of, if you want to call them, scopes of
19  work. I think they were sort of telling somebody
20  what needed to be done. They were not included in
21  the original documentation and they weren't
22  accompanied by specific fine print or terms or
23  conditions. But scopes of work change on the fly in
24  many types of business to business situations.

Page 228

1      Q. And I guess I'm asking you specifically,
2  you have never been in a scenario where you have
3  advised a 3PL warehouse on what the scope of work
4  for an inspection should entail. What should be the
5  content of the scope of work?
6      MR. BETTA: Objection.
7      You can answer.
8      A. I guess I would disagree with that because
9  for a third -- for Iron Mountain I was in charge of
10  designing the process, the forms, the vehicles.
11      Q. And what did the form for the inspection
12  report reflect on it? That's what I'm asking about,
13  specifically the inspection report. I'm not asking
14  about the process. I'm asking what should the form
15  inspection report contain.
16      A. What should it contain or did it contain?
17      Q. What should it contain.
18      A. It should include the -- an itemization of
19  the cargo, and whether it's been received or not.
20  And whether there's any loss damage associated or
21  inversions associated with that.
22      Q. Okay.
23      A. Normally.
24      Q. And this inspection report does not contain

Page 229

1  any indication about damage or inversions as you
2  just said, fair?
3      A. No, I don't think that's true. This is an
4  inversion check. This is a check to see if the
5  contents were as they should be.
6      Q. Right. And that's what I'm asking.
7  There's not a scope of work to indicate what the
8  contents should be. And that would be typical,
9  wouldn't it, in a 3PL warehouse to have a scope of
10  work when you're requesting that an inspection be
11  performed. That is industry standard, is it not?
12      A. No. As I said, a lot of inspection work
13  and a lot of checking work gets done on the fly.
14  I've done it myself. I actually have -- at Monoprix
15  I was with a clipboard -- but that was a third-party
16  warehouse. But I was checking contents and making
17  sure that things were okay. And if something came
18  up, we did a special little sidebar analysis like
19  this.
20      I mean, I think maybe you're framing the
21  question in terms of an inspection report and kind
22  of under the -- under the premise that there is a,
23  sort of a Holy Grail or perfect inspection report.
24  And there is no one such document that is accepted

Page 230

1 universally.
2    Q. What type of inspection report does UPS
3 issue? Do you know?
4    **A. I couldn't say right now.**
5    Q. What type of inspection report would FedEx
6 freight forwarding issue; do you know?
7    **A. I don't know.**
8    Q. Okay. What type of inspection report would
9 a FedEx warehouse issue; do you know?
10   **A. I'm not sure.**
11   Q. What type of inspection report would CH
12 Robinson issue; do you know?
13   **A. I don't know.**
14   Q. Aside from Iron Mountain and Monoprix, are
15 you aware of any other inspection reports that a
16 company would be issuing? Like that you've seen.
17   **A. Yes, almost every one of those client**
18 **engagements that we went through earlier had**
19 **warehousing and receipt and transportation**
20 **components to them.**
21   Q. And I'm asking specifically about what
22 would the warehouse inspection report look like?
23      Sitting here can you think of any in your
24 mind's eye what they would look like and what the

Page 231

1 terms would contain?
2    MR. BETTA: Objection.
3    **A. I think I just described before what it**
4 **should look like. It should have the cargo list and**
5 **an indication that it was received or not received,**
6 **and whether the right products were nested in the**
7 **other products. And whether there were any**
8 **anomalies associated with like loss, damage or**
9 **product inversions.**
10   Q. And how would someone know where to find
11 the serial number on any given product?
12   **A. I mean, I didn't mention that the serial**
13 **number was a part of what I just said. So I'm**
14 **not --**
15   Q. Serial numbers would not be checked in the
16 ordinary course, is that your testimony? On an
17 inspection report?
18   **A. Depends on the cargo. If you're talking**
19 **about, you know, Twinkies and Wheaties, no. If**
20 **you're talking about vehicles, the vehicle**
21 **identification numbers, yes.**
22   Q. At your warehouse if you as a shipee were
23 requiring the warehouse, the 3PL warehouse -- let me
24 start this question over.

Page 232

1      If you were the customer and you were
2 requiring a third-party warehouse to perform an
3 inspection report that included checking serial
4 numbers, would there not be a scope of work that
5 said here's what needs to be checked?
6    **A. Not necessarily. For example, Audi imports**
7 **vehicles into the United States. Every car**
8 **manufacturer imports vehicle. Each vehicle has a**
9 **vehicle identification number. I mean, it's pretty**
10 **sure that every one of those companies will take an**
11 **ocean car carrying ship coming across and will check**
12 **the vehicle numbers to make sure they received the**
13 **right vehicles. These tires were worth about 75 or**
14 **$100,000 each. So it doesn't surprise me to see the**
15 **serial number as part of this report.**
16   Q. Was the scope of your engagement to
17 consider what a third-party warehouse document
18 should or should not look like?
19      MR. BETTA: Objection.
20   **A. No.**
21   Q. Okay. I'm going to show you what we're
22 marking as Exhibit 17, and it's called warehouse
23 receipt.pdf and let me know when you have it up.
24   (Exhibit No. 17, marked; Warehouse

Page 233

1 Receipt.pdf.)
2    **A. Do you mind if I pull it up on my own**
3 **machine instead so I can enlarge it that way?**
4    Q. Of course. Do you have it in front of you?
5    **A. I do.**
6    Q. Okay. And this purports to be a warehouse
7 receipt (nonnegotiable). Do you see that? We have
8 the same document in front of us?
9    **A. Yes.**
10   Q. And what does nonnegotiable mean in terms
11 of a warehouse receipt?
12   **A. I don't know.**
13   Q. Have you ever advised a company on whether
14 they should make their warehouse receipts negotiable
15 or nonnegotiable?
16   **A. No.**
17   Q. Have you ever advised a third-party
18 logistics company on what their warehouse receipts
19 should contain?
20   **A. Other than what I just described earlier,**
21 **no.**
22   Q. And in looking at this warehouse receipt in
23 front of us, can you tell whether this was generally
24 rated through a WMS or not?

Page 234

1    A. Probably not.

2    Q. And that's because it doesn't have a

3 letterhead on it; is that right?

4    A. No, it's not because of that.  It's because

5 it has a combination of text and data.  And usual

6 WMS systems spit out data only.

7    Q. Would you expect a WMS system to spit out

8 warehouse receipts in most circumstances?

9    A. No.

10    Q. I'm sorry?

11    A. No.

12    Q. The document says that "XPO Global

13 Logistics, Inc., referred to as warehousing, has

14 received in storage for the account of the Great

15 Southland Limited of Singapore."  Do you see that?

16    A. Yes.

17    Q. Is that the name of your client, Great

18 Southland Limited of Singapore?

19       MR. BETTA:  Objection.

20       You can answer.

21    A. I don't know the full legal name of the

22 client.  And furthermore, I'm not really sure there

23 is really one client.  I'm not sure which client of

24 Great Southland might be the litigants, to be

Page 235

1 honest.

2    Q. You're not sure which entity is your

3 client?

4    A. Great Southland is an entity with

5 subentities.  So it could be that there's an entity

6 called Great Southland Limited of Singapore.  I just

7 don't know.

8    Q. Okay.  In connection with being in 3PL

9 warehouses, have you ever reviewed a warehouse

10 receipt to advise the client on what the receipt

11 should contain or not contain?

12    A. Wasn't that question already asked?

13    Q. Was the answer no?

14       MR. BETTA:  Objection.

15       You can answer but I think it's been asked.

16    A. I have -- I think I advised on that in the

17 case of Purchasing Center, which is a client we

18 didn't talk about earlier.  They delivered -- they

19 set up a process to deliver MRO goods to customers

20 and we design -- my team designed the forms, I

21 think.  But that -- that confirmed receipt of goods

22 upon delivery.

23    Q. And is that entity a third-party logistics

24 warehouse?

Page 236

1    A. It's a non-asset based third-party

2 provider.

3    Q. Do they operate a warehouse?

4    A. At the time, they did not.

5    Q. Is it your experience that the 3PL who does

6 not operate the warehouse would issue the warehouse

7 receipt?

8    A. No.  But in this case I think it's

9 debatable who was actually operating the warehouse.

10    Q. Why do you think XPO was operating the

11 warehouse?

12    A. They -- because there was no -- there was

13 no service contracts between Roadmaster and XPO.

14 There was only a lease agreement.

15       So the lease agreement would imply that the

16 only agreement that they had with Roadmaster was for

17 the facility lease itself.  And the services

18 provided may or may not have been provided by XPO.

19    Q. Do you know who employed the humans in the

20 warehouse who were operating the warehouse?  Was it

21 XPO or Roadmaster?

22    A. Apparently that this was Roadmaster, but

23 the employee of record does not translate to control

24 in the case of employees and contractors.

Page 237

1    Q. Are you purporting to offer a legal opinion

2 on the control of the employees in this case?

3    A. No.

4    Q. And -- well I'll move on to a different

5 question.

6       Is it atypical to have critical terms of a

7 warehouse receipt missing, like the weight and the

8 storage rate and the handling rate?

9    A. In an early stage of draft it would be

10 typical.

11    Q. Well this is a signed, executed document.

12 At least it purports to be, right?

13    A. Yeah.  I'm not really sure when this was

14 actually -- it's not clear to me.  This document

15 might have been altered or further developed later

16 in the process of this.  I'm not really sure when it

17 was issued because it doesn't have a date -- well it

18 does have a date on it.  Yeah, typically it wouldn't

19 be signed unless it's finalized.

20    Q. And if it's signed you would expect all of

21 the criteria to be filled in like weight, storage

22 rate and handling, right?

23    A. Not necessarily.  If they were irrelevant

24 they might be blank.

Case: 2:17-cv-00719-SDM-KAJ Doc #: 251-1 Filed: 12/23/21 Page: 62 of 113 PAGEID #: 4424

Page 238

1    Q. Is the amount that you're paying irrelevant
2  typically?
3        MR. BETTA: Objection.
4    A. It could be, because what I see here is
5  rates. If there's a fixed price there might be no
6  rate. A rate is one number divided by another
7  number. Like an hourly rate or a per unit rate. If
8  the parties agreed to a fixed price, there may not
9  be a relevant unit rate.
10    Q. Was there a fixed price here?
11    A. I'm not even sure, to be honest.
12    Q. This says "The terms of this receipt govern
13  the relationship between the parties and supercede
14  any other bill of lading, delivery order, or
15  warehouse receipt." Do you see that?
16    A. Yes.
17    Q. Is it your experience that the warehouse
18  receipt would typically contain more detailed terms
19  and conditions?
20    A. No.
21    Q. If the warehouse receipt did not contain
22  detailed terms and conditions, how would the parties
23  have an understanding of things like liability,
24  release, all of those mechanics that you would need

Page 239

1  to know?
2    A. You wouldn't.
3    Q. What 3PL warehouse receipt have you
4  reviewed that doesn't contain detailed terms and
5  conditions?
6    A. In the case of Georgia Pacific, there was a
7  receiving process and receiving forms that didn't
8  have terms and conditions because the parties were
9  engaged on a framework agreement working for a very
10  long time with many shipments and many --
11    Q. And that's not this circumstance, right?
12  This is not a long-term relationship that's been
13  independently negotiated over a course of years like
14  you just described with Georgia Pacific and DFC.
15        MR. BETTA: Objection.
16        You can answer.
17    A. That's correct. But XPO might have taken
18  this template from one of those other contracts and
19  just used it for expedience in the case of a single
20  transaction or a small series of transactions with a
21  party like Great Southland.
22    Q. But you're speculating about that, right?
23    A. Yes. I'm just explaining why if I were
24  Great Southland I might not be too suspicious of

Page 240

1  this document.
2    I think they would probably have the same
3  speculations that I'm voicing.
4    Q. Have you ever talked with Dave Hodgson at
5  Great Southland?
6    A. No.
7    Q. Have you ever talked with Tervor Thompson
8  at Great Southland?
9    A. No.
10    Q. Aside from counsel have you ever talked
11  with anyone in connection with the tire cases to
12  form your opinion?
13    A. No.
14    Q. If you flip back to your rebuttal report,
15  which is Exhibit 3.
16    A. Okay.
17    Q. I'm sorry, let me back up for a moment.
18        Did you review the warehouse receipt in
19  Exhibit 17 and the inspection report in Exhibit 18
20  in connection with issuing your primary report
21  specifically?
22    A. When you say Exhibit 17 and 18 you're
23  talking about the warehouse receipt nonnegotiable
24  that we just looked at?

Page 241

1    Q. Correct.
2    A. And which other one?
3    Q. The inspection.
4    A. With lading on it?
5    Q. Yes.
6    A. Yes, I did.
7    Q. We're flipping to Exhibit 3 and we're on
8  page 12.
9    A. This is the rebuttal report?
10    Q. Correct.
11    A. Just a moment, please.
12    Q. Sure.
13    A. Okay. Yes, I have it in front of me.
14    Q. Okay. I am looking at section 3.2.2.
15  There was one set of terms and conditions.
16    A. Yes.
17    Q. Okay. And you say "The way the procedure
18  in 4.1 above was designed, there was supposed to be
19  only one bill of lading, presumably from XPO." Do
20  you see that?
21    A. Yes. That's supposed to say 3.2.1 above.
22    Q. I gotcha.
23        What was that presumption that the bill of
24  lading would be from XPO based on?

Page 242

1    A. Nowhere in the nearly 15,000 pages that I
2  read was any other carrier referenced.
3    Q. But there was not any discussion that you
4  saw about the cost of shipping -- of XPO shipping
5  the goods or how XPO shipped the goods, was there?
6    A. No.
7    Q. And when it says number 7, "The bill of
8  lading would be made out to GSL," I think you
9  previously testified that you have not seen a bill
10  of lading.
11    A. Correct.
12    Q. It says "There would be one set of
13  underlying terms and conditions implicit or
14  explicit" in 3.2.2.
15    A. Yes.
16    Q. The set of terms and conditions, that
17  relates to Figure 2; is that right?
18    A. Which one is Figure 2?
19    Q. Right above.
20    A. Oh. Yes. So what is the question?
21    Q. Is Figure 2 what you're referring to as the
22  underlining terms and conditions implicit or
23  explicit?
24    A. Yes.

Page 243

1    Q. And have you seen sometimes 16 or sometimes
2  20-step process?
3    A. I don't recall.
4    Q. You don't recall whether the process
5  sometimes contained 15 steps or sometimes contained
6  more?
7    A. I recall it having 15 steps.
8    Q. Okay. And if there were multiple emails
9  that set out different steps, would those also be
10  terms and conditions?
11    A. In the absence of a more explicit set of
12  fine print, as you say, yes.
13    Q. How many times have you been an expert
14  witness?
15    A. Four or five.
16    Q. When were the first -- when was the first
17  time you were an expert?
18    A. Well when you say an expert witness, I've
19  been at various times a consultant in a case without
20  being deposed or testifying. And in other cases
21  I've written a report. And in one case I was
22  deposed. So do you mean expert witness by that? Do
23  you mean all of those above situations?
24    Q. Sure.

Page 244

1    A. And the question was have I -- how many
2  times have I been an expert witness?
3    Q. Yes.
4    A. Yeah, four or five. And I gave the detail
5  to the discovery process.
6    Q. Okay. So we have Great Southland as one.
7  We talked earlier about the American Energy power
8  dispute I think.
9    A. Yes.
10    Q. And that's where you testified in the
11  deposition?
12    A. Right.
13    Q. Okay. What was the time before that?
14    A. BP. There was a case for -- there was a
15  case related to BP.
16    Q. Okay. Was it a filed litigation?
17    A. Yes. It was a very public litigation.
18    Q. And what year was that approximately?
19    A. About 2013.
20    Q. What was the summary of the expert opinion
21  that you gave in that case?
22    A. It related to the damages to the market for
23  oil and gas infrastructure and equipment supply
24  stemming from the Gulf of Mexico explosion.

Page 245

1    Q. And who were you testifying for, BP or
2  someone else?
3    A. That was -- that was indirectly on behalf
4  of BP. It was a very complicated case which I may
5  actually appreciate with many, many, many litigants
6  and cases and counter cases. And I was working for
7  a law firm that had clients. But I believe that the
8  case that I provided input for was -- was on behalf
9  of BP.
10    Q. What was the fourth engagement as an
11  expert?
12    A. It's a company called RTA.
13    Q. Rent-a-Center?
14    A. No, that's a fifth one. I'm sorry, I
15  forgot about that one.
16    Q. Okay. What is RTA?
17    A. RTA was a company that manufactured medical
18  beds and chairs. Highly specialized pieces of
19  equipment like first-class airplane seats. And they
20  used a third-party logistics company to provide --
21  to manage their supply. And there it was a dispute
22  over the rates and fees that the third party charged
23  for its services to RTA.
24    Q. Their allegation was fraud in that case?

Page 246

1  A. Sort of. There was an issue of insider
2  trading and conflict of interest.
3     Q. Insider trading in the sense it was a
4  publicly traded company?
5     A. Not insider trading. Scratch that. I
6  meant conflict of interest. Cross ownership in the
7  equity and a contention or claim on behalf of -- on
8  the plaintiff's side that the overcharging was to
9  basically take money from one pocket and put it in
10  the other.
11     Q. What court was that pending in?
12     A. I don't recall. If that's important I can
13  find it out.
14     Q. What year was this?
15     A. It was about 2016 maybe.
16     Q. Okay. And who was the entity that you were
17  consulting for the client?
18     A. It was called RTA. Just a second. I'll
19  find it.
20     MR. BETTA: Can we go off the record for a
21  second?
22     MS. MOTLEY: Sure.
23     (An off-the-record discussion was held.)
24     A. I'm going to say that -- the question is

Page 247

1  which court was it pending in?
2     Q. Yes.
3     A. I do not remember. The lawyers were in
4  Connecticut.
5     Q. Do you remember who the opposing party was?
6     A. It was another shareholder. So there were
7  two shareholders in the company. One had a
8  conflicting equity interest in the -- in the
9  logistics provider. But to my recollection, these
10  were not name brand logistics providers. So it was
11  a name that I don't really recall. And if it was a
12  major company like XPO or FedEx or UPS or DHL, I
13  would've remembered it.
14     Q. The Rent-a-Center litigation, who did you
15  represent in that case?
16     A. It sounds like it should be an easy
17  question I know, but I don't look at it as
18  representing a party or not. I'm usually hired for
19  an objective opinion, so forgive me if I don't
20  remember whether it was one side or the other. I
21  think it was for -- I think it was against
22  Rent-a-Center. Yeah, I think it was against
23  Rent-a-Center.
24     Q. Okay. And I should have asked you this

Page 248

1  about your other engagements. Did you render a
2  report in the RTA case?
3     A. I did, but I don't think it was submitted
4  to a court. I don't know whether it was actually
5  submitted to a court or not. It might have just
6  gone between the lawyers and the parties.
7     Q. Okay. But you did write a formal report in
8  the RTA case?
9     A. Yes.
10     Q. Okay. And in the BP case, did you author a
11  written report?
12     A. I provided documentation and analysis, but
13  not in the format that we see in this case where
14  it's tightly structured with a cover page and all
15  that.
16     Q. I understand. What was the sixth expert
17  engagement?
18     A. Well I think we just covered it. So
19  Rent-a-Center, American Energy Partners, RTA, BP.
20  Oh this probably doesn't count at all, but a lawyer
21  requested -- asked me for a referral last year and I
22  collected a small referral fee.
23     Q. Okay. So the five that we talked about
24  including GSL is the total of -- your sum total

Page 249

1  experience in terms of litigation?
2     A. Yes.
3     Q. You have not taken any legal classes, have
4  you?
5     MR. BETTA: Objection.
6     You can answer.
7     A. That's not true. I took legal studies in
8  college.
9     Q. Like a business law class?
10     A. Yes. Business law, torts, et cetera.
11     Q. Was it one class or multiple classes?
12     A. It was one class.
13     Q. Do you know if the Roadmaster warehouse
14  offered activities like kitting, assembly,
15  packaging?
16     A. I don't. And that's very important that I
17  don't, because apparently there was no contract for
18  such services.
19     Q. Outside of what services XPO may have
20  contracted or not with Roadmaster, you're not aware
21  of whether Roadmaster performed those services for
22  anyone, are you?
23     A. It's unknown from all the material that I
24  reviewed.

Page 250

1    Q. Okay. Are you offering any expert opinions
2  in this case about the sufficiency or the lack
3  thereof of the services that Roadmaster provided?
4    **A. No.**
5    Q. Are there any opinions that you anticipate
6  offering at trail in this case that are not
7  contained in your supplemental report, your primary
8  report, or your rebuttal report?
9    **A. I don't expect so. I guess it could depend**
10  **on what transpires between now and whatever happens**
11  **at that point.**
12    Q. Sure. But sitting here today --
13    **A. Yeah, no. I anticipate it would be based**
14  **on what I've written so far.**
15    Q. Okay. Let's look at page 14 of your
16  rebuttal report. And I'm specifically looking at
17  Footnotes 5 and 6 if that helps orient you.
18    **A. Yes.**
19    Q. Footnote 5 is the Guide to Loss and Damage
20  Claims for FedEx; is that right?
21    **A. Yes.**
22    Q. And within that document it expressly
23  limits the application to FedEx Freight; is that
24  your recollection?

Page 251

1    **A. I don't know.**
2    MS. MOTLEY: Okay. Why don't we mark that
3  as an exhibit. We'll mark that as Exhibit 19.
4    (Exhibit No. 19, marked; Guide to Loss and
5  Damage Claims.pdf.)
6    Q. And it is in your subpoena response and the
7  name is guide_2_loss_. Does that get you --
8    **A. Guide to Loss and Damage Claims, yes.**
9    Q. Yes. And if you look on the second page of
10  this document, the second sentence -- I'm sorry,
11  third sentence, second paragraph.
12    **A. Right.**
13    Q. It says "Whether this information is being
14  provided to you as a courtesy or per your request,
15  please know that the information contained herein
16  applies only to FedEx Freight."
17    Do you see that?
18    **A. Yes.**
19    Q. Okay. You did not have a role in preparing
20  this FedEx Freight document, did you?
21    **A. No, I didn't.**
22    Q. And then Footnote 6 relates to The 4 Most
23  Common Freight Claims Submitted to Shippers, and I
24  will ask you to pull up that document that was in

Page 252

1  your subpoena response that we'll mark as
2  Exhibit 20.
3    (Exhibit No. 20, marked; The 4 Most Common
4  Freight Claims Submitted by Shippers-Redwood
5  Logistics_Redwood Logistics.pdf.)
6    **A. Yeah, I see it.**
7    Q. Okay. Who is Redwood?
8    **A. I believe Redwood is a third-party**
9  **logistics service provider of some kind.**
10    Q. Were you aware of Redwood before this
11  litigation?
12    **A. No.**
13    Q. And do you know specifically what services
14  Redwood offered in terms of intermodal, LTL, freight
15  forwarding, et cetera?
16    **A. No.**
17    Q. Okay. And The 4 Most Common Freight Claims
18  Submitted By Shippers, do you know what this article
19  is premised upon?
20    **A. Just one second.**
21    Q. Sure.
22    **A. I don't and it doesn't -- I don't and it's**
23  **not critical to my opinion. My opinion is based on**
24  **my own experience, to be honest.**

Page 253

1    Q. This could be based on Redwood's anecdotal
2  experience, you just don't know?
3    MR. BETTA: Objection.
4    You can answer.
5    **A. I would say that's probably not the case**
6  **because -- just a second. Probably not the case**
7  **because they use the word specific. Four specific**
8  **types of freight claims. And they also say which**
9  **are more popular than which others. They point out**
10  **the first one is most popular and then they say the**
11  **second most popular. It appears they're basing it**
12  **on some quantitative data.**
13    Q. Okay. And we don't know what that
14  quantitative data is sitting here?
15    **A. No. I would say I only brought this file**
16  **and the other one about FedEx in because they're**
17  **what I consider to be an obvious case. And that the**
18  **statement, regardless of whether it's supported by**
19  **third party, quantitative evidence or research.**
20    Q. So you are relying on this document or you
21  are not relying on this document?
22    **A. To be honest, I'm really not relying. I**
23  **know this information.**
24    Q. What steps did you take to verify the truth

1  of the information contained in the Redwood blog
2  post we see?
3      **A. I compared it with my experience and it**
4  **matched.**
5      Q. And in your experience what's the fifth
6  most common freight claim that shippers file?
7      **A. It's very far down the list. In other**
8  **words, there are these four types that are**
9  **relatively common and other types are just way far**
10 **below.**
11     Q. And these are freight claims -- do they
12 relate to LCL, intermodal, freight forwarding? It's
13 all the same or it's different?
14     **A. I would say it's generally consistent**
15 **across those types.**
16     Q. And what is that based on?
17     **A. My experience. Having worked for companies**
18 **in all segments of the business, LTL, truckload,**
19 **third-party logistics and information technology.**
20     Q. Before this engagement had you ever
21 attempted to rank the most common freight claims
22 that shippers file on a 1 to 4 scale?
23     **A. No.**
24     Q. Would you rank them in this precise order?

1      **A. Yes.**
2      Q. And would you say that this precise order
3  is consistent across all of the different
4  modalities: LTL, intermodal, freight forwarding, et
5  cetera?
6      **A. No. That's probably not the same.**
7      Q. And for freight forwarding, which claims
8  would be more prevalent than others?
9      **A. It would be in the order that it's listed**
10 **here.**
11     Q. Have you done any type of qualitative
12 analysis to determine what the top four most common
13 freight claims shippers file for freight forwarding
14 would be?
15     **A. I wrote a chapter for a book on shipper**
16 **compliance in freight transportation and on carrier**
17 **compliance in freight transportation, and for those**
18 **chapters of a book that's published by Tarantino I**
19 **did a lot of analysis.**
20     Q. What was the title of that book?
21     **A. It's cited in my report, I believe.**
22     Q. Give me a few words and I'll help you out.
23     **A. Tarantino is referred to on page -- I'll**
24 **open up my report.**

1      Q. The primary report?
2      **A. And the title of the book listed there is**
3  **Governance, Risk, and Compliance Handbook. And I**
4  **believe it has a long subtitle which I didn't**
5  **include.**
6      Q. I'm sorry, is this in your --
7          MR. BETTA: It's in your main report,
8  correct?
9          THE WITNESS: My main report.
10     Q. Okay. And it's page 38 of 49?
11     **A. Page 5.**
12     Q. Page 5. I'm way off.
13     **A. And I also did extensive analysis for a**
14 **presentation on risk management that I presented at**
15 **a global conference.**
16     Q. Your Tarantino 2006 book, that's what
17 you're referring to?
18     **A. Yes.**
19     Q. Have you done any work since 2006 to
20 qualitatively evaluate the top shipping issues?
21     **A. The presentation I was just alluding to in**
22 **addition to this one was in about 2013.**
23     Q. Okay. And since 2013 have you done any
24 kind of qualitative analysis to determine which is

1  the top shipping complaints?
2      **A. I don't believe so.**
3      Q. Do you know if they've changed or you just
4  don't know?
5      **A. They could have. 2013 is pretty close to**
6  **the time frame of this case. I don't think they**
7  **would have changed too much over two or three years.**
8  **Which is the difference between the date of -- if**
9  **that's the date of the second presentation that I**
10 **described 2015, 2016 fraud in question here.**
11     Q. Sorry, what was the name of that
12 presentation? Risk management in oil and gas?
13     **A. Something like that.**
14     Q. In Berlin in 2013?
15     **A. No, this one was in -- no. This one was**
16 **Abu Dahbi.**
17     Q. Major Accident Prevention and Lessons
18 Learned in Oil and Gas: Four Guidelines and Thirteen
19 Best Practices For Governing Safe Supply Chain in
20 November of 2013?
21     **A. That's the one I'm referring to.**
22     Q. Okay. And that's specifically related to
23 oil and gas supply chains?
24     **A. It draws on a very broad study of risk**

Page 258

1 management, standards and procedures across a lot of
2 industries and covers everything from cargo risk to
3 health and safety risks and everything in between.
4     Q. And that presentation provided some type of
5 analysis on the four most common claims submitted by
6 shipees -- by shippers?
7     A. No, it didn't. But now as I'm remembering
8 I also did work at FedEx on -- at FedEx there used
9 to be like a 50-page report every month on
10 exceptions of all kinds to standards, procedures.
11     Q. Which could include four most common
12 freight claims, but could also included other things
13 too?
14     A. Many, many operational anomalies worth
15 tracking.
16     Q. And did you ever perform a qualitative
17 analysis on that FedEx report to determine what are
18 the four most common freight claims? Or any number
19 of most common claims?
20     A. No. But I also did work for A.T. Cross,
21 which we didn't discuss.
22     Q. Okay. Let me back up for a minute. The
23 FedEx exception report you just talked about, which
24 FedEx entity did that relate to? Was that the air

Page 259

1 cargo?
2     A. I think it was air operations. The one I'm
3 thinking of was air operations, but I'm sure they
4 had many other operations.
5     Yeah, I was just referring to the A.T. Cross
6 engagement which involved warehousing. And I did
7 quantitatively measure loss and damage and other
8 warehousing logistics and supply chain costs in
9 their supply chain.
10     Q. A.T. Cross the pen company?
11     A. Yes.
12     Q. Okay. So you were looking at A.T. Cross's
13 exceptions, for lack of a better word, not a 3PL
14 warehouse or 3PL generally?
15     A. They used a lot of 3PLs, so I don't
16 remember whether the warehouses that I was
17 quantifying were operated directly by Cross or by a
18 3PL.
19     Q. What year was that?
20     A. I'm going to guess 2005.
21     Q. Have you ever advised a 3PL to hire a
22 private detective?
23     A. Yes. No, a shipper. I advised a shipper,
24 not a 3PL.

Page 260

1     Q. Who was the shipper?
2     A. I don't recall the name.
3     Q. What year was this?
4     A. About 2014.
5     Q. And what were the circumstances where you
6 advised the shipper to hire a private detective?
7     A. A container load of cargo went missing from
8 a port.
9     Q. Did they retain a private detective?
10     A. I'm not sure. They had an initial
11 consultation with me and I advised them to engage a
12 specialist, consultant or detective in security.
13     MR. BETTA: Martha, before you go too much
14 further, we're getting close to seven hours. Maybe
15 we do, you know, another 15, 20 minutes. But I
16 think we're getting pretty close to done.
17     MS. MOTLEY: We're definitely not getting
18 anywhere near to being close. We started 15 minutes
19 late. We took three 30-minute breaks. We took a
20 15-minute break.
21     MR. BETTA: We didn't take three 30-minute
22 breaks.
23     MS. MOTLEY: Three 10-minute breaks. We
24 took three 10-minute breaks, 30 minutes.

Page 261

1     MR. BETTA: So you want to be here until
2 what, 7 o'clock tonight?
3     MS. MOTLEY: I want to be here until I ask
4 all the questions I need to ask. If there's a
5 reason you need to conclude this deposition early,
6 we can talk about that.
7     MR. BETTA: No, it's called -- no, you are
8 not keeping time accurately. It's ridiculous.
9 You're just dragging this out. You're dragging this
10 out for no reason whatsoever.
11     MS. MOTLEY: Well that's your opinion.
12     MR. BETTA: Well that's fine. I got my --
13 fine. You know what, there's going to come a
14 certain point where we're just going to stop and you
15 can call the judge if you want.
16     MS. MOTLEY: What's the time that you've
17 been keeping? What do you think the time is at
18 right now?
19     MR. BETTA: I think you have until about
20 5:15. That gives you an extra hour. A whole extra
21 hour of time.
22     MS. MOTLEY: And it's your opinion under the
23 Federal Rules you calculate the time of the
24 deponent's day and not the time spent during

Page 262

1 testimony?
2 MR. BETTA: No, it's -- no. That's time we
3 spent in testimony, including breaks.
4 MS. MOTLEY: You would include breaks in the
5 time of testimony?
6 MR. BETTA: Yes. No.
7 MS. MOTLEY: You do not.
8 MR. BETTA: No, he -- thank you. Tell me
9 what I do know and don't know. I really appreciate
10 it.
11 No, what I'm saying is the deposition, if it
12 had gone off smoothly would've ended at four
13 something. The amount of breaks that we've taken
14 add up to about an hour. That puts you at five
15 something. So I'm going to give you until about
16 5:15. But beyond that it's getting ridiculous.
17 MS. MOTLEY: Well I'm going to ask my
18 questions until I'm done. And if you want to end
19 the deposition, then that's your prerogative and we
20 can visit it with the judge. But this is just
21 wasting time.
22 MR. BETTA: Really. You're telling me about
23 wasting time. All right. Fine.
24 MS. MOTLEY: I don't appreciate your tone

Page 263

1 and I would appreciate if you were a little bit more
2 respectful on the record.
3 MR. BETTA: Listen, with your tone of voice
4 and the way you snort and laugh when people ask
5 questions and give answers, please don't talk to me
6 about respect. Please.
7 MS. MOTLEY: Are you done? Can I continue?
8 MR. BETTA: Sure. Go right ahead.
9 MS. MOTLEY: Okay.
10 Q. (By Ms. Motley) Let's turn to Exhibit 2,
11 the supplemental report.
12 **A. What's the file name of that document?**
13 Q. I believe it's David Jacoby expert report -
14 supplemental.
15 **A. Is this on the testimony of Bradley F.**
16 **Jacobs?**
17 Q. Correct.
18 **A. Okay. Yeah, I have a file here like that.**
19 **26 pages?**
20 Q. I'm sorry?
21 **A. Is it 26 pages long?**
22 Q. It is.
23 **A. So I'm with you.**
24 Q. Okay. And on page 3 of this document it

Page 264

1 indicates that you reviewed the Jacobs deposition
2 and exhibits.
3 **A. Yes.**
4 Q. Okay. And I think on page 5 at Section 1.4
5 the materials reviewed --
6 **A. Yes.**
7 Q. -- is just the Jacobs exhibits and the
8 deposition; is that right?
9 **A. Correct.**
10 Q. Okay. Did you consult any third party
11 sources or treatises or HR documents or anything
12 like that?
13 **A. No.**
14 Q. If you turn to page 7, the very bottom of
15 the page.
16 **A. Yes.**
17 Q. It says "To the extent Friedman processed
18 all or nearly all of the operational communications
19 coming into the CEO's office," what is the basis for
20 your belief that she processed all or nearly all of
21 the operational communications?
22 **A. Her testimony.**
23 Q. Okay. So in addition to Mr. Jacobs'
24 testimony you also reviewed Ms. Friedman's testimony

Page 265

1 in preparing this report?
2 **A. Yes. I think that's an omission. I'm**
3 **sorry. Or was that noted as a source in one of my**
4 **earlier reports?**
5 Q. I don't think so.
6 **A. But I did -- I did read her deposition.**
7 Q. Okay. Is there anything else that you
8 reviewed in connection with this supplemental
9 report, Exhibit 2, that's not referenced in the
10 materials considered?
11 **A. I think there's a citation in there too or**
12 **there's a footnote I believe to Brad -- Troy Cooper**
13 **-- maybe not. But I think I mentioned that on -- I**
14 **think I looked at LinkedIn and saw Troy Cooper's**
15 **file.**
16 Q. And is it your opinion that Troy Cooper
17 should have been cc'd on all operational emails?
18 **A. No.**
19 Q. Let me ask that a different way.
20 In reviewing this report it seems that
21 you're taking exception to the fact that
22 Ms. Friedman forwarded on operational emails without
23 cc'ing Troy Cooper. Is that fair?
24 **A. No. I mean, the nature of what's come to**

1 the fore here is very serious. It's far from all
2 operational emails.
3     Q. If you look at page 8 of 26.
4     A. Yes.
5     Q. Okay. The first full paragraph that says
6 "Disregard for the apparent chain of command" at the
7 top of the page.
8     A. Yes.
9     Q. And it says -- sorry, are you with me?
10    A. Yes.
11    Q. Okay. It says "Although we don't have an
12 organizational chart for XPO, employees with title
13 such as branch manager and VP of operations would
14 likely report directly or indirectly to the COO and
15 yet Friedman did not copy Troy Cooper." Do you see
16 that section?
17    A. Yes.
18    Q. Okay. Is it your opinion that Katherine
19 Friedman should have copied Troy Cooper on all
20 operational emails?
21    A. No.
22    Q. Help me understand your opinion.
23    A. You said on all operational emails. I
24 mean, that covers everything. That's a very broad

1 range. It's almost flipping it from one to the
2 other direction. She seemed to process so much
3 communication and routed for the required people
4 that in the case of a high priority matter with
5 legal ramifications that originated from an
6 operational problem, I would expect somebody like
7 the COO to be on copy.
8     Q. And what is that expectation based on? Is
9 it just common sense?
10    A. It's experience and common sense.
11    Q. And what experience?
12    A. Well FedEx had a COO that was actively
13 involved in operations. And I think -- I mean Iron
14 Mountain had a president and a COO who was involved
15 in operational issues. I mean, almost every company
16 that I've worked for that has a COO is, of course by
17 it's definition of chief operating officer,
18 responsible for important matters of operation.
19    Q. What's the basis for your opinion that
20 Mr. Cooper was not involved in operational
21 communications?
22    A. I don't know. Maybe he was. But he wasn't
23 copied on the -- on these emails that were listed in
24 the exhibits, which I found strange.

1     Q. Okay. Fair enough.
2        In terms of the relationship between
3 Mr. Jacobs and Ms. Friedman, it's your opinion that
4 there should have been a written policy on how she
5 managed his emails; is that fair?
6     A. No, it's not really characterizing what I
7 said. There should have been a policy. I mean, I'm
8 not saying it should have been written. When people
9 hire assistants and they -- they -- you know, that
10 they ramp them up and train them, of course that
11 training always involves some understanding of
12 policies and procedures and in learning what's
13 important. And according to Brad Jacobs' testimony,
14 there was no policy. Either written or oral.
15    Q. So it would not, in your opinion, have
16 needed to be a written policy; is that fair?
17    A. That's fair.
18    Q. So an understanding based on the years of
19 experience between the two parties here, would that not
20 have led to an understanding of what the scope of
21 her duties were?
22    A. That would ordinarily be correct, except if
23 I remember Brad Jacobs' testimony, he explicitly
24 said that he gave her no guidance.

1     Q. Except for the fact that they worked
2 together daily for ten years and had an
3 understanding from that relationship, fair?
4     A. I believe he even said that at no point
5 during his relationship with her did he actually
6 provide guidance. I may be -- I'd have to go back
7 to the actual deposition, but it was pretty
8 declarative.
9     Q. And your understanding is that by the time
10 the Star Funding dispute rolled around in 2016,
11 Mr. Jacobs and Ms. Friedman had been working
12 together on a daily basis for nearly a decade?
13    A. I didn't know and still am not exactly sure
14 when she was hired. And when they started working
15 together.
16    Q. But it was a significant time earlier. It
17 wasn't just early in 2015, for example.
18    A. I know she was with him at his previous
19 company. That's really all I know.
20       And I'm also saying this based on risk
21 management pursuant to the -- all the discussions we
22 just recently had, that companies like UPS and FedEx
23 and other logistics companies document policies to
24 ensure reliable process control.

Page 270

1     Q. Have you ever reviewed a policy that
2 specifically relates to the communication between a
3 CEO and his secretary?
4     **A. In a way, yes.**
5     Q. And I'm talking about specific to the
6 communications between the CEO and his secretary.
7 Not a general email policy.
8     **A. I reviewed secretarial -- I benchmarked**
9 **secretarial staffing policies for C level executives**
10 **when I was working in Paris for Bunn.**
11     Q. And that was in the early '90s?
12     **A. Yes.**
13     Q. Did they have email in the company you were
14 working for at that time?
15     **A. I think so.**
16     Q. Do you recall specifically they did?
17     **A. I don't.**
18     Q. You also seem to take issue with the fact
19 that after Ms. Friedman would manage a
20 communication, the hard copy would get shredded; is
21 that fair?
22     **A. Not completely. Like I would -- shredding**
23 **and document disposal processes are important.**
24 **They're an important part of every company's record**

Page 271

1 **management. That's what Iron Mountain is all about.**
2     Q. Have you ever drafted a record retention
3 policy?
4     **A. No.**
5     Q. Have you ever advised a client on what
6 their record retention policy should be?
7     **A. Only in so far as Iron Mountain operations**
8 **structured around defined record management**
9 **processes.**
10     Q. Because Iron Mountain is a records holding
11 entity; is that fair?
12     **A. Right. So they -- they -- I mean the**
13 **frequency with which their customers provide them**
14 **boxes for storage and retrieve those boxes from**
15 **storage, it's integral to their document retention**
16 **policy.**
17     **Yeah, when we were structuring the**
18 **procedures for operations they were built on Iron**
19 **Mountain's communications with its customers and our**
20 **communications with them about their operations.**
21 **Their communications with their customers about**
22 **their record retention.**
23     Q. And I guess I asked a bad question. I'm
24 not asking about what was Iron Mountain's retention

Page 272

1 policy as it relates to like, you know, these boxes
2 I've got behind me when I send them to Iron
3 Mountain, I'm not asking about how long they keep
4 those boxes, I'm asking whether you advised a client
5 what their email retention policy should be?
6     **A. Well, they're the same thing. That's**
7 **connected directly because Iron Mountain is no**
8 **longer just about documents. Hard copy documents.**
9 **They're in the document business whether it's**
10 **electronic or not.**
11     **So the same policies that underguarded the**
12 **physical document retention back decades ago now**
13 **underlie all of their email and electronic document**
14 **policy as well.**
15     Q. And I'm not -- again, I'm not asking about
16 what their client's documents, or if you dump a
17 bunch of electronic records with Iron Mountain, I'm
18 not asking about those. I'm asking about Iron
19 Mountain's own internal record management policy for
20 its employees.
21     Did you say you drafted that policy or
22 advised on it?
23     **A. No, I don't think I have.**
24     Q. Okay.

Page 273

1     **A. But I would have a suspicion if somebody**
2 **deleted records systematically as a matter of common**
3 **sense.**
4     Q. As a matter of common sense.
5     Do you have issues with the fact that
6 Ms. Friedman responded on behalf of Mr. Jacobs in a
7 general manner as it is just with regards to the
8 Star Funding case?
9     **A. It applies as a general rule which violates**
10 **a lot of risk management principles.**
11     Q. Explain to me how that violates risk
12 management principles.
13     **A. There's a couple of risk management**
14 **principles called segregation of duties or**
15 **separation of duties. And that's to make sure**
16 **there's always two eyes on something in one case and**
17 **to -- and to make sure responsibilities are clearly**
18 **delineated.**
19     **So in the case where she handled almost**
20 **everything just seems like -- Muzi got him to look**
21 **out for being, as he called it, her gatekeeper.**
22 **That there was no separation of duties in those**
23 **cases. So there was only one eye on those -- on**
24 **that entire workflow. That was Katherine Friedman's**

1 eye. So that violates the risk management
2 principle.
3    Q. Is it your opinion that he should have had
4 two assistants who were performing that task?
5    A. It would've partially solved that problem.
6    Q. What CEOs are you aware of that had two
7 assistants who were involved in monitoring their
8 email?
9    A. None. It didn't have to be a second
10 assistant. It could've been anybody else. It
11 could've been Troy Cooper or anybody else.
12    Q. What CEOs are you familiar with that also
13 have their COOs lay eyes on all of their emails?
14    A. None. Because if it was all their emails,
15 then they would be completely redundant so.
16    Q. On page 8 of 26 you talk about deniability
17 by design.
18    A. Yes.
19    Q. Are you just using your common sense or
20 inferring that Mr. Jacobs did this intentionally for
21 plausible deniability?
22    A. Absolutely. It's a little more than that.
23 While reviewing all those depositions and observing
24 so many instances of evasiveness on the part of

1 Muzi, Shook and Oliver and Baltagi and others, I put
2 together what looked like a pattern to me. I put
3 was a little more than common sense. It was based
4 on my observations, reading all of the depositions
5 coupled with common sense.
6    Q. And when you say they were evasive you mean
7 in the deposition they seemed evasive?
8    A. Yes.
9    Q. Could it have been that those were just bad
10 questions asked, like I have done many times today?
11    A. No. It was in my opinion and in my
12 observation, it was almost on par with Baltagi
13 saying he pleads the Fifth to every single question.
14 The amount of I don't knows and I don't remembers in
15 many of those depositions left a lot of open
16 questions.
17    Q. Did you review deposition transcripts in
18 any of your four prior expert engagements?
19    A. Yes.
20    Q. Which ones?
21    A. American Energy. I think that might be it.
22 American Energy.
23    Q. And can you give an example of your
24 perceived -- of the perceived evasiveness of

1 Mr. Muzi, for example?
2    A. I believe I provided that in my main
3 report. Just off the top of my head, he couldn't
4 pin a time frame, even to within a year or two or
5 three, of when Baltagi like became -- was either
6 hired or when the Houston branch was started or
7 questions like that that seemed like they should
8 have fairly simple answers. Especially as to when
9 the legal department became involved, all the
10 answers around that whole subject were very evasive.
11       So basic time frames were notably absent
12 from all those -- from many of those deposition
13 transcripts.
14    Q. This sort of --
15    A. Can I finish? Which made it difficult for
16 me to put together the timeline. And so -- yeah.
17 I'll just leave it at that.
18    Q. Okay. This sort of ties into my next
19 question about the last paragraph on page 8,
20 screening for privilege. We've already established
21 that you are not a lawyer and your legal training is
22 one business law course.
23    A. Right.
24    Q. Is that fair? Have you done any other

1 research, readings, scholarly articles, et cetera on
2 the concept of attorney/client privilege?
3    A. Well I've been actively involved in these
4 five other cases, as I mentioned, which involved
5 certain elements of privilege in each case.
6    Q. Yeah, and my question was have you done any
7 reading of articles, scholarly literature, journals,
8 anything to have an understanding of the contours of
9 what the attorney/client privilege can mean?
10    A. No.
11    Q. Have you ever been involved in a legal
12 investigation run by a company's in-house legal
13 group?
14    A. I don't think so, as I recall.
15    Q. And in this -- bottom of page 8 you say
16 "The CEO relied on lawyers to brief him, not XPO
17 operation staff or assistants, so legal could assert
18 the privilege." The causal effect here, you're
19 speculating, right?
20    A. Correct.
21    Q. In your primary report -- I forgot to ask
22 you, you made a couple statements, and I can find
23 the cite if you'd like me to, about how
24 Mr. Jorgensen should have called the whistleblower

Page 278

1 hotline.

2     **A. Yes.**

3     Q. Why would Mr. Jorgensen have called the

4 whistleblower hotline?

5     **A. Mr. Jorgensen seems to be one of the most**

6 **transparent and aware witnesses of the depositions**

7 **that I read. And because of that he seemed to have**

8 **an appreciation for the fact that something was**

9 **wrong. And there was a hotline for the specific**

10 **purpose of whistleblower fraud concerns that**

11 **presumably he had access to.**

12     Q. Okay. Have you ever been involved in

13 reviewing the calls or the content made to

14 whistleblower hotlines for any of your clients?

15     **A. I don't think so.**

16     Q. Why would Mr. Oliver or Mr. Shook or

17 Mr. Muzi not have been tasked with calling a

18 whistleblower hotline? I guess I'm just wondering

19 why in your report you call up Mr. Jorgensen as

20 having missed that, but not the others?

21     **A. To be honest, I still question to some**

22 **degree whether some of the others were complicit in**

23 **this. And I don't believe they would have called a**

24 **hotline if they were facilitators of this scam.**

Page 279

1     Q. Yeah, and I think we talked about this

2 before, that you don't have specific evidence to

3 cite to. It's just more of your speculation, right?

4     **A. Well the evidence is the evasiveness of**

5 **basic questions about facts and timelines that**

6 **persist throughout much of the depositions of the**

7 **immediate management layer above Afif Baltagi.**

8     Q. And it's based on the evasiveness at the

9 depositions; is that right?

10     **A. Yes.**

11     Q. Is it fair to say that you have not advised

12 clients on when they should or should not implement

13 a whistleblower hotline? On what circumstances they

14 should implement a whistleblower hotline?

15     **A. Well not really because -- I mean at**

16 **General Motors I told you I helped developed an**

17 **ethics policy and part of that policy was to call**

18 **the whistleblower hotline.**

19     Q. Okay. And did you make the specific

20 recommendation to GM that they should implement a

21 whistleblower hotline or did they already have a

22 whistleblower hotline in existence?

23     **A. I don't remember.**

24     Q. Okay. Can you think of any clients where

Page 280

1 you made the recommendation that they implement a

2 whistleblower hotline?

3     **A. No. But if I'm not mistaken, just to be**

4 **clear, I believe that XPO had already had a**

5 **whistleblower hotline. It was written in the**

6 **employee handbook or the procedures manual and the**

7 **number was there. So they didn't need to implement**

8 **it. It was already there.**

9     Q. Right. And I was just asking if you made

10 that recommendation to clients.

11     **A. No.**

12     Q. Okay. I would like to turn to what we're

13 marking as Exhibit 21, the Sabino report.

14     (Exhibit No. 21, marked; Expert Report of

15 Gerald Sabino dated June 14, 2021.)

16     Q. And I just want to ask you if you agree or

17 disagree with some of these statements in here. I'm

18 on page 3.

19     **A. Wait a second. This is -- what's the file**

20 **name?**

21     Q. It's -- I'm sorry. It's called Scan_0023.

22     **A. Was that in what you sent over?**

23     Q. It was.

24     **A. I don't see a file -- oh here it is. Okay.**

Page 281

1 **Go ahead. Yes, I see it.**

2     Q. Okay. And I'm on page 3.

3     **A. Yes.**

4     Q. The second bullet point says "Warehouse

5 receipts are automatically generated by a software

6 program maintained by the warehouse." Do you agree,

7 disagree or no opinion about that statement?

8     **A. Generally agree, although it's an iterative**

9 **process. I mean, the warehouse system might spit**

10 **out a form and then the form is completed by**

11 **somebody as to which articles arrive and everything**

12 **about them. But then the receipt might be finalized**

13 **in some system of inventory management.**

14     **So it's not like there's necessarily one**

15 **single identifiable document called a warehouse**

16 **receipt. There could be a series of documents of**

17 **different shapes and sizes and formats.**

18     Q. Okay. Paragraph 4, "It's contrary to

19 industry custom and practice for a warehouse receipt

20 to be directed to and signed by XPO which was

21 serving as a freight forwarder." Agree, disagree or

22 no opinion?

23     **A. Generally agree.**

24     Q. The next paragraph down, "A freight

Page 282

1  forwarder like XPO Global Forwarding would not be
2  expected to sign a warehouse receipt at all because
3  it was not a warehouse and tracks the movement of
4  goods on a bill of lading and airway bills." Agree,
5  disagree or no opinion?
6      A. Generally agree.
7      Q. The last paragraph "In my experience the
8  warehouse branch manager is not the person on the
9  dock confirming inventory arrived." Agree, disagree
10 or no opinion?
11     A. What number paragraph are you on?
12     Q. It's the very bottom bottom of page 3.
13     A. Oh, I see. It's a bullet. "The warehouse
14 branch manager is not the person on the dock" --
15 generally speaking I would agree with that.
16         But I'll add that these things are not
17 really visible or apparent to a company like Great
18 Southland. I think they're minor distinctions.
19     Q. On page 5, paragraph 6.
20     A. Yes.
21     Q. The last sentence says "It is not uncommon
22 for freight forwarders to refrain from use of a WMS
23 even where they utilize Cargowise and have the
24 option to activate the WMS function of that

Page 283

1  program." Agree, disagree or no opinion?
2      A. Somewhat agree. I think that's true in the
3  past, although I think that's been changing as
4  information systems have evolved and now more
5  freight forwarders are actually using different WMS
6  capabilities.
7      Q. When do you think that began to evolve?
8      A. Probably in the 2010 to 2020 time frame.
9      Q. And are you aware of any non-asset based
10 freight forwarders who do utilize a WMS?
11     A. I am not. I would refer to whatever Evan
12 Armstrong said about that.
13     Q. So no opinion on that?
14     A. No, no opinion.
15     Q. Okay. On paragraph 7 it says "A WMS would
16 not necessarily catch multiple entries of the same
17 inventory into the system. For example, some WMS
18 only validate the inventory against the same
19 storer." Agree, disagree or no opinion?
20     A. Yeah, I think I agree with that.
21     Q. Page 6, paragraph 13.
22     A. Yes.
23     Q. It says "I have seen no indication that
24 Roadmaster failed to appropriately maintain

Page 284

1  inventory or that XPO had a reason to believe that
2  was the case, or that Roadmaster's handling of the
3  inventory contributed to fraud." Agree, disagree or
4  no opinion?
5      A. I'm not sure I completely agree with the
6  second part of that sentence, that Roadmaster's
7  handling -- in other words if you take the part "I
8  see no indication that handling of inventory
9  contributed to the fraud," I'm not totally sure I
10 agree with that. Because the fault not necessarily
11 being Roadmaster's, but if the way that XPO set up
12 the relationship with Roadmaster contributed to the
13 fraud.
14     Q. But is there anything that you think a
15 Roadmaster did or didn't do that contributed to the
16 fraud?
17     A. Well in a way, yes. They shouldn't have
18 signed a lease agreement if they were actually
19 providing services.
20     Q. Do you have a sense of the magnitude of
21 services that went back and forth between Roadmaster
22 and XPO at the Houston location?
23     A. No.
24     Q. Do you have a sense of the dollar amount on

Page 285

1  an annual basis of those relations or those
2  transactions between Roadmaster and XPO?
3      A. I don't know the dollar amount, but I will
4  say that in the depositions one of those managers of
5  Baltagi when asked about the markup process for the
6  Roadmaster invoices indicated that it was a standard
7  thing. That it was not exceptional for Roadmaster
8  to provide services.
9      Q. I'm sorry, whose testimony was that?
10     A. It was -- I believe it was Muzi or Shook.
11 There were several questions about how Roadmaster's
12 costs were passed through to the customer and the
13 answer was that they were -- there was a standard
14 process with a markup which indicates or implies
15 that there was sufficient volume that this was not
16 just a one time exception.
17     Q. But in terms of what the specific volume
18 was you're just not sure?
19     A. That's true.
20     Q. On page 7, paragraph 18 talks about
21 Roadmaster not being a bonded warehouse.
22     A. Yes.
23     Q. What's your understanding of what a bonded
24 warehouse is?

Page 286

1    A. One that's used for goods in transit that
2  has specific secure stopping locations.
3    Q. If you're somewhat knowledgeable in the
4  industry are you able to identify a bonded warehouse
5  by sight if you do an inspection? I guess not an
6  inspection, a walk-through?
7    A. It's hard to tell in my experience, because
8  you might get a general idea from looking around at
9  locks and gates and surveillance cameras that it's a
10  secure warehouse. But the difference between a
11  secure warehouse and a bonded warehouse is harder to
12  tell in my experience. Unless somebody tells you
13  it's a bonded warehouse.
14    Because the bonding refers to the insurance
15  that the operator has, the policy they have on the
16  ability to cover damages and losses and other things
17  which can be reduced by the proper surveillance and
18  security measures.
19    So that information is usually something
20  that people have told me. For example, I'd be
21  walking through a warehouse and somebody would say
22  this is a bonded warehouse.
23    Q. And is the bonding related to the
24  insurance? Whether you have insurance that makes it

Page 287

1  bonded?
2    A. I'm really not totally sure on this. So I
3  would have to refer to a definition somewhere.
4    Q. So fair to say that you don't have an
5  opinion about whether or not Roadmaster was a bonded
6  warehouse?
7    A. I saw nothing in the material I read to
8  believe it was a bonded warehouse. That being said,
9  I have no idea whether it's -- whether it's -- what
10  its insurance policies are. What it represents
11  itself as to external parties besides Great
12  Southland.
13    Q. Okay. Just hopping back to your main
14  report for just a moment. I just want to circle
15  back to something that we talked about earlier on
16  page 23. Let me know when you're there. I can
17  share screen if it's easier.
18    A. Was this in my file?
19    Q. Sorry?
20    MR. BETTA: She was just -- Martha was just
21  talking about page 23 of your main report.
22    A. Yeah, which according to what I see here is
23  a bunch of reviews about one of my books.
24    Q. Let me share screen.

Page 288

1    A. Oh, I see. Okay.
2    Q. So I'm struggling a little bit because I
3  think you previously testified that you had not seen
4  a complete Spruce Point report that we showed that
5  had the truck on the front. And here, you can see
6  where my mouse is in the middle of page 23 of 49
7  that says "The complete Spruce Point report can be
8  found in Appendix A."
9    A. Yes. I believe that that document -- at
10  the time I wrote that I believed that was the
11  complete report.
12    Q. Okay. And I'm just going to scroll down.
13  This that I'm showing you on page 31 and -- well
14  page 29, 30 and 31.
15    A. Right.
16    Q. This is what you were referring to as the
17  Spruce Point report?
18    A. Yes.
19    Q. So it's your testimony that Appendix A is
20  not that full 67 or whatever it was page Spruce
21  Point report?
22    A. Yes, that's correct. That is not what I
23  was referring to, the big document that you showed
24  me earlier.

Page 289

1    Q. Okay. Give me just a sec.
2    Appendix 5 here, scrolling to page 3. This
3  is the investor report that we were just looking at.
4  It's just that two-pager; is that right?
5    A. Correct.
6    Q. Okay. Thank you for clarifying that.
7    MS. MOTLEY: Let's take a quick five and I
8  think I'm almost done.
9    THE WITNESS: Okay.
10    (Recess was taken at 5:28 p.m.)
11    (Reconvened at 5:33 p.m.)
12    MS. MOTLEY: I have just a couple more
13  questions.
14    Q. (By Ms. Motley) Do you know whether
15  Roadmaster was a CFS?
16    A. I don't.
17    Q. What research or investigation did you do
18  to determine that XPO did not have a TQM?
19    A. What do you mean when you say TQM?
20    Q. No. Let me -- hang on. Do I mean to say
21  TMQ?
22    A. That doesn't help much either. Do you mean
23  a WMS?
24    Q. No.

Page 290

1    **A.  A TLA?  A three letter acronym?**

2    Q.  It's a three letter acronym that relates

3  to -- hang on.  Let me find it.

4    **A.  A CFS?**

5    Q.  Golly, I don't know where it is.  Hang on.

6  Let me look in one more spot.

7       It was in connection with one of your

8  opinions about how XPO should have done a KYZ.

9  Nothing?  Gosh, give me just a second.  I'm not

10  sure -- total quality management system.

11    **A.  Mm-hmm.**

12    Q.  Okay.  And I must've just abbreviated that

13  in my notes as a TQM.

14       Why is it your opinion that XPO did not have

15  a total quality management system?

16    **A.  I never rendered an opinion on that.**

17    Q.  Okay.  Did you review the lawsuit or

18  lawsuits filed between Midwest Coal and Star

19  Funding?

20    **A.  I don't think that was in the list of**

21  **materials that I reviewed.  If it wasn't on my list**

22  **and we haven't talked about it today, no.**

23    Q.  Okay.  And you've never personally signed a

24  warehouse receipt?

Page 291

1    **A.  No.**

2    MS. MOTLEY:  I think those are all of my

3  questions.  I appreciate your time.

4    **THE WITNESS:  My pleasure.  Thank you very**

5  **much.**

6    MS. MOTLEY:  Do you want to give the reading

7  instructions, Tony?

8    MR. BETTA:  No, you can.  That's okay.

9    We'd like to read.

10    MS. MOTLEY:  Okay.  All right.  Thanks

11  everyone.

12    (Whereupon the deposition concluded at 5:38

13  p.m.)

14

15

16

17

18

19

20

21

22

23

24

Page 292

1               C E R T I F I C A T E

2  COMMONWEALTH OF MASSACHUSETTS

3  Worcester, ss.

4       I, Jennifer A. Doherty, Certified

5  Shorthand Reporter and Notary in and for the

6  Commonwealth of Massachusetts, do hereby certify

7  that the foregoing Pages 1 to 118 to be a true,

8  complete and accurate transcript of the testimony of

9  the aforementioned hearing held at the time and

10  place hereinbefore set forth, to the best of my

11  knowledge, skill and ability.

12

13       IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY

14  HAND AND SEAL THIS 16TH DAY OF JULY, 2021.

15

16       *Jennifer A. Doherty for PRI*

17       Certified Shorthand Reporter

18       CSR No. 1398F95

19

20

21  My Commission Expires:

22  October 19, 2023

23

24

Page 293

1            CERTIFICATE OF COURT REPORTER

2       I, Jacqueline P. Travis, Registered

3  Professional Reporter, do certify that pages 119 to

4  291 of the deposition of DAVID S. JACOBY, in the

5  matter of Great Southland Limited v. Landash

6  Corporation, et al., on July 9, 2021, was

7  stenographically recorded by me; that the witness

8  provided satisfactory evidence of identification,

9  as prescribed by Executive Order 455 (O3-13) issued

10  by the Governor of the Commonwealth of Massachusetts,

11  before being sworn by me, a Notary Public in and for

12  the Commonwealth of Massachusetts; that the transcript

13  produced by me is a true and accurate record of the

14  proceedings to the best of my ability; that I am

15  neither counsel for, related to, nor employed by any

16  of the parties to the above action; and further that

17  I am not a relative or employee of any attorney or

18  counsel employed by the parties thereto, nor

19  financially or otherwise interested in the outcome

20  of the action.

21

22    *Jacqueline P. Travis for PRI*_____  July 21, 2021

23  Jacqueline P. Travis, RPR, CSR

24





390 S. Washington Avenue
Columbus, Ohio 43215-5542

**614.460.5000 • 800.229.0675**

fax 614.460.5566

www.priohio.com • pri@priohio.com

# WITNESS ERRATA SHEET

| Case Caption: | **GREAT SOUTHLAND LIMITED vs. LANDASH CORPORATION, ET AL.** |
| Deposition of: | **David Jacoby** |
| Date Taken: | **07/09/2021** |
| File Number | **RAW321498** |

**INSTRUCTIONS**

If there are any corrections, indicate them on this form, giving the change, page number, line number and reason for the change. Please print additional copies as needed or use a blank piece of paper.

**REASONS FOR CHANGES**

1) To clarify the record.
2) To conform to the facts.
3) To correct transcription errors

Page _____ of _____

| Page # | Line # | Change | Reason # |
|---|---|---|---|
| 1 | 15 | Change "10003" to "10023" | 2) To conform to the facts |
| 7 | 17 | Change "Dwayne Morris" to "Duane Morris" | 3) To correct transcription errors |
| 7 | 20 | Change "Dwayne Morris" to "Duane Morris" | 3) To correct transcription errors |
| 8 | 5-6 | Change "Dwayne Morris" to "Duane Morris" | 3) To correct transcription errors |
| 14 | 2 | Change "Backer" to "Barker" | 3) To correct transcription errors |
| 15 | 7-8 | Delete "and" | 3) To correct transcription errors |
| 17 | 4 | Change "five multiple" to "five" | 3) To correct transcription errors |
| 17 | 7 | chang e"kinals" to "kilns" | 3) To correct transcription errors |
| 14-65 | All | Not for public disclosure - NDA concern | 1) To clarify the facts |
| 30 | 7 | "in" should be "and" | 3) To correct transcription errors |
| 32 | 12 | change "during" to "to" | 3) To correct transcription errors |
| 33 | 22 | change "accumulative" to "cumulative" | 3) To correct transcription errors |
| 35 | 22 | Change "Ford Winno" to "Ford, Renault," | 3) To correct transcription errors |
| 36 | 9 | change "mulit" to "multi" | 3) To correct transcription errors |
| 37 | 11 | Change "in consumer" to "end consumer" | 3) To correct transcription errors |
| 43 | 3 | Change "getting existed" to "yet existed" | 3) To correct transcription errors |
| 46 | 17-18 | Change "the sort of the cornerstone store" to "a sort of cornerstone store" | 3) To correct transcription errors |
| 58 | 23 | Change "report to the" to "purport to be a" | 3) To correct transcription errors |
| 71 | 3 | Change "Monet" to "Moet" | 3) To correct transcription errors |
| 72 | 3 | Change "in" to "and" | 3) To correct transcription errors |
| 72 | 5 | Change "Valet" to "Vale" | 3) To correct transcription errors |
| 78 | 5 | Delete the word "set" | 3) To correct transcription errors |
| 79 | 3 | Change "branding" to "running" | 3) To correct transcription errors |

**＊ ＊ ＊ ＊ ＊**

I, **David Jacoby**, have read the foregoing transcript of my deposition given on **07/09/2021**; together with the corrections on this page noting changes in form or substance, if any, it is true and correct.

Date: __July 27, 2021_____     Signature: _David Steven Jacoby_____



**390 S.Washington Avenue**
Columbus, Ohio 43215-5542

**614.460.5000 • 800.229.0675**

fax 614.460.5566

www.priohio.com • pri@priohio.com

*prompt. precise. professional.*

# WITNESS
# ERRATA SHEET

| | |
|---|---|
| Case Caption: | **GREAT SOUTHLAND LIMITED vs. LANDASH CORPORATION, ET AL.** |
| Deposition of: | **David Jacoby** |
| Date Taken: | **07/09/2021** |
| File Number | **RAW321498** |

**INSTRUCTIONS**
If there are any corrections, indicate them on this form, giving the change, page number, line number and reason for the change. Please print additional copies as needed or use a blank piece of paper.

**REASONS FOR CHANGES**
1) To clarify the record.
2) To conform to the facts.
3) To correct transcription errors

Page _____ of _____

| Page # | Line # | Change | Reason # |
|---|---|---|---|
| 80 | 3 | Change "Norvair" to "Norbert" | 3) To correct transcription errors |
| 80 | 14 | Change "Norvair" to "Norbert" | 3) To correct transcription errors |
| 81 | 19 | Change "creditable" to "credible" | 3) To correct transcription errors |
| 88 | 13 | Change "heavy" to "have an" | 3) To correct transcription errors |
| 89 | 2 | Change "CSPC" to "CSCP" | 3) To correct transcription errors |
| 91 | 3 | Delete "have been" | 3) To correct transcription errors |
| 92 | 19 | Change "served" to "cited" | 3) To correct transcription errors |
| 97 | 16 | remove umlaut from Abington | 3) To correct transcription errors |
| 97 | 17 | remove umlaut from Abington | 3) To correct transcription errors |
| 98 | 5 | Change "SP" to "SAP" | 3) To correct transcription errors |
| 99 | 16 | Change "sense" to "place" | 3) To correct transcription errors |
| 101 | 24 | Change "exhibit" to "exhibits" | 3) To correct transcription errors |
| 104 | 5 | Change "cocx" to "docx" | 3) To correct transcription errors |
| 105 | 11 | Change "force" to "source" | 3) To correct transcription errors |
| 109 | 11 | Change "LPL" to "LTL" | 3) To correct transcription errors |
| 110 | 5 | Change "asset-liked" to "asset-light" | 3) To correct transcription errors |
| 110 | 13 | Change "asset-liked" to "asset-light" | 3) To correct transcription errors |
| 110 | 15 | Change "proceduric" to "strategic" | 3) To correct transcription errors |
| 112 | 24 | Change "Shook" to "Komsky" | 2) To conform to the facts |
| 113 | 18 | Change "Shook" to "Komsky" | 2) To conform to the facts |
| 113 | 19 | Change "Shook" to "Komsky" | 2) To conform to the facts |
| 114 | 3 | Change "Shook" to "Komsky" | 2) To conform to the facts |
| 114 | 13 | Change "Shook" to "Komsky" | 2) To conform to the facts |
| 114 | 14 | Change "Mutton" to "Muzi" | 3) To correct transcription errors |

\*  \*  \*  \*  \*

I, **David Jacoby**, have read the foregoing transcript of my deposition given on **07/09/2021**; together with the corrections on this page noting changes in form or substance, if any, it is true and correct.

Date: _____July 27, 2021_____       Signature: *David Steven Jacoby*



**390 S.Washington Avenue**
Columbus, Ohio 43215-5542

**614.460.5000 • 800.229.0675**

fax 614.460.5566

www.priohio.com • pri@priohio.com

*prompt. precise. professional.*

# WITNESS ERRATA SHEET

Case Caption: **GREAT SOUTHLAND LIMITED vs. LANDASH CORPORATION, ET AL.**
Deposition of: **David Jacoby**
Date Taken: **07/09/2021**
File Number **RAW321498**

**INSTRUCTIONS**
If there are any corrections, indicate them on this form, giving the change, page number, line number and reason for the change. Please print additional copies as needed or use a blank piece of paper.

**REASONS FOR CHANGES**
1) To clarify the record.
2) To conform to the facts.
3) To correct transcription errors

Page _____ of _____

| Page # | Line # | Change | Reason # |
|--------|--------|--------|----------|
| 115 | 19 | Change "CTL" to "CGL" | 3) To correct transcription errors |
| 121 | 4 | delete "we or" | 3) To correct transcription errors |
| 121 | 15 | Change "rouge" to "rogue" | 3) To correct transcription errors |
| 133 | 13 | Change "community in" to "could be" | 3) To correct transcription errors |
| 133 | 14 | Change "mediums" to "medians" | 3) To correct transcription errors |
| 147 | 6 | Change "Jacody" to "Jacoby" | 3) To correct transcription errors |
| 168 | 22 | Change "rigger" to "rigor" | 3) To correct transcription errors |
| 170 | 7 | Change "reporting" to "purporting" | 3) To correct transcription errors |
| 179 | 1 | capitalize "Workspace" | 3) To correct transcription errors |
| 183 | 5 | Change "SaaS" to "SAS" | 3) To correct transcription errors |
| 184 | 9 | Change "SaaS" to "SAS" | 3) To correct transcription errors |
| 184 | 14 | Change "SaaS" to "SAS" | 3) To correct transcription errors |
| 212 | 12 | Add "a": "for a transaction" | 3) To correct transcription errors |
| 215 | 11 | Change "hold" to "role" | 3) To correct transcription errors |
| 217 | 24 | Delete "not" | 2) To conform to the facts |
| 218 | 18 | Change "nothing" to "anything" | 1) To clarify the facts |
| 220 | 8 | Change "Beckton" to "Vecrim" | 3) To correct transcription errors |
| 221 | 5 | Change "Beckton" to "Vecrim" | 3) To correct transcription errors |
| 221 | 6 | Change "Curby" to "Kirby" | 3) To correct transcription errors |
| 221 | 7 | Change "Curby" to "Kirby" | 3) To correct transcription errors |
| 222 | 5 | Change "even" to "not" | 3) To correct transcription errors |
| 235 | 17 | Change "Purchasing Center" to "PurchasingCenter" | 3) To correct transcription errors |
| 236 | 13 | Change "contracts" to "contract" | 3) To correct transcription errors |
| 236 | 23 | Change "employee" to "employer" | 3) To correct transcription errors |

**\* \* \* \* \***

I, **David Jacoby**, have read the foregoing transcript of my deposition given on **07/09/2021**; together with the corrections on this page noting changes in form or substance, if any, it is true and correct.

Date: ___July 27, 2021_____     Signature: _____*David Steven Jacoby*_____



390 S.Washington Avenue
Columbus, Ohio 43215-5542

**614.460.5000 • 800.229.0675**

fax 614.460.5566

www.priohio.com • pri@priohio.com

# WITNESS ERRATA SHEET

| | |
|---|---|
| Case Caption: | **GREAT SOUTHLAND LIMITED vs. LANDASH CORPORATION, ET AL.** |
| Deposition of: | **David Jacoby** |
| Date Taken: | **07/09/2021** |
| File Number | **RAW321498** |

**INSTRUCTIONS**
If there are any corrections, indicate them on this form, giving the change, page number, line number and reason for the change. Please print additional copies as needed or use a blank piece of paper.

**REASONS FOR CHANGES**
1) To clarify the record.
2) To conform to the facts.
3) To correct transcription errors

Page _____ of _____

| Page # | Line # | Change | Reason # |
|---|---|---|---|
| 238 | 13 | Change "supercede" to "supersede" | 3) To correct transcription errors |
| 245 | 4 | Change "I" to "you" | 3) To correct transcription errors |
| 250 | 6 | Change "trail" to "trial" | 3) To correct transcription errors |
| 257 | 10 | Change "described 2015" to "described and the 2015" | 3) To correct transcription errors |
| 257 | 16 | Change "Dahbi" to "Dhabi" | 3) To correct transcription errors |
| 266 | 18 | Change "Katherine" to "Catherine" | 3) To correct transcription errors |
| 269 | 10-12 | "For nearly a decade" contradicts Friedman testimony | 2) To conform to the facts |
| 270 | 10 | Delete "for Bunn" | 3) To correct transcription errors |
| 273 | 20 | Delete "Muzi got him to" | 3) To correct transcription errors |
| 273 | 24 | Change "Katherine" to "Catherine" | 3) To correct transcription errors |
| 285 | 10 | Change "Muzi or Shook" to "Komsky" | 2) To conform to the facts |
| 286 | 2 | Change "stopping" to "stocking" | 3) To correct transcription errors |
| 290 | 8 | Change "KYZ" to "KYC" | 3) To correct transcription errors |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**\* \* \* \* \***

I, **David Jacoby**, have read the foregoing transcript of my deposition given on **07/09/2021**; together with the corrections on this page noting changes in form or substance, if any, it is true and correct.

Date: ___July 27, 2021_____        Signature: *David Steven Jacoby*